COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
CHRISTOPHER P. SEEFER (201197)
SHIRLEY H. HUANG (206854)
SYLVIA SUM (207511)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
cseefer@csgrr.com
shuang@csgrr.com
ssum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re UTSTARCOM, INC. SECURITIES LITIGATION | Master File No. C-04-4908-JW(PVT) |
| | CLASS ACTION |
| This Document Relates To: | FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      INTRODUCTION ..............................................................................................1

II.    JURISDICTION AND VENUE ........................................................................9

III.   THE PARTIES.................................................................................................10

IV.   CONFIDENTIAL WITNESSES ....................................................................14

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
CLASS PERIOD.............................................................................................19

     A.    Lu, Sophie, Wu and Toy Falsely Represented that UTSI's Financial
          Results Were Fairly Presented in All Material Respects and that Lu and
          Sophie Had Designed, Maintained and Evaluated the Company's
          Disclosure Controls and Procedures and Concluded They Were Adequate
          and Effective ........................................................................................20

          1.     Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew
                 There Were Significant Internal Control Weaknesses Related to
                 Revenue Recognition ...............................................................27

          2.     Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew
                 There Were Insufficient Controls in Place to Assure Sales Were
                 Not Obtained by Bribing Foreign Government Officials in
                 Violation of the FCPA ..............................................................36

          3.     Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew
                 UTSI Failed to Properly Account for Stock Compensation
                 Expenses ...................................................................................38

          4.     Facts Raising a Strong Inference Lu, Sophie, Toy and Wu Knew
                 UTSI Failed to Disclose and Properly Account for Related-Party
                 Transactions ..............................................................................47

          5.     Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew
                 There Were Significant Internal Control Weaknesses Related to
                 Goodwill ...................................................................................49

          6.     Suspicious Insider Selling Strengthens the Inference Lu, Sophie,
                 Wu and Toy Knew About the Significant Internal Control
                 Weaknesses that Caused UTSI to Report Materially False and
                 Misleading Financial Results....................................................51

          B.    Lu and Sophie Falsely Represented There Was Strong Demand for the
          Company's PAS Systems When They Knew China Telecom and China
          Netcom Were Substantially Reducing Orders and Falsely Represented the
          Company's Backlog of Orders Provided "Tremendous Visibility" into
          Future Results When They Knew There Was No Reasonable Basis for the
          Guidance ...............................................................................................59

1

2                                                                          **Page**

3              1.     False and Misleading Statements in 2003..................................................59

4              2.     False and Misleading Statements in 2004..................................................85

5              3.     False and Misleading Statements in 2005..................................................123

6              4.     False and Misleading Statements in 2006..................................................138

7    VI.     LOSS CAUSATION/ECONOMIC LOSS ....................................................................140

8    VII.    CLASS ACTION ALLEGATIONS AND FRAUD ON THE MARKET
             PRESUMPTION OF RELIANCE ..................................................................................143
9
     VIII.   GROUP PLEADING AND CONTROL ........................................................................145
10
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      INTRODUCTION

1.      This is a securities fraud class action on behalf of all persons who purchased the publicly traded securities of UTStarcom, Inc. ("UTSI" or the "Company") between 2/21/03 and 10/12/07 (the "Class Period"), against UTSI and certain of its officers and directors for violations of §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§240.10b-5 and 240.14a-9, and against SOFTBANK Corporation ("SBC"), SOFTBANK America, Inc. ("SBA") and SOFTBANK Holdings, Inc. ("SBH") (collectively, "SOFTBANK") for violation of §20(a) of the 1934 Act.

2.      UTSI is an Alameda, California-based company that designs, manufactures, and sells wireless, "limited mobility" telecommunications systems known as Personal Access Systems ("PAS") to service providers that operate wireline and wireless networks in rapidly growing communications markets.  Prior to the Class Period, substantially all of the Company's sales (85%-98%) were to two service providers in China, China Telecom and China Netcom.  China was the largest and fastest growing communications market in the world, and UTSI dominated the PAS market, selling 62.5% of PAS infrastructure systems and 70% of PAS handsets by the end of 2002. UTSI's sales grew exponentially from $10 million in 1995 to $981 million in 2002.  The rapid sales growth continued during the Class Period – reported sales increased to $1.92 billion in 2003 ($1.7 billion or 86% from China) and $2.6 billion in 2004 ($2.0 billion or 79% from China).

3.      Defendant Hong Liang Lu ("Lu") was the Company's Chief Executive Officer ("CEO") throughout the Class Period.  Defendant Michael J. Sophie ("Sophie") was the Company's Chief Financial Officer ("CFO") until 9/05, and the Company's Chief Operating Officer ("COO") from 9/05 to 4/06 when he "resigned."  Defendant Ying Wu ("Wu") was, until his termination in 6/07, the CEO of UTStarcom China Company, Ltd. ("UTSI-China"), the Company's Chinese subsidiary.  Defendant Thomas J. Toy ("Toy") was a director of UTSI, chairman of the compensation committee and a member of the Audit Committee.  SOFTBANK was the Company's largest shareholder and third largest customer and, as reported in every Form 10-K UTSI filed with the Securities and Exchange Commission ("SEC"), has significant influence over UTSI's management and affairs.

4.       Lu, Sophie, Wu and Toy (collectively, "Individual Defendants") defrauded Class members by (1) causing UTSI to report materially false and misleading financial results in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's publicly reported accounting policies, (2) falsely representing that UTSI's financial results were fairly presented in all material respects, (3) falsely representing that Lu and Sophie had designed, established, and maintained adequate disclosure controls and procedures[1] to provide reasonable assurance that UTSI's financial reporting was reliable and in accordance with GAAP, and (4) falsely representing that Lu and Sophie had evaluated the Company's disclosure controls and procedures and concluded they were adequate and effective.

5.       As detailed herein, numerous facts from corroborating sources conclusively establish that each of these representations was materially false and misleading, and raise a strong inference that Lu, Sophie, Wu, and Toy knew it.  The Company has admitted that its financial results were not fairly presented in accordance with GAAP, and that UTSI's disclosure controls and procedures were not effective, but riddled with numerous material weaknesses.  In fact, the Company admitted there were (and still are) significant control deficiencies related to revenue recognition, cost of sales, inventory, deferred costs, inventory reserves, goodwill, accrued expenses, related-party transactions, and the preparation of the Company's financial statements.

6.       ***The Company has restated its financial statements three times so far, and admitted that every financial statement issued during the Class Period was materially false and misleading.***  The Company admitted that it improperly recognized more than $328 million of revenues on 84 transactions over six years (2000-2005), that it improperly failed to record $26.7 million of stock compensation expenses over eight years (1998-2005) and that it failed to record a $7.5 million impairment charge in 2003 on a related-party transaction.  As shown in the following chart, the three

_____

[1]       Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.  SEC Rule 13a-15(e), 17 C.F.R. §240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 2 -

1   restatements establish UTSI overstated net income by $121.5 million from 2000 to 2005 ($ in

2   millions):[2]

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Originally Reported Net Income (Loss) | $27.0 | $56.9 | $107.9 | $202.3 | $73.4 | ($487.4) |
| Restated Net Income (Loss) | $21.8 | $47.2 | $81.6 | $192.4 | $50.8 | ($532.6) |
| Amount Overstated | **$5.2** | **$9.7** | **$26.3** | **$9.9** | **$22.6** | **$45.2** |
| Percent Overstated | **23.8%** | **20.6%** | **32.2%** | **5.2%** | **44.5%** | **9.3%** |

7.     In 4/05, the Company admitted it did not have the ability to test for impairment of goodwill, and then recorded a $323 million charge to write off 100% of the Company's goodwill in 3Q05.  And the Company admitted that it did not have sufficient controls in place to ensure sales were not being obtained by bribing foreign government officials in violation of the Foreign Corrupt Practices Act ("FCPA"), causing investigations by the SEC and the Department of Justice ("DOJ") that will likely result in sanctions, including fines, disgorgement, and an injunction.

8.     The magnitude and duration of the significant internal control weaknesses, restatements, and impairment charges strongly infer Lu, Sophie, Wu, and Toy were at least deliberately reckless in representing that the Company's financial results were fairly presented in all material respects, and that UTSI's disclosure controls and procedures were adequate and effective. It is the only plausible inference when also considering the lawsuit filed against Lu, Sophie, and UTSI by the SEC on 5/1/08; the Cease & Desist Order ("C&D Order") Lu, Sophie, and UTSI agreed to in order to settle the suit; the Company's explanations for the restatements; information provided by former UTSI employees; the positions of Lu, Sophie, Wu, and Toy at UTSI; suspicious insider selling by Lu, Sophie, Wu, Toy, and other UTSI executives; the resignation of Sophie; the termination of Wu; and other facts detailed herein.

9.     These sources establish, among other things, that (1) Lu, Sophie, Wu, and Toy knew it was a common practice at UTSI to supplement or amend sales contracts with side letters that

---

[2]     On 6/1/06, the Company restated and reduced net income from 1Q05 to 3Q05 by $2.6 million, which was reflected in the $487.4 million net loss originally reported for FY05.

1    contained non-standard product upgrade provisions precluding revenue recognition; (2) Lu, Sophie,

2    and the Company's Audit Committee (of which Toy was a member) received multiple Management

3    Recommendation letters from UTSI's auditors *beginning in 3/03*, detailing multiple and significant

4    internal control weaknesses related to revenue recognition, including the need to "strengthen

5    procedures to ensure side letters and contract amendments are communicated and accounted for in a

6    timely manner"; and (3) UTSI improperly recognized $400 million of revenue on 84 sales

7    transactions between 2000 and 2005 because sales contracts were amended or supplemented with

8    product upgrade provisions.  The SEC summarized its factual findings in the C&D Order as follows:

9            This matter involves recurring internal control deficiencies and inaccurate
         financial filings by UTSI, a publicly-traded telecommunications company that has
10        restated its financial statements three times since 2005 to correct multiple accounting
         irregularities.  Since 2000, UTSI has improperly recognized revenue on transactions
11        subject to undisclosed side agreements, failed to properly disclose and account for
         related party transactions, and failed to properly record compensation expenses
12        related to employee stock options.  ***Despite being put on notice of potential
         accounting issues by, among other things, material weakness letters sent by the
13        company's outside auditors, CEO Hong Liang Lu and former CFO Michael J.
         Sophie failed to implement and maintain adequate internal controls and falsely
14        certified that UTSI's financial statements and books and records were accurate.***

15        10.    Lu and Sophie also defrauded Class members by making materially false and

16   misleading statements about the demand for the Company's PAS systems and the Company's future

17   financial results.  On 4/16/03 and 7/17/03, Lu and Sophie told investors that there was extraordinary

18   demand for the Company's PAS systems, that gross margins – a key metric closely followed by Wall

19   Street analysts – would be 34%-35% in 3Q03, 4Q03 and FY03, and that the billion-dollar backlog of

20   PAS orders and broadband equipment orders gave them a tremendous amount of visibility into

21   UTSI's future results.

22        11.    Lu and Sophie knew there was no reasonable basis for these statements for several

23   reasons.  First, they knew that China Telecom and China Netcom were substantially reducing orders

24   for PAS equipment by hundreds of millions of dollars in 2003, and that the reduced demand for PAS

25   equipment caused prices and gross margins to decline.  Second, they knew gross margins were being

26   negatively impacted by widespread operational problems described as pervasive and systemic by

27   former UTSI employees that delayed the development and delivery of the Company's products, and

28   caused the Company to deliver and install defective products that delayed customer acceptance and

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                          - 4 -

1   increased the costs of the backlogged sales.  Third, Lu and Sophie knew the significant internal

2   control weaknesses precluded them from knowing if UTSI was properly accounting for revenues,

3   stock compensation expenses, related-party transactions, and goodwill.

4          12.     UTSI originally reported a 31.8% gross margin for 3Q03, a 31% gross margin for

5   4Q03, and a 32.4% gross margin for FY03, not 34%-35%, confirming the substantially reduced

6   demand for PAS equipment, and the undisclosed operational problems prevented Lu and Sophie

7   from accurately forecasting the Company's future results.  Indeed, PAS equipment gross margins

8   declined from 40% in 2002 to 32% in 2003.  The restatements of the Company's financial results on

9   4/13/05, 6/1/06, and 10/10/07 caused the gross margins for 4Q03 and FY03 to decline to 29.1% and

10  the FY03 gross margin to decline to 31.6%, confirming the significant internal control weaknesses

11  also prevented Lu and Sophie from accurately forecasting UTSI's future results.

12         13.     On 10/23/03, 1/9/04, and 1/22/04, Lu and Sophie represented that in 2004, UTSI

13  would report gross margins of 30%-32%, $500-$600 million of international revenues (sales outside

14  of China) and earnings per share ("EPS") of $1.90-$1.94.  They assured investors that the guidance

15  was conservative, and that the billion-dollar backlog continued to give them tremendous visibility

16  into the Company's future results.  Lu and Sophie continued to know there was no reasonable basis

17  for the guidance because of the reduced demand for the Company's PAS systems, the pervasive and

18  systemic operational problems, and the significant internal control weaknesses.  Further, by 1/04, Lu

19  and Sophie also knew about another problem.  Sales of PAS handsets – and the profitability of those

20  sales – were rapidly declining due to intense competition and increased costs.

21         14.     On 4/27/04, UTSI reported a 1Q04 gross margin of 28.3%, substantially less than the

22  30%-32% Lu and Sophie told investors to expect, and lowered gross margin guidance.  But Lu and

23  Sophie told investors that UTSI would report $2.75 billion of revenues in 2004, and that gross

24  margins would increase throughout the year – to 27%-28% in 2Q04, to 29%-30% in 3Q04, and to

25  30%-31% in 4Q04.  They also said the substantial decline in PAS handset gross margins from 25%

26  in 4Q03 to 21% in 1Q04 would be offset by (1) the sale of PAS handsets with internally designed

27

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                              - 5 -

1   lower cost ASICs[3]; and (2) the sale of internally manufactured cellular handsets, when they knew

2   there were problems with the development of both that delayed their introduction.

3       15.     On 7/27/04, UTSI reported a 25.6% gross margin for 2Q04, substantially less than the

4   30%-32% Lu and Sophie told investors to expect in 10/03 and 1/04, and the 27%-28% they told

5   investors to expect on 4/27/04. Lu and Sophie again lowered gross margin guidance to 27% for the

6   rest of the year.  After knowing China Telecom and China Netcom had been reducing PAS

7   equipment orders by hundreds of millions of dollars in 2003 and 2004, and would not order any PAS

8   equipment in 3Q04, Lu and Sophie finally told investors that revenues from China PAS sales would

9   decline from $2.1 billion in 2004 to $1.5 billion in 2005.

10      16.     But Lu and Sophie assured investors gross margins had reached a low point in 2Q04,

11  that the Company would report $2.95-$3.0 billion of revenue in 2004, including $600 million from

12  higher margin international sales, and that EPS in 2004 would be $1.65-$1.70.  Further, Lu and

13  Sophie said the Company would report $4.0-$4.3 billion of revenues in 2005 (including $1.5 billion

14  from China PAS sales and $1.2-$1.3 billion from broadband sales), 27% gross margins, and EPS of

15  $2.20.  Lu and Sophie knew there was no reasonable basis for the guidance because of the

16  substantially reduced demand for PAS systems, the pervasive and systemic operational problems that

17  were delaying revenue recognition and increasing the costs of backlogged sales, and the significant

18  internal control weaknesses that prevented Lu and Sophie from knowing if UTSI was properly

19  reporting its financial results.

20      17.     Lu and Sophie subsequently lowered the guidance, UTSI originally reported results

21  that were substantially less than the guidance, and then UTSI subsequently restated and reduced the

22  originally reported results. Lu and Sophie lowered the guidance for 2004 on 9/20/04, 10/26/04, and

23  1/6/05, and UTSI originally reported $2.7 billion of revenue in 2004 (not $3.0 billion), $293 million

24  of international revenue (not $600 million), a gross margin of 22.3% (not 27%-28%), and EPS of

25  $0.64 (not $1.65-$1.70).  Revenues were restated and reduced to $2.58 billion, the gross margin was

26

27  [3]     An ASIC, or Application Specific Integrated Circuit, is a custom designed chip for a specific
    application.

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                          - 6 -

1   restated and reduced to 22.1%, and EPS was restated and reduced to $0.45.  PAS equipment gross

2   margins declined from 32% in 2003 to 29% in 2004, PAS handset gross margins declined from 25%

3   in 2003 to 18% in 2004 and broadband gross margins declined from 53% in 2003 to 20% in 2004.

4          18.     For 2005, the shortfalls were even larger.  UTSI originally reported $2.9 billion of

5   revenue (not $4.3 billion) that was subsequently restated and reduced to $2.87 billion.  UTSI

6   originally reported $968 million of revenues from sales of PAS equipment and handsets in 2005 (not

7   $1.5 billion) that was subsequently restated and reduced to $947 million.  The Company originally

8   reported $508 million of broadband revenues in 2005 (not $1.2-$1.3 billion) that was subsequently

9   restated and reduced to $449 million.  The Company originally reported a loss per share of $4.16 in

10  2005 that was subsequently restated and reduced to a loss of $4.55 per share.  PAS equipment gross

11  margins declined from 29% in 2004 to 26% in 2005 and PAS handset gross margins declined from

12  18% in 2004 to 12% in 2005. Broadband gross margins increased to 31% in 2005 – solely due to a

13  suspect related-party transaction with SOFTBANK affiliate Japan Telecom – and then became

14  negative in 2006.

15         19.     On 1/6/05, Sophie acknowledged that he and Lu could not accurately forecast the

16  Company's future results by stating that UTSI would provide guidance for only one quarter into the

17  future.  But Lu and Sophie could not even do that.  UTSI failed to report revenues, gross margins, or

18  EPS in line with guidance in 2Q05, 3Q05, and 4Q05, and then subsequently restated and reduced the

19  originally reported results.

20         20.     The materially false and misleading statements and omissions caused the price of

21  UTSI's securities to trade at artificially inflated prices.  From 2/21/03 to 8/21/03, the Company's

22  stock price increased 150% (compared to a 34% increase in the proxy peer group[4] and a 32%

23  increase in the NASDAQ)[5] and reached a Class Period high of $45.36.  The stock continued to trade

24  _____

25  [4]     The proxy peer group ("PPG") is the S&P Wireless Telecommunication Services index,
    which UTSI compared the performance of its stock to in the Company's Proxy Statements filed with
26  the SEC on 4/2/03, 4/7/04 and 4/18/05.

27  [5]     "NASDAQ" refers to the National Association of Securities Dealers Automated Quotation
    System.
28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                              - 7 -

in the $30.00-$40.00 range through 1/04, and Lu, Sophie, Wu, Toy, and other UTSI executives took advantage of the inflated stock price by selling 1.62 million shares of their UTSI stock for more than $58 million, including sales of 250,421 shares that the Individual Defendants and other UTSI executives acquired at illegally backdated exercise prices. They also used the inflated stock price to raise $475 million the Company needed to acquire cellular technologies and the handset division of Audiovox Communications Corporation ("Audiovox") to diversify UTSI's product offerings and reduce its dependence on the declining China PAS market. Indeed, Audiovox became the Company's Personal Communications Division ("PCD") and comprised 67% of UTSI's revenues in 2007.

21.    Class members who purchased UTSI securities at inflated prices were damaged when the artificial inflation was removed from the stock price as UTSI began to partially reveal the Company's true financial condition.

22.    The effects of the fraud have been devastating. The Company has restated its financial statements three times and admitted that UTSI improperly recognized $328 million in revenue and improperly failed to record $26.7 million of stock compensation expenses. Hundreds of millions of dollars in asset impairment and other charges have been recorded. The Company has also admitted that the numerous material weaknesses in UTSI's financial reporting controls have not been remedied and continue to plague the Company. The Company's workforce has declined from 8,200 employees at the end of 2004 to 5,100 employees as of 12/31/07. The Company has hired numerous additional accounting personnel, including a new CFO to replace defendant Sophie, who suspiciously resigned in 4/06 just before the second restatement was disclosed. The Company reported a $533 million net loss in 2005, a $117 million net loss in 2006, and a $196 million net loss in 2007, wiping out the $471.5 million of earnings reported from 2000 to 2004. The Company's auditors have concluded there is now substantial doubt whether UTSI can continue as a going concern.

23.    The SEC has initiated multiple investigations of the Company, recommended a civil injunctive suit against Lu alleging he violated §10(b) of the 1934 Act, and sued UTSI, Lu, and Sophie for falsely certifying that UTSI's financial statements, books, and records were accurate. The

1   SEC and the DOJ are investigating possible violations of the FCPA, which will probably result in

2   sanctions, including fines, disgorgement, and an injunction.  UTSI's stock price has not recovered

3   and currently trades at less than $5 per share.  UTSI's market capitalization has declined more than

4   90% from $4.5 billion in 8/03 to approximately $500 million today.

5         24.   The following chart (which is also attached hereto in foldout form) illustrates how the

6   false and misleading statements and omissions caused the price of UTSI's securities to be inflated,

7   and how Class members were damaged when the Company's true financial condition began to be

8   revealed to the market:



**UTStarcom Inc.**
Daily Share Pricing: February 2, 2003 to May 9, 2008

22   **II.     JURISDICTION AND VENUE**

23         25.   The claims asserted arise under §§10(b), 14(a) and 20(a) of the 1934 Act (15 U.S.C.

24   §§78j(b), 78n(a) and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder (17 C.F.R.

25   §§240.10b-5 and 240.14a-9).

26         26.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

27   §§1331 and 1337 and §27 of the 1934 Act (15 U.S.C. §78aa).

28

1    27.    Venue is proper pursuant to §27 of the 1934 Act.  Defendant UTSI has its principal

2  place of business at 1275 Harbor Bay Parkway, Suite 100, Alameda, California, and UTSI and/or the

3  Individual Defendants conduct business in this District and the wrongful conduct took place here.

4  **III.    THE PARTIES**

5    28.    On 3/15/05, the Court appointed Locals 302 and 612 of the International Union of

6  Operating Engineers-Employers Construction Industry Retirement Trust (the "Trust") and Erwin

7  DeBruycker as Lead Plaintiffs.  The Trust is a pension fund that is responsible for investing billions

8  of dollars in assets for the benefit of its participants.  Mr. DeBruycker is a sophisticated investor with

9  substantial experience in the telecommunications industry.  Plaintiffs Robert Lee Weese and

10  Gennadiy Sherman are individual investors.  All plaintiffs suffered significant losses in connection

11  with their transactions in UTSI stock, which are listed in Exhibit 1.

12    29.    Defendant UTSI was founded in 1991 and completed its initial public offering

13  ("IPO") on 3/3/00, selling 11.5 million shares at $18.00 per share for net proceeds of approximately

14  $189.4 million.  On 8/3/01, the Company completed a follow-on offering and sold 7.4 million shares

15  at $20.00 per share for net proceeds of approximately $140 million.  On 3/12/03, the Company

16  completed a private placement of $402.5 million of convertible subordinated notes which were

17  registered for resale in 8/03.  On 1/9/04, the Company sold 12.1 million shares to Banc of America

18  Securities LLC ("Banc of America") at $39.50 per share for net proceeds of approximately $475

19  million.  The Company is headquartered in Alameda, California, and listed on the NASDAQ.

20    30.    Defendant Hong Liang Lu ("Lu") was, throughout the Class Period, CEO, President

21  and a director.  Lu participated in the quarterly conference calls and assisted in the preparation of the

22  false releases.  Lu signed the false and misleading Forms 10-Q for 1Q03-2Q06, the Forms 10-K for

23  FY02-FY05, and the Registration Statements filed in connection with the Class Period securities

24  offerings.  As required by §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Lu certified

25  UTSI's financial results were fairly presented and that the Company's disclosure controls and

26  procedures were adequate and effective.  UTSI has since admitted these certifications were false.

27  During the Class Period, Lu sold 215,000 shares of UTSI stock at inflated prices, for proceeds of

28  over $8.1 million.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                          - 10 -

31.     Defendant Michael J. Sophie ("Sophie") was, from the start of the Class Period until 9/05, CFO and Vice President ("VP") of Finance.  In 6/05, Sophie was "promoted" to Executive Vice President ("EVP") and COO and replaced as CFO by Fran Barton ("Barton").   Sophie "resigned" in 4/06.  Sophie participated in the quarterly conference calls and assisted in the preparation of the false releases.  Sophie signed the false and misleading Forms 10-Q for 1Q03-2Q05 and the Forms 10-K for FY02-FY04.  Sophie also certified UTSI's financial results were fairly presented and that the Company's disclosure controls and procedures were adequate and effective. During the Class Period, Sophie sold 228,322 shares of UTSI stock, for proceeds of over $7.1 million.

32.     Defendant Ying Wu ("Wu") was a co-founder of the Company and until his termination in 6/07 was EVP and Vice Chairman of the Board of Directors of UTSI.  Wu was also Chairman and CEO, and until 2/04, President of UTSI-China, UTSI's Chinese subsidiary.  Wu was also the founder and President of Starcom.  Wu assisted in the preparation of the false statements issued to the market.   Wu signed the false and misleading Registration Statements filed in connection with the securities offered during the Class Period and the Forms 10-K for FY02-FY05. During the Class Period, Wu sold 595,000 shares of UTSI stock at inflated prices, for proceeds of over $22.8 million.

33.     Defendant Thomas J. Toy ("Toy") was, throughout the Class Period, a director of UTSI, chairman of the compensation committee and a member of the Audit Committee.  Toy assisted in the preparation of the false statements issued to the market.  Toy signed the false and misleading Registration Statements filed in connection with the Class Period securities offerings and the Forms 10-K for FY02-FY05, which contained false and misleading statements.  During the Class Period, Toy sold 70,000 shares of UTSI stock at inflated prices, for proceeds of over $2.7 million.

34.     Defendant SBA, a Delaware corporation, is a wholly owned subsidiary of defendant SBH, a Delaware corporation, which is a wholly owned subsidiary of defendant SBC, a Japanese corporation.  During the Class Period, non-party Masayoshi Son ("Son") was the President, CEO, Chairman and largest shareholder of SBC.  Son also was CEO and Chairman of SBH and Chairman of SBA.  According to UTSI's SEC filings and SBC's website, Son was also (1) president and CEO

1  of SoftBank BB Corporation ("SBBC"), a subsidiary of SBC and customer of UTSI, and

2  (2) Representative Director Chairman of Japan Telecom, a customer of UTSI.

3      35.   Son co-founded UTSI and served as UTSI's Chairman of the Board from 10/95 to

4  3/03 and as a director until 9/15/04.  UTSI reported in its 2002 Form 10-K that Son was ***SBA's***

5  ***designee*** on UTSI's Board and Son signed UTSI's Forms 10-K for 2002 and 2003.  According to

6  UTSI's 9/20/04 press release, Son resigned from the Board so that UTSI could comply with the

7  NASDAQ requirement to have the Board "comprised of a majority of independent directors to

8  ***minimize conflicts of interests and improve corporate governance***."

9      36.   Defendants SOFTBANK and UTSI engaged in numerous related party transactions.

10  SOFTBANK was the Company's third largest customer and its largest stockholder.  SOFTBANK

11  owned 60% of the Company's common stock at the time of UTSI's IPO and had three Directors on

12  the Board.  On 4/5/03, UTSI repurchased eight million shares of the Company's stock from

13  SOFTBANK for $139.6 million which reduced SOFTBANK's ownership of UTSI's shares from

14  21.2% in 2002 to 14.1% in 2003.  In 2004, SOFTBANK's ownership of UTSI's stock declined to

15  12.8% because UTSI issued 12.1 million additional shares in 1/04. It was reported in SOFTBANK's

16  Schedule 13G filings and UTSI's Proxy filings that the shares were registered in the name of SBA,

17  but that SBC, SBH, SBA and Son were all beneficial owners of the shares and had the shared power

18  to vote or dispose of the shares.

19      37.   In its Form 10-K for 2002, 2003 and 2004, UTSI admitted that SOFTBANK's stock

20  ownership gave it the ability to significantly influence all matters submitted to the Company's

21  stockholders for approval, as well as UTSI's management and affairs.  In the 2004 Form 10-K, UTSI

22  reported the following:

23        SOFTBANK CORP. and its related entities, including ***SOFTBANK America, Inc.,***
24        ***have significant influence over our management and affairs, which it could***
          ***exercise against the best interests of our stockholders***.

25           ***SOFTBANK CORP. and its related entities, including SOFTBANK***
        ***America Inc. (collectively, "SOFTBANK")***, beneficially owned approximately
26        12.8% of our outstanding stock as of December 31, 2004.  As a result, ***SOFTBANK***
        ***has the ability to influence all matters submitted to our stockholders for approval,***
27        ***as well as our management and affairs***.

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)             - 12 -

In addition, UTSI disclosed in its 2002 Form 10-K that SBA had the ability to control UTSI through Son:

> ***SOFTBANK CORP. AND ITS RELATED ENTITIES, INCLUDING SOFTBANK AMERICA INC., HAS SIGNIFICANT INFLUENCE OVER OUR MANAGEMENT AND AFFAIRS, WHICH IT COULD EXERCISE AGAINST YOUR BEST INTERESTS***
>
> SOFTBANK CORP. and its related entities, including ***SOFTBANK America Inc., beneficially own 21.2% of our outstanding stock***. As a result, SOFTBANK CORP. and its related entities, including SOFTBANK America Inc., ***have the ability to exercise significant influence over all matters submitted to our stockholders for approval and exert significant influence over our management and affairs***.
>
>        *       *       *
>
> The interests of SOFTBANK America Inc. may not always coincide with our interests. ***SOFTBANK America Inc., acting through its designees [(i.e., Son)] on the Board of Directors and through its ownership of voting securities, will have the ability to exercise significant influence over our actions irrespective of the desires of our other stockholders or directors.*** On August 29, 2002, we completed the repurchase of six million shares of our common stock for $72.9 million from SOFTBANK CORP., reducing their beneficial ownership to 21.2%.

38.      SOFTBANK was also a customer, and UTSI reported the following amounts of sales to SOFTBANK from 2002 to 2007:

| 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|
| $123 million | $184.4 million | $143.7 million | $475.3 million | $130.8 million | $67.8 million |

39.      As detailed herein, there were problems with the broadband products sold to the SOFTBANK affiliates that delayed revenue recognition and increased costs.

40.      UTSI also invested with SOFTBANK. Following the Company's 2000 IPO, UTSI invested $10 million in SOFTBANK China, an investment fund established by SOFTBANK focused on investments in Internet companies in China. During 1Q02, the Company invested $2 million in Restructuring Fund No. 1, a venture capital investment limited partnership established by an affiliate of SOFTBANK, which focuses on leveraged buyout investments in companies in Asia undergoing restructuring or bankruptcy proceedings. On 7/17/03, the Company entered into a $10.1 million Mezzanine Loan Agreement and modem rental and service agreements with other SOFTBANK affiliates. UTSI and SOFTBANK Asia Infrastructure Fund ("SAIF"), a venture capital fund affiliated with SOFTBANK, invested in MDC Holdings Limited ("MDC") with UTSI's employees

1   owning 67% of MDC and holding key management positions.  UTSI registered MDC's websites and

2   formed a strategic business relationship with MDC.  UTSI failed to disclose this affiliated

3   transaction with SOFTBANK or its investment in MDC as required by GAAP until UTSI restated its

4   2003 financial statements on 4/13/05.

5       41.   SOFTBANK also invested with China Netcom, one of UTSI's largest customers.  On

6   1/30/03, CNN reported the U.S. bankruptcy court approved the purchase of Asia Global Crossing by

7   China Netcom and its partners, including SAIF.

8   **IV.   CONFIDENTIAL WITNESSES**

9       42.   Several of the allegations included herein are based on information provided by

10  several former UTSI employees referred to as confidential witnesses ("CW").  The information

11  provided by the former employees is reliable and credible because (1) each of the witnesses (except

12  CW9) worked at UTSI during the Class Period, (2) each witness stated they had personal knowledge

13  of the information provided, (3) the witnesses' job titles and responsibilities show they had personal

14  knowledge of the information provided, (4) many of the witness accounts corroborate one another

15  and (5) the witness accounts are corroborated by other information alleged herein.

16      43.   CW1 was a supervisor for Order Processing at the Company's Alameda facility from

17  6/03 until 10/03.  CW1 reported to controller Elsa Liu ("Liu"), who reported to VP of Finance Gloria

18  Fan ("Fan"), who reported to Sophie.  CW1 supervised the staff that entered international sales

19  orders into the Company's QAD accounting system.  CW1 stated the Company improperly recorded

20  revenue on orders that were entered into QAD as accepted even though the customer had not yet

21  accepted the sale.  CW1 also said that costs of sales were understated on the orders entered into

22  QAD if the order did meet predetermined gross margin requirements.

23      44.   CW2 was an order administration specialist from 9/03 to 12/03 when CW2 resigned.

24  CW2 reported to CW1 and controller Liu.  CW2 entered international purchase orders into the QAD

25  system and also stated the orders were improperly entered as accepted and that costs of sale were

26  understated.  CW2 has personal knowledge of the Company's manufacturing problems in China, as

27  CW2 handled product returns.

28

45.     CW3 was a product manager at the Company's Alameda facility from 9/02 until 6/05 when CW3 was laid off as part of UTSI's 1,400 employee reduction in force.  CW3 served as a liaison between the UTSI sales operations personnel and the Hangzhou factory personnel to fulfill customer orders.  As explained below, CW3 has first hand knowledge about the Company's poor internal controls and manufacturing processes, including the systemic part numbering problems that led to delays in product delivery.  CW3 also knew about problems with UTSI's broadband products, including products sold to Japan Telecom.

46.     CW4 was a manager of UTSI's ASIC Engineering Group at the Company's Fremont, California facility from 4/04 until 8/04 when CW4 resigned.  CW4 oversaw the development of an ASIC that was intended for use in PAS handsets, and supervised a group of engineers, including the engineers in Shanghai, China, for that project.  As explained below, CW4 stated there were delays in producing the ASICs which had not been resolved by 9/04 when CW4 resigned.

47.     CW5 worked at 3Com Corporation ("3Com") prior to the 5/03 acquisition of Commworks by UTSI and was a contract employee for UTSI until 6/05 when CW5 was laid off as part of UTSI's 1,400 employee reduction in force.  CW5 was involved with UTSI's effort to enter the U.S. and Latin American cellular handset markets and said there were numerous problems with the Company's Code Division Multiple Access ("CDMA") handsets that UTSI intended to sell through the Audiovox channel.

48.     CW6 was a director of field and customer marketing at UTSI from 3/03 to 10/05 when CW6 resigned.  CW6 assisted prospective and current PAS customers with sales and marketing plans to launch services using UTSI's PAS equipment.  As explained herein, CW6 said there were problems with the quality of PAS handsets sold in Vietnam that led to customer complaints.  In addition, CW6 stated UTSI's efforts to sell PAS in Africa were largely unsuccessful and that coverage was terrible leading to regular complaints from subscribers.  CW6 also said there were a number of problems with UTSI's technology, including the Company's mVision TVoIP (Television over Internet Protocol) technology that led to delays in customers, including DSSI LLC ("DSSI"), providing final acceptance and paying for the equipment.

49.     CW7 served as the VP of International Sales and Marketing from 5/02 to 4/05.  CW7 reported directly to defendant Lu.  CW7 was deposed by the SEC and said the SEC investigation was focused on the related party deal between UTSI and Japan Telecom and the Company's revenue recognition and financial reporting procedures and practices.

50.     CW8 was a project manager for UTSI's research and development ("R&D") facility in Iselin, New Jersey from 2000 to 3/05 when CW8 was laid off.  CW8 managed, developed and tested products manufactured by the Company.  As detailed below, CW8 has personal knowledge of the problems associated with the development of iAN-8000 equipment sold to Japan Telecom.

51.     CW9 worked for DSSI for approximately four years as a senior network engineer until 9/05 when CW9 resigned.  CW9 tested and worked with the mVision and mSwitch equipment UTSI supplied to DSSI and, like CW6, stated there were numerous problems with the equipment that resulted in DSSI refusing to pay UTSI.

52.     CW10 was an international product manager at UTSI's Hangzhou, China facility from 6/03 through 9/04 when CW10 resigned.  CW10 was responsible for wireline products, wireless products, and Internet Protocol ("IP") switching solutions.  CW10 stated that unethical business conduct at UTSI was so widespread that everybody knew about them, including the Company's practice of managing earnings and profits through accounting manipulations, such as allocating or shifting profit or R&D costs to meet certain financial numbers.

53.     CW11 was a billing supervisor at UTSI from 1/06 to 3/06 when CW11 was terminated.  CW11 was hired to help improve UTSI's billing controls.  As detailed below, CW11 said there were millions of dollars of receivables included in the Oracle system for which UTSI did not have supporting documentation to confirm the customer was ever billed and other receivable balances are so old that collection is uncertain.

54.     CW12 was UTSI's director of southeast operations for the Indian subcontinent from 2000 to 5/05 when CW12 resigned.  CW12 worked in India and was responsible for establishing and managing the Company's India operations.  CW12 believed the $22 million of improperly recognized revenue reported by UTSI on 2/9/06 and restated on 5/24/06 was related to a transaction

1    with Reliance and that it was possible the revenue was improperly recognized to smooth out earnings

2    and report results in line with guidance.

3         55.    CW13 was an engineering manager at UTSI from 11/04 to 5/06 when CW13

4    resigned.  CW13 worked in the broadband business unit and led a team of engineers responsible for

5    designing and developing UTSI's NetRing product which was part of the GEPON (Gigabit Ethernet

6    Passive Optical Network) Fiber-to-the-Home ("FTTH") and IPTV (Internet Protocol Television)

7    offerings.  CW13 described problems with the Company's broadband products in 2004 and 2005 that

8    caused SBBC to demand replacement of the defective product, incur millions of dollars in additional

9    expenses and UTSI to sue the supplier of chips it believed was the cause of the product problems.

10        56.    CW14 was a manager of financial planning and analysis at UTSI from 3/06 to 8/06

11   when CW14 resigned.  According to CW14, both Sophie and Fan were pushed out of the Company

12   because senior management wanted to get rid of the regime that had caused so many problems.

13   CW14 also had concerns regarding the Company's revenue recognition practices because all revenue

14   recognized was based on Excel spreadsheets submitted by business units that (1) did not include

15   supporting documentation, (2) did include errors and (3) could not be reconciled with other reports.

16   In fact, CW14 left UTSI because of concerns about the Company's internal controls.

17        57.    CW15 was a production manager at UTSI from 5/04 to 2/06 when CW15 resigned.

18   CW15 reported to production manager John Zhang who reported to Chief Technology Officer

19   William (Bill) Huang ("Huang").  CW15 was responsible for managing the contractors that were

20   manufacturing UTSI's ASIC chips for inclusion in the Company's PAS handsets.  CW15 stated that

21   the first internally developed ASICs were shipped to the Company's Hangzhou facility in 9/05 for

22   incorporation into the PAS handsets.  CW15 also said that Huang supervised the design and

23   development of the ASICs.

24        58.    CW16 worked at 3Com prior to the 5/03 acquisition of 3Com's Commworks division

25   by UTSI and was a senior network system engineer and project manager at UTSI from 5/03 until

26   10/07 when CW16 was laid off.  CW16 worked at the Company's Rolling Meadows, Illinois facility

27   and in Pensacola, Florida.  As detailed below, CW16 described problems with the mVision TVoIP

28   product sold to DSSI that led to the contract being canceled, the failure of the Company's R&D

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 17 -

engineers in China to resolve product quality issues, and the failure of the Company's R&D engineers in China to maintain necessary documentation on the development of products that prevented the identification of why products were failing.  In addition, CW16 said that customers refused to pay for product because contract terms had not been satisfied and that in 2004 and 2005 the Company's auditors, PricewaterhouseCoopers LLP ("PWC"), told UTSI it had to reverse revenues improperly recognized on contracts that included service requirements that had not been fulfilled.

59.     CW17 worked at 3Com prior to the 5/03 acquisition of 3Com's Commworks division by UTSI and was a senior service logistics operations manager at UTSI from 5/03 until 1/08 when CW17 was laid off.  CW17 was responsible for managing the repair of products returned by UTSI customers.  As detailed below, CW17 described problems with manufacturing that caused product problems, the failure of the Company's manufacturing personnel to maintain necessary documentation on the development of products that prevented the identification of why products were failing, and the Company's manufacturing personnel changing part numbers which prevented or delayed products clearing customs.

60.     CW18 was a senior manager for sales operations in the Asia Pacific region and India from 5/05 until 5/06 when CW18 resigned.  CW18 was responsible for negotiating contracts with existing and potential customers.  As detailed below, CW18 stated that UTSI was experiencing considerable issues with revenue recognition before and during the time CW18 was employed by UTSI.  CW18 said the revenue recognition issues involved contracts with maintenance and warranty obligations, that the Company failed to validate the terms of sales before recognizing revenue and that UTSI lacked documentation to support revenue that was recognized.

61.     CW19 was a national accounts manager at UTSI from 2/06 until 4/07 when CW19 was terminated.  CW19 was responsible for selling hardened IP DSLAMs (Digital Subscriber Line Access Modules), the mVision IPTV product and Commworks voicemail systems.  As detailed below, CW19 said that there were quality issues with the products CW19 was responsible for selling.

62.     CW20 held a number of accounting positions at UTSI for six years including revenue controller from 2Q05 until CW20 resigned in the second half of 2007.  As detailed herein, CW20

1   knew about the Japan Telecom transaction, reviewed historical data on the transaction and said that

2   the Japanese subsidiary created by UTSI for the Japan Telecom transaction, Global Telecom Sales &

3   Marketing K.K. ("GTSM"), was used to pass through money to Japan Telecom and did not do a lot

4   of marketing even though the terms of the 8/20/04 contract required UTSI to perform sales

5   promotion activities.  CW20 also said broadband products like IPTV sold to SOFTBANK affiliates

6   did not take off as anticipated.  CW20 said the side letter agreement on the transaction with Reliance

7   Telecom that required UTSI to provide system upgrades required UTSI to restate and reduce

8   revenues by $22 million between 2003 and 2005.  CW20 said Reliance Telecom was generally not

9   happy with the features of the AN2k digital loop carrier product purchased from UTSI and that the

10  side agreement required UTSI to deliver additional features that Reliance desired.

11          63.     CW21 was a senior design engineer manager at UTSI in China during the first half of

12  2003 until his contract expired.  CW21 said that UTSI was building more PAS infrastructure

13  equipment than was needed in 2003 given the excess capacity on existing PAS networks, and also

14  said that China Netcom was typically very slow in paying UTSI.

15  **V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING
         THE CLASS PERIOD**

16

17          64.     **Recipient of alleged false statements:** This Court's 3/20/07 Order directed Lead

18  Plaintiffs to "[d]escribe the person or entity to whom the [alleged false] statement was made and

19  how the recipient recorded or captured the statement."  Each alleged false statement was made to the

20  public at large (including plaintiffs and Class members) in UTSI press releases, during conference

21  calls or in reports UTSI filed with the SEC.  These statements were repeated to the market in reports

22  issued by analysts.  The public relied upon the integrity of the efficient NASDAQ market to reflect

23  all public information in UTSI's stock price.

24          65.     **Loss causation/extent of loss:** This Court's 3/20/07 Order directed Lead Plaintiffs to

25  allege the "[d]ate of loss," the "[n]ature of loss," and the "[e]xtent of loss" caused by each alleged

26  false statement.  The dates and nature of the losses are alleged herein.  The extent or amount of loss

27  is the difference between the inflated price Lead Plaintiffs and Class members paid for the stock and

28  the non-inflated price the stock would have been if UTSI's true condition was public.  Any award of

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                                    - 19 -

damages, however, cannot exceed the difference between the inflated price paid for the stock and the mean trading price of the stock during the 90 days after the Class Period. 15 U.S.C. §78u-4(e)(1). The *precise* amount of inflation per share during the Class Period and the corresponding loss is the subject of expert analysis and opinion.

      **A.**    **Lu, Sophie, Wu and Toy Falsely Represented that UTSI's Financial Results Were Fairly Presented in All Material Respects and that Lu and Sophie Had Designed, Maintained and Evaluated the Company's Disclosure Controls and Procedures and Concluded They Were Adequate and Effective**

      66.   **Date of Statements and Statements:**  UTSI reported the following false financial results during the Class Period.  As shown in the following table, the financial results were originally reported in press releases, and then repeated during the Company's conference calls and in the Forms 10-Q and 10-K filed with the SEC ($ in millions, except EPS):

| Period | F02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 | F03 | 1Q04 | 2Q04 | 3Q04 | 4Q04 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Press Release and Conference Call | N/A | 4/16/03 | 7/17/03 | 10/23/03 | 1/22/04 | 1/22/04 | 4/27/04 | 7/27/04 | 10/26/04 | 2/8/05 |
| Date of 10-Q or 10-K | 2/21/03 | 5/12/03 | 8/4/03 | 11/12/03 | N/A | 3/9/04 | 5/10/04 | 8/16/04 | 11/9/04 | N/A |
| Revenues | $981.8 | $330.5 | $405.8 | $584.4 | $643.6 | $1,964.3 | $622.3 | $689.6 | $645 | $746.6 |
| Stock Compensation Expenses | $3.957 | $0.499 | $1.681 | $0.115 | $0.776 | $3.071 | $0.055 | $0.120 | $0.059 | $0.136 |
| Net Income (Loss) | $107.9 | $37.3 | $39.4 | $59.1 | $66.4 | $202.3 | $54.8 | $43.9 | $4.9 | $(30.2) |
| Basic EPS | $0.98 | $0.35 | $0.39 | $0.58 | $0.64 | $1.95 | $0.48 | $0.39 | $0.04 | $(0.26) |
| Diluted EPS | $0.94 | $0.33 | $0.32 | $0.45 | $0.53 | $1.64 | $0.39 | $0.32 | $0.04 | $(0.22) |
| Goodwill | | | | | | | | | | $180.6 |

| Period | F04 | 1Q05 | 2Q05 | 3Q05 | 4Q05 | F05 | 1Q06 | 2Q06 |
|---|---|---|---|---|---|---|---|---|
| Date of Press Release and Conference Call | 2/8/05 | | 5/5/05 | 8/2/05 | 11/3/05 | 2/9/06 | 6/1/06 | 6/21/06 | 8/9/06 |
| Date of 10-Q or 10-K | 4/15/05 | 5/10/05 | 8/9/05 | 11/10/05 | N/A | 6/1/06 | 6/22/06 | 8/9/06 |
| Revenues | $2,703.6 | $901.8 | $722.9 | $635.3 | $675.7 or $685.5 | $2,929.3 | $596.6 | $549.1 |
| Stock Compensation Expenses | $0.370 | $0.409 | $0.412 | $0.372 | $0.961 | $2.154 | $4.159 | $4.610 |
| Net Income | | $38 | $(74.7) | ($402.6) | ($45.3) | ($487.4) | ($10.6) | ($21.4) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (Loss) | $73.4 | | | | or ($20.6) | | | |
| Basic EPS | $0.64 | $0.33 | $(0.65) | ($3.40) | ($0.39) or ($0.17) | ($4.16) | ($0.09) | ($0.18) |
| Diluted EPS | $0.54 | $0.29 | $(0.65) | ($3.40) | ($0.39) or ($0.17) | ($4.16) | ($0.09) | ($0.18) |
| Goodwill | $180.6 | $195.8 | $196.0 | | | | | |

In addition, it was falsely represented in each Form 10-Q and 10-K listed in the above table that UTSI adhered to the following accounting policies:

> Revenues from sales of telecommunications equipment and handsets are recognized when persuasive evidence of an arrangement exists, delivery of the product has occurred, customer acceptance has been obtained, the fee is fixed or determinable and collectability is reasonably assured. . . .

*        *        *

> The Company accounts for employee stock option grants in accordance with Accounting Principles Board Opinion No. 25 . . . .  Under APB 25, compensation expense is based on the difference, if any, on the date of grant between the fair value of the common stock and the exercise price of the option.

*        *        *

> **The exercise price of ISOs granted under the 1997 plan may not be less than 100% of the fair market value of common stock on the grant date . . . .**

*        *        *

> **Under the terms of the 2001 Director Option Plan, the exercise price of each option granted is equal to the market value of the common stock on the date of grant.**

67. Further, as required by §302 of the Sarbanes-Oxley, Lu and Sophie expressly certified that (1) they had "reviewed" the Forms 10-K and 10-Q, (2) the Forms 10-K and 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and (3) UTSI's financial statements were "fairly present[ed] in all material respects." To assure investors that Lu and Sophie had a legitimate basis for making these statements, and to prevent them from later claiming to be unaware of material information that rendered the Forms 10-K and 10-Q false, Lu and Sophie also certified (until 3/31/05) that (1) they were each "responsible for establishing and maintaining [UTSI's] disclosure controls and procedures," (2) they had

1    "designed such disclosure controls and procedures to ensure that material information . . . is made

2    known to [them] by others" within UTSI during the period covered by the report, (3) they had

3    personally "evaluated the effectiveness of [UTSI's] disclosure controls and procedures" and

4    concluded they were "adequate and effective," and (4) they had "disclosed . . . to [UTSI's] auditors

5    and the Audit Committee . . . all significant deficiencies in the design or operation of internal

6    controls . . . and any fraud . . . that involves management or other employees."

7    　　　　68.　　In the Forms 10-K filed on 2/21/03 and 3/9/04 and the Forms 10-Q filed on 2/21/03,

8    5/12/03, 8/4/03, 11/12/03, 5/10/04, 8/16/04 and 11/9/04, each of the Individual Defendants

9    represented that:

10   　　　　Our chief executive officer and our chief financial officer, after evaluating the
     　　　　effectiveness of [UTSI's] disclosure controls and procedures . . . as of a date (the

11   　　　　"Evaluation Date") within 90 days before the filing date of this [Form 10-Q or Form
     　　　　10-K], have concluded that as of the Evaluation Date, our disclosure controls and

12   　　　　procedures are effective to ensure that information that we are required to disclose in
     　　　　reports that we file or submit under the Exchange Act is recorded, processed,

13   　　　　summarized and reported within the time periods specified in SEC rules and forms.

14   　　　　69.　　On 3/31/05, Lu and Sophie admitted UTSI's disclosure controls and procedures were

15   *not* effective but riddled with numerous material weaknesses that made it more than a remote

16   likelihood material misstatements in the Company's financial statements would not be prevented or

17   detected.  Even after acknowledging the ineffective disclosure controls and procedures, Lu and

18   Sophie continued to falsely represent UTSI's financial results were fairly presented in all material

19   respects.

20   　　　　70.　　**Identity of authors:** The statements in the press releases and the Forms 10-Q and 10-

21   K are attributed to each of the Individual Defendants because they were the senior officers at UTSI,

22   and because the statements contained therein are reasonably presumed to be the collective actions of

23   the Company's officers.  In addition:

24   　　　　•　　All of the press releases, Forms 10-K and Forms 10-Q were issued on behalf of
     　　　　　　UTSI, so the statements included therein are attributable to the Company.

25

26   　　　　•　　The statements in the 4/16/03, 7/17/03, 10/23/03, 1/22/04, 4/27/04, 7/27/04,
     　　　　　　10/26/04, 2/8/05, 5/5/05, 8/2/05, 11/3/05, and 2/9/06 press releases are attributable to

27   　　　　　　Lu and Sophie because (1) they were quoted in the press releases, (2) Sophie was
     　　　　　　listed as a source for some of the press releases, (3) Lu and Sophie repeated the

28   　　　　　　financial results in the press releases during the conference calls and answered

questions about them, and (4) Sophie was the CFO of the Company and responsible for the reporting of the Company's financial results. The financial results reported in the 6/1/06, 6/21/06 and 8/9/06 press releases are attributable to Lu because he was quoted in the press releases and attended the conference calls where the financial results were repeated.

- The financial results reported in the press releases were repeated by Lu and Sophie during the conference calls on 4/16/03, 7/17/03, 10/23/03, 1/22/04, 4/27/04, 7/27/04, 10/26/04, 2/8/05, 5/5/05, 8/2/05, 11/3/05, and 2/9/06. The financial results repeated during the conference calls on 6/21/06 and 8/9/06 are attributable to Lu because he attended the conference calls.

- Lu, Sophie, Wu and Toy signed the 2002 Form 10-K filed on 2/21/03, the 2003 Form 10-K filed on 3/9/04, and the 2004 Form 10-K filed on 4/15/05. Lu, Wu and Toy signed the 2005 Form 10-K filed on 6/1/06. Lu and Sophie signed the Forms 10-Q filed on 5/12/03, 8/4/03, 11/12/03, 5/10/04, 8/16/04, 11/9/04, 5/10/05, and 8/9/05. Lu signed the Forms 10-Q filed on 11/10/05, 6/22/06 and 8/9/06.

- As a member of the Audit Committee, Toy reviewed and approved the quarterly earnings releases, the Forms 10-Q and Forms 10-K. It was reported in UTSI's Proxy Statements that the Audit Committee (1) reviewed the Company's quarterly earnings prior to the public release of the information, (2) provided oversight and monitoring of Company management and their activities with respect to the Company's financial reporting process, (3) reviewed and approved non-audit services of the independent auditors, (4) reviewed compliance with UTSI's existing major accounting and financial reporting policies, and (5) reviewed the results of the audit with the independent auditors and the Company's management.

- Lead Plaintiffs allege that the statements contained in the quarterly earnings releases and the Forms 10-Q are attributable to Wu because he signed the Forms 10-K for 2002-2005, and because he was the President and CEO of the Company's Chinese subsidiary that accounted for a majority of the Company's sales.

- Lu and Sophie signed the certifications required by the Sarbanes-Oxley that were included in the Forms 10-K filed on 2/21/03, 3/9/04 and 4/15/05 and in the Forms 10-Q that were filed on 5/12/03, 8/4/03, 11/12/03, 5/10/04, 8/16/04, 11/9/04, 5/10/05, and 8/9/05. Lu signed the certifications required by the Sarbanes-Oxley that were included in the Form 10-K filed on 6/1/06 and the Forms 10-Q filed on 11/10/05, 6/22/06 and 8/9/06.

71.    **True facts:** The restatements of UTSI's financial results and the Company's admissions that there were (and still are) numerous material weaknesses with its disclosure controls and procedures establish that (1) revenues were overstated and recognized before customer acceptance, (2) stock option compensation expenses were materially understated, (3) net income and EPS were materially overstated, (4) UTSI did not account for employee stock option grants in

1   accordance with Accounting Principles Board Opinion No. 25 ("APB 25"), (5) the exercise prices of

2   stock options were not the market values of the stock on the dates of the grants, and (6) the

3   Sarbanes-Oxley certifications were false and misleading.

4          72.    **The First Restatement**:  On 4/13/05, the Company announced the first restatement

5   reduced pretax income in 4Q03 by 11% from $88.5 million to $78.7 million, and also reduced the

6   Company's 4Q03 gross margin from 31.0% to 29.2%, and the F/03 gross margin from 32.4% to

7   31.8%.  UTSI's 4Q03 and FY03 financial results were originally misstated because the Company

8   failed to record a $7.5 million inventory impairment charge by failing to consolidate the results of

9   MDC, a related-party Chinese company that was formed in 2001 to provide value-added services to

10  UTSI products.

11         73.    **The Second Restatement:** On 5/24/06, the Company announced it would have to

12  restate its financial statements a second time.  The press release stated in part:

13         As a result of the findings of the investigation, *the Company will restate revenues*
           *and earnings for the fiscal years ended 2003 and 2004, and for each fiscal quarter*
14         *within these fiscal years, and for the first three quarters of 2005*.  The aggregate
           impact of the error corrections over the restatement periods have the effect of
15         *reducing previously reported revenue by approximately $49.6 million and net*
           *income by approximately $11.8 million*.
16
17         74.    As detailed in Exhibit 2, net sales, net income and EPS were misstated in every

    quarter in 2003, 2004 and the first three quarters of 2005, and were overstated by the following
18
    amounts in 2003, 2004 and the first three quarters of 2005 ($ in millions, except EPS):
19

|  | Previously Reported | As Restated | Adjustment | Percent Overstated |
|---|---|---|---|---|
| 2003 Net Sales | $1,965.2 | $1,941.1 | ($24.1) | 1.24% |
| 2003 Net Income | $215.6 | $209.9 | ($5.7) | 2.7% |
| 2003 EPS | $2.07 | $2.02 | ($0.05) | 2.9% |
|  |  |  |  |  |
| 2004 Net Sales | $2,703.6 | $2,684.4 | ($19.2) | 0.72% |
| 2004 Net Income | $73.4 | $69.8 | ($3.6) | 5.2% |
| 2004 EPS | $0.65 | $0.61 | ($0.04) | 6.6% |
|  |  |  |  |  |
| 1Q05-3Q05 Net Sales | $2,260.1 | $2,253.7 | ($6.4) | 0.3% |
| 1Q05-3Q05 Net Income | ($439.4) | ($442.0) | ($2.6) | 0.6% |
| 1Q05-3Q05 EPS | ($3.72) | ($3.75) | ($0.03) | 0.8% |

75. **The Third Restatement:** On 2/1/07, UTSI announced it would have to restate its financial statements a third time because it failed to record stock compensation expenses in accordance with APB 25. On 10/10/07, UTSI issued restated financial statements and recorded $26.7 million of additional stock option compensation expenses, which reduced net income by $27.2 million as follows ($ in 000s):

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q06 | 2Q06 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Originally Reported Stock Comp. Expense | $294 | $3,957 | $8,238 | $3,706 | $2,209 | $3,071 | $370 | $2,154 | $4,159 | $4,610 | $32,768 |
| Additional Stock Comp. Expense | $1,244 | $0 | $556 | $4,870 | $8,110 | $12,470 | ($410) | ($1,290) | $662 | $504 | $26,716 |
| Tax Increase (Decrease) | ($448) | $0 | ($104) | ($942) | ($1,550) | ($1,381) | $791 | $4,143 | $9 | $6 | $524 |
| Reduction in Net Income | $796 | $0 | $452 | $3,928 | $6,560 | $11,089 | $381 | $2,853 | $671 | $510 | $27,240 |

76. On 9/17/07, UTSI reported that it would have to restate an undisclosed amount of revenue improperly recognized on sales in China, and on 10/10/07, the Company reported that it had improperly reported $278.6 million of revenue between 2000 and 2005, which caused net income to be overstated by $97.7 million ($ in millions):

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|
| Improperly Recognized Revenue | $12,408 | $17,154 | $64,732 | $21,060 | $104,965 | $58,232 | $278,551 |
| Overstatement of Net Income | $4,781 | $5,779 | $19,697 | $6,382 | $18,594 | $42,433 | $97,666 |

77. **Combined Impact of the Three Restatements:** UTSI did not report the impact of the third restatement on the Company's quarterly financial results from 1998 to 2004. The combined impact of the restatements for 2000-2005 is summarized in the table below ($ in millions, except EPS):

| Period | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Originally Reported Revenues | $368.6 | $612.9 | $981.8 | $1,965.2 | $2,703.6 | $2,929.3 |
| Restated Revenue | $356.2 | $595.7 | $917.1 | $1,920.1 | $2,579.4 | $2,871.1 |
| Amount Overstated | **$12.4** | **$17.2** | **$64.7** | **$45.1** | **$124.2** | **$58.2** |
| Percent Overstated | **3.5%** | **2.9%** | **7.1%** | **2.3%** | **4.8%** | **2.0%** |
| | | | | | | |
| Originally Reported Stock-Based Compensation Expense | $8.238 | $3.706 | $2.209 | $3.071 | $0.370 | $2.154 |
| Restated Stock-Based Compensation Expenses | $8.690 | $7.634 | $8,769 | $13.260 | $0.210 | $4.947 |
| Amount Understated | $0.452 | $3.928 | $6.560 | $10.189 | N/A | $2.793 |
| Percent Understated | **5.5%** | **106%** | **300%** | **332%** | **N/A** | **129%** |
| | | | | | | |
| Originally Reported Net Income (Loss) | $27.0 | $56.9 | $107.9 | $202.3 | $73.4 | ($487.4) |
| Restated Net Income (Loss) | $21.8 | $47.2 | $81.6 | $192.4 | $50.8 | ($532.6) |
| Amount Overstated | **$5.2** | **$9.7** | **$26.3** | **$9.9** | **$22.6** | **$45.2** |
| Percent Overstated | **23.8%** | **20.6%** | **32.2%** | **5.2%** | **44.5%** | **9.3%** |
| | | | | | | |
| Originally Reported Diluted EPS | $0.28 | $0.52 | $0.94 | $1.64 | $0.54 | ($4.16) |
| Restated Diluted EPS | N/R | N/R | $0.71 | $1.56 | $0.40 | ($4.55) |
| Amount Overstated | **N/R** | **N/R** | **$0.23** | **$0.08** | **$0.14** | **$0.39** |
| Percent Overstated | **N/R** | **N/R** | **32.4%** | **5.2%** | **35%** | **9.4%** |

78.    **Scienter and factual basis for scienter:** The factual findings in the SEC C&D Order, the Company's explanations for the restatements, information provided by former UTSI employees, the magnitude and duration of the restatements, the positions of the Individual Defendants, Sophie's resignation, Wu's termination, and suspicious insider selling by each of the Individual Defendants and other UTSI executives raise a strong inference Lu, Sophie, Wu and Toy knew or were deliberately reckless in not knowing that UTSI was reporting materially false and misleading financial results and falsely representing the Company's disclosure controls and procedures were adequate and effective.

1                 **1.**     **Facts Raising a Strong Inference Lu, Sophie, Wu and Toy**

                               **Knew There Were Significant Internal Control Weaknesses**

2                                **Related to Revenue Recognition**

3        79.     **The SEC C&D Order:** On 5/1/08, the SEC announced it had filed suit against UTSI,

4 Lu and Sophie in connection with the Company's false financial reports and recurring internal

5 control deficiencies, that Lu and Sophie had agreed to pay civil penalties of $100,000 and $75,000

6 respectively, and that UTSI, Lu and Sophie agreed to cease and desist from violating various

7 sections of the 1934 Act. The SEC deemed it appropriate that cease-and-desist proceedings be

8 instituted against UTSI, Lu and Sophie for their repeated false representations that (1) UTSI's

9 quarterly and annual reports did not contain any misstatements or omit material information, (2) the

10 reports disclosed all significant deficiencies in the design or operation of UTSI's internal controls,

11 and (3) the reports fairly presented in all material respects UTSI's financial condition and results of

12 operations.

13        80.     The factual findings in the SEC C&D Order establish that (1) Lu, Sophie and the

14 Company's Audit Committee (Toy was a member of the Audit Committee) knew it was a common

15 practice at UTSI to supplement or amend sales contracts with side letters that contained non-standard

16 product upgrade provisions precluding revenue recognition, (2) Lu, Sophie and the Company's

17 Audit Committee received multiple Management Recommendation letters from UTSI's auditors

18 *beginning in 3/03*, detailing multiple and significant internal control weaknesses related to revenue

19 recognition, including the need to "'strengthen procedures to ensure side letters and contract

20 amendments are communicated and accounted for in a timely manner,'" and (3) UTSI improperly

21 recognized $400 million of revenue between 2000 and 2005 on 84 sales transactions because sales

22 contracts were amended or supplemented with product upgrade provisions that precluded revenue

23 recognition.

24        81.     ***The SEC concluded that Lu, Sophie and the Company's Audit Committee had been***

25 ***on notice since at least March 2003 of significant internal control weaknesses, including the use***

26 ***of side letters and contract amendments precluding revenue recognition that were not forwarded***

27 ***by sales offices to the contract and finance departments.*** It was stated in the SEC C&D Order that

28 UTSI sometimes used letter agreements or side letters to supplement or amend contractual terms,

and that in March 2003, the Company's auditors sent a Management Recommendation letter to Lu, Sophie and the Audit Committee, detailing internal control weaknesses identified during the December 31, 2002 year-end audit.  Among other things, the letter specifically noted that UTSI should "'strengthen procedures to ensure side letters and contract amendments are communicated and accounted for in a timely manner.'"  In its written response to the auditor's letter, UTSI said it had implemented the necessary controls to track and monitor side letters and non-routine transactions.

82.     According to the SEC C&D Order, UTSI received another Management Recommendation letter from its auditors in April 2004, detailing multiple internal control weaknesses (many classified as material) identified during the December 31, 2003 year-end audit. The letter was copied to Lu and Sophie, and again noted concerns about the use of side letters that were not forwarded to the finance department.  In its written response, UTSI said it had strengthened controls to identify side letters.   According to the SEC, UTSI also received management recommendation letters from its auditors noting multiple material weaknesses in connection with the 2004 and 2005 year-end audits.

83.     ***UTSI improperly recognized $400 million of revenue on 84 sales transactions between 2000 and 2005 because side letters or side agreements promised future performance by UTSI.***   The SEC C&D Order and the Company's restatements confirm UTSI prematurely recognized nearly $50 million in net revenue between 2003 and 2005 on six international sales, which were subject to side agreements that were not reviewed by the Company's finance personnel, and prematurely recognized $350 million in net revenue between 2000 and 2005 on 78 sales transactions in China because the contracts contained non-standard product upgrade provisions precluding revenue recognition that were not reviewed by the Company's finance personnel. According to the SEC, UTSI sales personnel entered into contracts that contained non-standard product upgrade provisions precluding revenue recognition.  In some instances, sales personnel documented the sales on two separate contracts, and only the company's standard contract (without upgrade provisions) was made available to UTSI's finance personnel.  Because these side

1     agreements promised future performance by UTSI, revenue should not have been recognized under

2     GAAP.

3          84.     The SEC C&D Order described sales transactions with side letters that Lu and Sophie

4     knew about. For example, UTSI improperly recognized $22 million of revenue from 2Q04 to 2Q05

5     on the sale of a network system to a purchaser in India. According to the SEC, at the time of sale,

6     securities analysts had expressed concerns about UTSI's ability to enter markets outside China, and

7     Lu specifically highlighted this deal as indicative of UTSI's success in gaining traction in India.

8          85.     During 2Q04, the purchaser sent UTSI a final acceptance certificate, but included a

9     proposed side agreement requiring UTSI to upgrade the system after 2Q04. According to the SEC,

10     Lu and Sophie were aware of the proposed side agreement and knew that UTSI's revenue

11     recognition manager specifically admonished that approving the side agreement would prevent

12     revenue recognition. Lu personally communicated with the customer to request that they accept the

13     products without a side agreement.

14          86.     Notwithstanding these directions, a UTSI sales executive signed a side agreement

15     with the purchaser, but failed to adequately disclose the agreement to finance personnel, resulting in

16     the improper recognition of revenue by UTSI. The SEC concluded that Lu and Sophie failed to take

17     adequate steps to determine how the customer's request for a side agreement had been resolved and

18     whether revenue recognition was appropriate.

19          87.     During 2Q05, UTSI recognized additional revenue from the India sale. Once again, a

20     UTSI sales executive had signed a side letter making the customer's acceptance contingent on future

21     upgrades (and thus rendering revenue recognition improper under GAAP). According to the SEC,

22     Lu and Sophie were aware the customer had made such a request, but received a communication

23     from finance personnel that the final acceptance certificates received from the customer were

24     acceptable. Neither Lu nor Sophie took steps to determine how the issue was resolved and whether

25     revenue was properly recognized.

26          88.     ***The Company admitted revenues were restated because of significant internal***

27     ***control weaknesses, and specifically because the sales transactions were not reviewed to determine***

28     ***whether there were side agreements that amended or supplemented contract terms thereby***

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)            - 29 -

1  *precluding revenue recognition.*  In the 2005 Form 10-K filed on 6/1/06, UTSI reported that the $22

2  million of revenue improperly recognized on the sale to the customer in India was the result of two

3  previously unknown side letter agreements provided to the customer in 2004 and 2005 that obligated

4  UTSI to deliver a variety of software bug fixes, features, updates and upgrades for no additional

5  consideration.  It was also reported that $13.3 million was improperly recognized in 2004 on three

6  significant international contracts because the terms were changed, and that $3.1 million was

7  improperly recognized in 2005 because of UTSI's obligation for customer rebates and other sales

8  adjustments.

9     89.    In its 2006 Form 10-K filed on 10/10/07, UTSI reported that $278.6 million of

10  revenue was improperly recognized between 2000 and 2005 on 78 sales transactions in China

11  because the contracts "contained obligations for the Company to deliver software upgrades when and

12  if made available for the equipment sold for no additional consideration and for an unspecified

13  period that could extend over the term of the contract."

14     90.    UTSI also acknowledged the $278.6 million of revenue was improperly recognized

15  because of inadequate controls.  The Company reported that the obligations to deliver free software

16  upgrades were included in the contract files but that the revenue was improperly recognized because

17  of the "failure to prevent or detect instances of override related to controls in China over customer

18  agreements, lack of proper management oversight, unclear record retention policies and procedures

19  relating to systems contracts, and inadequate employee training."  UTSI acknowledged the need for

20  restating $278.6 million of revenue was discovered by reviewing 1,200 contract files from several

21  sales offices in China and the electronic files of 45 employees, and by interviewing 96 employees.

22  In short, UTSI admitted the $278.6 million of revenue was improperly recognized because contract

23  files were simply not reviewed.

24     91.    To simply rely on the contract documentation submitted by the sales offices without

25  reviewing the actual files or confirming the terms of the transactions with the sales representatives or

26  customers given the common practice of using side letters to amend or supplement contract terms

27  and the repeated notices from the Company's auditors that there were multiple and significant

28  internal control weaknesses related to revenue recognition, including the need to "'strengthen

1   procedures to ensure side letters and contract amendments are communicated and accounted for in a

2   timely manner,'" raises a strong inference each of the Individual Defendants was at least deliberately

3   reckless in representing that the Company's financial results were fairly presented in all material

4   respects, and that the Company's disclosure controls and procedures were adequate and effective.

5           92.     ***Information provided by former UTSI employees establishes that the revenue***

6   ***recognition problems – including the auditors' concerns about revenue recognition – were well***

7   ***known throughout the Company.***  CW1 and CW2 said UTSI improperly recognized revenue and

8   understated the cost of UTSI's international sales.  CW1 knew UTSI regularly and improperly

9   recognized revenue before receiving customer acceptance because CW1 oversaw the UTSI order

10  processors, including CW2, who entered orders into the QAD order-entry system as accepted even

11  though acceptance contingencies were not met and customer acceptance not received.  CW1 said the

12  purchase orders received from the international sales team led by Chuck Farrell included payment

13  terms, including the condition of receiving customer acceptance.  CW1 said the order processing

14  personnel processed about 15 orders per day as accepted even though CW1 knew of only five

15  instances of UTSI actually receiving customer acceptance during the four months CW1 worked at

16  UTSI.

17          93.     CW1 was also prevented from establishing a customer acceptance policy and cleaning

18  up the order processing division, the reason CW1 was initially hired.  According to CW1, UTSI had

19  no written guidelines for when an order was to be entered as accepted and the only process was to

20  have the customer sign off on a document acknowledging acceptance of the product and satisfactory

21  installation.  Liu told CW1 that the acceptance policy CW1 was trying to develop was too strict for

22  UTSI and often directed orders be incorrectly entered as accepted so revenue could be recognized.

23          94.     Other witness accounts confirm that there were red flags that indicated revenues had

24  been and were being improperly recognized.  CW11 was hired to improve UTSI's billing controls

25  and was told in 1/06 that some of UTSI's receivables were questionable.  CW11 said UTSI

26  personnel in Japan, Taiwan, India and South America billed customers and managed collections and

27  manually documented the transactions on Excel spreadsheets that were sent to Alameda to be

28  entered into the Company's Oracle accounting database.  But CW11 said there were receivables

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                      - 31 -

1  included in the Oracle system for which UTSI did not have supporting documentation to confirm the

2  customer was ever billed and other receivable balances so old that collection was uncertain.

3       95.    During a 1/23/06 revenue recognition team meeting that CW11 attended, it was

4  reported that UTSI did not have evidence that an Indian customer had ever been invoiced for $41

5  million of products shipped in 2005 and prior periods. CW11 also stated UTSI could not verify it

6  had billed $20 million of revenue included on Excel spreadsheets received from UTSI's Asia-Pacific

7  region. In addition, CW11 said there were receivables recorded by UTSI personnel in Europe, the

8  Middle East and Africa that could not be verified. CW11 said the discrepancies between overseas

9  billings and UTSI's corporate accounting records were staggering. In some cases, UTSI's overseas

10  employees did not bill customers and in other cases, UTSI did not have documentation supporting

11  amounts that were billed. These issues were not resolved when CW11 left UTSI at the end of 3/06

12  and UTSI announced two revenue restatements after 3/06 that reduced revenues by $328 million.

13  CW14, the manager of financial planning, stated that revenue was recognized even though the Excel

14  spreadsheets contained errors, did not include supporting documentation and could not be reconciled

15  with other reports.

16       96.    CW18 said UTSI was experiencing considerable revenue recognition issues when

17  CW18 joined the Company in 5/05. CW18 said that the Company and its auditors, PWC, discovered

18  that UTSI had improperly recognized revenue on a number of contracts before fulfilling maintenance

19  and warranty obligations required by the contracts. CW18 explained that UTSI failed to validate the

20  terms of sales submitted by personnel outside North America which led to the revenue being

21  improperly recognized. Specifically, CW18 said that the Company's regional personnel prepared

22  excel spreadsheets to report sales from their respective regions that were submitted to corporate

23  finance and accounting personnel in Alameda. The corporate finance and accounting personnel did

24  not validate the sales including whether the customer had provided final acceptance. CW18 said that

25  revenues had to be reversed on a contract with Reliance in India for this reason. In addition, CW18

26  said that UTSI had to reverse revenues previously recognized because it did not have documentation

27  supporting when the revenue was recognized.

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)      - 32 -

97.     CW16 also said that PWC was giving UTSI a terrible time in 2004 and 2005 regarding revenues that had been recognized on contracts that included maintenance obligations and installation obligations.  CW16 said UTSI recognized revenue after completing installation but before the maintenance obligations had been fulfilled that PWC required to be reversed.  CW16 said that revenues had to be reversed on contracts with Reliance in India and contracts with Sprint PCS, Verizon and AT&T.  CW17 also was told by colleagues in Rolling Meadows that some Indian customers were refusing to pay UTSI.

98.     CW16 also said UTSI improperly recognized revenue on other sales.  For example, in 2004 CW16 reviewed contracts with customers that were not paying for CDMA and GSM (global system for mobile) IP-based cellular phone switches purchased from TELOS Technology, Inc. ("TELOS"), a company UTSI acquired in 4/04.  CW16 discovered that UTSI had improperly recognized approximately $1.6 million of revenues because TELOS had failed to perform professional services required by the contracts.  From 2004 to 2006, CW16 said UTSI provided the professional services (which increased the costs of the sales) and the customers paid UTSI the amounts due under the contract.

99.     ***The Individual Defendants knew adequate and effective disclosure controls and procedures were particularly important at UTSI.***  Each of the Individual Defendants knew that adequate disclosure controls and procedures were particularly important for several reasons.  First, as reported in the 2002 Form 10-K, each of the Individual Defendants knew (1) UTSI's growth had placed "significant strain on our management, operational, financial and other resources," and (2) UTSI had to "continue to expand . . . operations to address potential market opportunities," that would "continue to place a significant strain on our management, operational, financial and other resources."

100.    Second, as disclosed in the SEC C&D Order and the Company's Forms 10-K, each of the Individual Defendants knew that sales in China accounted for 86% and 79% of UTSI's revenue in 2003 and 2004, respectively, and that personnel at the Company's regional sales offices in China executed the contracts and were responsible for forwarding them to the Company's China headquarters for accounting purposes.  Similarly, sales personnel in countries outside of China were

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 33 -

1  responsible for forwarding contracts to the Company's Alameda headquarters for accounting

2  purposes. Third, Lu, Sophie, Wu and Toy knew it was a common practice at UTSI to supplement or

3  amend sales contracts with side letters that contained non-standard product upgrade provisions

4  precluding revenue recognition. Fourth, the Company's auditors repeatedly told Lu, Sophie and the

5  UTSI Audit Committee that there were significant internal control weaknesses related to revenue

6  recognition, including the fact that side letters and contract amendments introducing revenue

7  contingencies were not forwarded by sales offices to the contract and finance departments.

8        101. ***The terminations and resignations of all the Individual Defendants except Toy***

9  ***strengthen the inference each was at least deliberately reckless in representing that the***

10  ***Company's financial results were fairly presented in all material respects and that UTSI's***

11  ***disclosure controls and procedures were adequate and effective.*** The Company publicly disclosed

12  Sophie's resignation on 4/13/06 as UTSI and the SEC were conducting investigations of the

13  Company's financial reporting and just before the second restatement was publicly disclosed on

14  5/24/06. CW14 stated that Sophie and Fan, UTSI's VP of Finance and direct report to Sophie who

15  also resigned by 4/06, were pushed out of the Company because senior management wanted to get

16  rid of the regime that caused so many problems.

17        102. On 5/10/06, the Company announced Lu would resign by the end of the year and be

18  replaced by Wu. On 10/11/06, UTSI announced that Wu would not replace Lu as CEO because the

19  Board had asked Wu to oversee the Company's exploring of strategic alternatives to enhance

20  shareholder value. On 12/22/06, UTSI reported that Lu would remain as CEO until the completion

21  of strategic alternatives process. In the same release, UTSI stunned investors by disclosing that Lu

22  had received a Wells Notice from the SEC in connection with an ongoing investigation into trading

23  activities by third parties, and that the staff of the SEC had recommended the SEC file a civil

24  injunctive action against Lu alleging he violated §10(b) of the 1934 Act. On 6/28/07, UTSI

25  announced that Peter Blackmore was hired to replace Lu as President and that he would succeed Lu

26  as CEO within the next year.

27        103. The only plausible inference from the termination of Wu in 6/07 is that he knew of

28  the improprieties that led to the $278.6 million revenue restatement. Wu was the President of UTSI-

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)       - 34 -

1    China where 78 sales transactions were improperly accounted for.  Before being terminated, the

2    Company announced on 5/10/06 that he would succeed Lu as UTSI's CEO, and then on 10/11/06,

3    the Company announced that Wu would not take over as CEO and instead would lead the effort to

4    explore strategic alternatives with Merrill Lynch & Co., Inc.  On 6/1/07, however, UTSI announced

5    that the strategic alternatives process had been concluded, that the Company would continue to

6    operate as a separate entity and that Wu had been terminated as EVP and CEO of UTSI-China.  Then

7    on 7/24/07, UTSI announced that Wu had resigned from the Board of Directors, and that the

8    Company was investigating historical sales contracts with customers in China.  On 9/17/07, UTSI

9    announced it had completed the China sales investigation and would have to restate its financial

10   statements by an undisclosed amount, and on 10/10/07, the Company announced it had improperly

11   recognized $278.6 million of revenue over six years on 78 China sales transactions.

12        104.   ***Wu knew or was deliberately reckless in not knowing that UTSI was reporting***

13   ***materially false and misleading financial results and falsely representing the Company's***

14   ***disclosure controls and procedures were adequate and effective.***  The fact that the Company's

15   auditors repeatedly told Lu, Sophie, Toy and the other members of UTSI's Audit Committee that

16   there were significant internal control weaknesses, including the failure to forward side agreements

17   to the Company's finance department, strongly infers that Wu also knew about the problem.  So do

18   the witness accounts because they reveal that the revenue recognition problems – including the

19   auditors' concerns about the problems – were known throughout the Company, including employees

20   who did not work at UTSI's corporate office in Alameda, California or in China.   The magnitude

21   and duration of the revenue restatements ($400 million improperly recognized on 84 sales

22   transactions over six years) establish the problems were widespread and bolster the inference Wu

23   knew about the revenue recognition problems.  The acknowledged importance of maintaining

24   adequate and effective disclosure controls and procedures given UTSI's rapid growth, the fact that a

25   majority of revenues were generated in China, and the common use of side letters and side

26   agreements further strengthens the inference that Wu knew about the problems.  Finally, the

27   suspicious insider selling by each of the Individual Defendants and the termination of Wu strongly

28   infer he knew about the problems.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 35 -

2.     **Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew There Were Insufficient Controls in Place to Assure Sales Were Not Obtained by Bribing Foreign Government Officials in Violation of the FCPA**

105.    The repeated and significant internal control weaknesses at UTSI during the Class Period, a series of disclosures by UTSI from 2006 to 2008 that the Company had possibly violated the FCPA by bribing foreign government officials to obtain sales in China, Mongolia, India and Southeast Asia, the unwinding of the Company's Mongolian joint venture after the UTSI Audit Committee completed its investigation of possible payments to a Mongolian government official, and continuing investigations by the DOJ and SEC raise a strong inference Lu, Sophie, Wu and Toy knew there were not sufficient controls in place to ensure UTSI was not recognizing revenues on sales that were obtained by bribing foreign government officials.

106.    The facts detailed above show that each of the Individual Defendants knew that (1) most of the Company's sales were generated in China, (2) at the end of 2002, the Company's business plan was expanded to sales in other foreign countries like India, Japan, and Thailand, (3) the finance departments in China and Alameda relied on the information provided from sales offices when recording revenues, and (4) PWC repeatedly told the Company that there were significant internal control weaknesses related to revenue recognition, including the fact that side letters and contract amendments introducing revenue contingencies were not forwarded by sales offices to the contract and finance departments.  These facts put each of the Individual Defendants on notice that revenues were being recorded without sufficient controls in place to assure revenue recognition was permissible under GAAP.

107.    When UTSI disclosed the need to restate its financial statements for these reasons in 5/06 and 6/06, it also disclosed in its 2005 Form 10-K filed on 6/1/06, that it was investigating allegations of improper payments – bribes – by people connected to the Company to government officials in Mongolia and India in violation of the FCPA.  The disclosures indicated that revenue recognized on sales related to the illegal payments would have to be disgorged, and that the Company faced the prospects of monetary and non-monetary sanctions:

> We have received notice of a formal inquiry by the staff of the Securities & Exchange Commission ("SEC") into certain aspects of our financial disclosures

*during prior reporting periods and certain other issues.  In addition, **in December 2005 the U.S. Embassy in Mongolia informed us that it had forwarded to the Department of Justice ("DOJ") allegations that an agent of our Mongolia joint venture had offered payments to a Mongolian government official in possible violation of the Foreign Corrupt Practices Act** (the "FCPA").  **In April 2006 we became aware that an agent of the Company may have made an offer to pay an Indian government official in possible violation of the FCPA.**  We, through our Audit Committee, authorized an independent investigation into these matters, and we have been in contact with the DOJ and SEC regarding the investigation. . . .  If the SEC or the DOJ makes a determination that we have violated federal laws, **we may face sanctions including, but not limited to, fines, disgorgement and an injunction**.  Additionally, such a determination by the SEC or the DOJ could adversely affect our stock price.  It is also possible that the findings and outcome of these inquiries may affect other lawsuits that are pending.*

108.    In its 2Q06 Form 10-Q filed two months later on 8/9/06, UTSI disclosed that in 6/06, it became aware that a former employee of the Company may have made a payment to a Thailand government official in possible violation of the FCPA.  On 7/19/07, UTSI filed a Form 8-K in which it disclosed the Company's investigation had now identified possible FCPA violations in China.  Five days later, UTSI disclosed it was reviewing sales contracts in China that could result additional restatements, and then on 10/10/07, UTSI reported that it had improperly recognized $278.6 million of revenue between 2000 and 2005 on sales made in China.

109.    Disclosures in the SEC Reports strongly infer illegal payments were made to a Mongolian government official, which caused UTSI to report false financial results in 2005.  According to UTSI's FY05 Form 10-K, the Mongolian joint venture was established in 1Q05 to install, develop and operate a PAS network in Mongolia, and consolidation of the joint venture resulted in a $6 million increase in both total assets and total liabilities and equity.  According to UTSI's 2Q06 Form 10-Q, as a result of the Audit Committee's investigation, UTSI terminated the joint venture and incurred a $5.9 million expense to write off the assets of the joint venture, and a $2.6 million expense to cover VAT (Value-Added Tax) liability as of 12/31/05.  The termination of the joint venture and related expenses indicate the joint venture illegally obtained the contract to install, develop and operate the PAS network, and that assets and capital were overstated in 2005 and 1Q06.

110.    The DOJ and SEC continue to investigate the numerous cases of FCPA violations.  In UTSI's 2007 Form 10-K, it was disclosed that (1) UTSI had been in contact with the DOJ and SEC

regarding its investigation of possible FCPA violations, (2) the DOJ had requested UTSI to voluntarily produce documents related to its investigation, (3) the SEC had subpoenaed the Company for documents, (4) the Company had received a Grand Jury Subpoena from the DOJ, requiring the production of documents related to one aspect of the DOJ's investigation and (5) the Company had executed tolling agreements extending the statute of limitations for the FCPA issues under investigation by the SEC and DOC and the immigration issues under investigation by the DOJ.

111.    These facts strongly infer that UTSI will report additional violations of the FCPA, incur additional charges to unwind transactions, and incur charges to resolve the investigations by the SEC and the DOJ, and that each of the Individual Defendants was at least deliberately reckless in representing that UTSI's disclosure controls and procedures were effective and that the Company's financial results were fairly presented.

                    **3.    Facts Raising a Strong Inference Lu, Sophie, Wu and Toy
                            Knew UTSI Failed to Properly Account for Stock
                            Compensation Expenses**

112.    **Magnitude and Duration of Stock Compensation Expense Restatement:**  The Company has admitted that it improperly failed to record $26.7 million of stock compensation expenses over eight years (1998-2Q06), and that stock compensation expenses were understated by 5.5% in 2000, 106% in 2001, 300% in 2002, 332% in 2003 and 129% in 2005.  In addition, the Company acknowledged in the 2006 Form 10-K filed on 10/10/07 that the restated amounts from 2000 to 2005 covered 10.3 million stock options or 36% of the 28.8 million stock options granted between 2000 and 2005.  UTSI reported that (1) 17.9 million stock options or 62% of the 28.8 million stock options granted between 2000 and 2005 had incorrect measurement dates, and (2) $25.5 million of additional stock compensation expense was required on 10.3 million stock options because the exercise prices were below the closing price of UTSI's stock on the date of the grant, including $6.1 million of additional compensation expenses on 2 million options granted to UTSI officers and directors.  The number and percentage of backdated options, the understatement of annual stock compensation expenses by more than 300% and the number of years covered by the

1   restatement raise a strong inference each of the Individual Defendants knew UTSI was not reporting

2   stock compensation expenses in accordance with APB 25.

3      113.   **SEC lawsuit and C&D Order establish UTSI failed to establish sufficient**

4   **controls:** In the lawsuit filed by the SEC against UTSI, Lu and Sophie and the SEC C&D Order, the

5   SEC found that UTSI failed to establish and implement adequate internal controls for the granting of

6   employee stock options by, among other things, "fail[ing] to maintain necessary documentation

7   showing when the grants were actually authorized by the Compensation Committee."

8      114.   **Defendants Lu, Wu and Toy approved the stock option plans:** Each of the

9   Individual Defendants knew the exercise price of any stock option could not be less than the market

10  price of the stock on the date of the grant.  Defendants Lu, Wu and Toy knew because as members of

11  the Board, they approved the two plans that governed the granting of stock options – the 1997 Stock

12  Plan ("1997 Plan") and the 2001 Director Option Plan ("2001 Plan") – that required the exercise

13  price of any option grant to be no less than 100% of the fair market value on the date of the grant.

14  *See* 1997 Plan, ¶8(a)(i)(B); 2001 Plan, ¶4. Defendants Lu, Sophie, Wu and Toy each received stock

15  options, and the plans required recipients to enter into a written or electronic agreement with the

16  Company which included the terms and conditions of the grant, and which expressly stated in

17  paragraph 1 that the exercise price of grants were subject to the terms of the plan.  *See* 1997 Plan,

18  ¶2(r) and Stock Option Agreement attached; 2001 Plan, ¶13 and Director Option Agreement

19  attached.  In addition, each of the Individual Defendants knew because it was publicly represented in

20  UTSI's Proxy Statement (a group-published document filed with the SEC on 4/2/03) that the

21  "exercise price of options is the market price on the date of grant, ensuring that the option will

22  acquire value only to the extent that the price of the Company's common stock increases relative to

23  the market price at the date of grant."

24      115.   **Defendants Lu, Wu and Toy approved the grants:** Each of the Individual

25  Defendants also knew they were receiving options with exercise prices that were less than the market

26  price of the stock on the date of the grant.  Defendants Lu, Wu and Toy knew because they were

27  members of the Board that approved the backdated grants.  The plan documents made the Board or a

28  Committee of the Board responsible for administering the plans, including the granting of any

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 39 -

1   options.  *See* 1997 Plan, ¶4; 2001 Plan, ¶4.  According to the 4/2/03 Proxy Statement, the plans were

2   administered by the Company's compensation committee, consisting of director Larry D. Horner and

3   defendant Toy.  However, the full Board had to approve the backdated options.  According to the

4   4/2/03 Proxy Statement, the compensation committee was "responsible for reviewing and

5   recommending for approval by the Board of Directors the Company's compensation practices,

6   including executive salary levels and variable compensation programs, both cash-based and equity-

7   based."  It was also reported in the Proxy Statement that defendant Lu was directly responsible for

8   recommending to the compensation committee the stock options to be granted to the Company's

9   executive officers.

10      116.   **Defendants Lu, Wu, Toy and Sophie receive backdated grants:** Defendants Lu,

11  Sophie, Wu, Toy and other UTSI executives received options with exercise prices less than the

12  market price of the stock on the date of the grant.  The Company has admitted $6.1 million of

13  additional compensation expenses were recorded on 2 million options granted to UTSI officers and

14  directors, and on 1/4/07, the Company identified two of the option grants included in that total.  On

15  1/4/07, UTSI filed a Form 8-K with the SEC, in which it was disclosed that: (1) the stock option

16  grants purportedly made on 2/28/02 with an exercise price of $20.25 were actually made on 3/27/02

17  when the market price of the stock was $25.25 and (2) the stock option grants purportedly made on

18  7/25/02 with an exercise price of $15.72 were actually made on 7/17/02 when the market price of the

19  stock was $20.82.  The 2/28/02 grant date was picked with the benefit of hindsight, and concealed a

20  $3.35 million financial benefit to Lu, Sophie, Wu and other UTSI executives:

| Date | Executive | No. of Options Granted | 2/28/02 Backdated Exercise Price | 3/27/02 Actual Exercise Price | Concealed Benefit to Executive and Unrecorded Expense to UTSI |
|------|-----------|------------------------|-----------------------------------|-------------------------------|----------------------------------------------------------------|
| 2/28/02 | Lu | 150,000 | $20.25 | $25.25 | $750,000 |
| 2/28/02 | Sophie | 100,000 | $20.25 | $25.25 | $500,000 |
| 2/28/02 | Wu | 100,000 | $20.25 | $25.25 | $500,000 |
| 2/28/02 | Kwock | 60,000 | $20.25 | $25.25 | $300,000 |
| 2/28/02 | Chou | 100,000 | $20.25 | $25.25 | $500,000 |
| 2/28/02 | Soloway | 80,000 | $20.25 | $25.25 | $400,000 |
| 2/28/02 | Huang | 80,000 | $20.25 | $25.25 | $400,000 |
| Total | | 670,000 | $20.25 | $25.25 | $3,350,000 |

117.    The 7/25/02 grant date was picked with the benefit of hindsight, and concealed a $1.68 million financial benefit to Lu, Sophie, Wu and other UTSI executives:

| Date | Executive | No. of Options Granted | 7/25/02 Forward-Dated Exercise Price | 7/17/02 Actual Exercise Price | Concealed Benefit to Executive and Unrecorded Expense to UTSI |
|------|-----------|------------------------|--------------------------------------|-------------------------------|--------------------------------------------------------------|
| 7/25/02 | Lu | 75,000 | $15.72 | $20.82 | $382,500 |
| 7/25/02 | Sophie | 50,000 | $15.72 | $20.82 | $255,000 |
| 7/25/02 | Wu | 50,000 | $15.72 | $20.82 | $255,000 |
| 7/25/02 | Kwock | 25,000 | $15.72 | $20.82 | $127,500 |
| 7/25/02 | Chou | 50,000 | $15.72 | $20.82 | $255,000 |
| 7/25/02 | Soloway | 40,000 | $15.72 | $20.82 | $204,000 |
| 7/25/02 | Huang | 40,000 | $15.72 | $20.82 | $204,000 |
| Total | | 330,000 | $15.72 | $20.82 | $1,683,000 |

118.    **Price of UTSI stock before and after the grants: the 2/28/02 Backdated Stock Option Grant:** The price of the Company's stock before and after the date of the backdated options strongly infers Lu, Sophie, Wu and Toy knew that the Company was granting options with exercise prices less than the price of the stock on the date of the grant, and that the Company was not accounting for these in the money options in accordance with APB 25.  As shown in the following chart, the 2/28/02 grant date price of $20.25 was the lowest closing price of the stock in 2/02, and was immediately after a sharp decline in UTSI's stock price and immediately before a sharp spike in the price:



119. **The 7/25/02 Forward-Dated Stock Option Grant:** The 7/25/02 grant date price of $15.72 was the lowest closing price of the stock in 7/02, while the actual 7/17/02 grant date was the date of UTSI's highest closing price in 7/02. The 7/25/02 grant date was also immediately after a sharp decline in UTSI's stock price:



120. Although UTSI has only acknowledged the options purportedly granted on 2/28/02 and 7/25/02 were actually granted on other dates, the following facts raise a strong inference the options granted on 10/18/00, 12/21/00 and 9/21/01 were granted on other dates when the Company's stock price was higher.

121. **10/18/00 Stock Option Grant:** A total of 380,000 options were purportedly granted on 10/18/00 to Lu, Sophie, Wu, Toy, Shao-Ning J. Chou ("Chou"), Gerald S. Soloway ("Soloway") and Huang with an exercise price of $15 per share. As shown in the following chart, the stock grant came immediately after a sharp decline in UTSI's stock price and immediately before a sharp spike in the Company's stock price. The price of the stock 20 trading days before the grant was $21.31 per

share, while the price of the stock 20 trading days after the grant was $19 per share.  Just 12 days after the purported grant, the stock price soared to $22.50 per share, a 50% increase.  Moreover, the purported exercise price was the lowest closing price in 10/00 when the stock traded between $15 and $20.50 per share.  The exercise price was also the fifth lowest closing price for the entire year. Based on the $19 per share price 20 trading days after the purported 10/18/00 grant date picked with the benefit of hindsight, the backdating of the option grant concealed a $1.5 million financial benefit, and caused UTSI to understate compensation expense and overstate net income and EPS in violation of GAAP (APB 25) and the Company's publicly reported accounting policy:



| Date | Executive | No. of Options Granted | Backdated Exercise Price | Stock Price 20 Trading Days After Grant | Concealed Benefit to Executive and Expense to UTSI |
|------|-----------|------------------------|--------------------------|-----------------------------------------|----------------------------------------------------|
| 10/18/00 | Lu | 100,000 | $15.00 | $19.00 | $400,000 |
| 10/18/00 | Sophie | 50,000 | $15.00 | $19.00 | $200,000 |
| 10/18/00 | Wu | 55,000 | $15.00 | $19.00 | $220,000 |
| 10/18/00 | Toy | 10,000 | $15.00 | $19.00 | $40,000 |
| 10/18/00 | Chou | 60,000 | $15.00 | $19.00 | $240,000 |
| 10/18/00 | Soloway | 55,000 | $15.00 | $19.00 | $220,000 |

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                      - 43 -

| 10/18/00 | Huang | 50,000 | $15.00 | $19.00 | $200,000 |
| Total | | 380,000 | $15.00 | $19.00 | $1,520,000 |

122.   **12/21/00 Stock Option Grant:** A total of 352,500 options were purportedly granted on 12/21/00 to Lu, Sophie, Wu, Toy, Chou, Soloway and Huang with a purported exercise price of $12.50 per share, which was ***the lowest closing price of the year*** and $17.29 per share less than the average closing price for the year.   As shown in the following chart, this stock grant came immediately after a sharp decline in UTSI's stock and immediately before a sharp spike in the Company's stock.   The price of the stock 20 trading days before the grant was $17 per share, while the price of the stock 20 trading days after the grant was $23.25 per share.   Moreover, the exercise price was the lowest closing price in 12/00 when the stock traded between $12.50 and $18.75 per share with an average price of $16.53 per share.   Based on the $23.25 per share price 20 trading days after the purported 12/21/00 grant date picked with the benefit of hindsight, the backdating of the option grant concealed a $3.8 million financial benefit, and caused UTSI to understate compensation expense and overstate net income and EPS in violation of GAAP (APB 25) and the Company's publicly reported accounting policy:

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**UTStarcom**

November 8, 2000 - February 6, 2001



15
16
17
18
19
20
21

| Date | Executive | No. of Options Granted | Backdated Exercise Price | Stock Price 20 Trading Days After Grant | Concealed Benefit to Executive and Expense to UTSI |
|------|-----------|-----------------------|--------------------------|------------------------------------------|----------------------------------------------------|
| 12/21/00 | Lu | 100,000 | $12.50 | $23.25 | $1,075,000 |
| 12/21/00 | Sophie | 50,000 | $12.50 | $23.25 | $537,500 |
| 12/21/00 | Wu | 55,000 | $12.50 | $23.25 | $591,250 |
| 12/21/00 | Toy | 7,500 | $12.50 | $23.25 | $80,625 |
| 12/21/00 | Chou | 50,000 | $12.50 | $23.25 | $537,500 |
| 12/21/00 | Soloway | 45,000 | $12.50 | $23.25 | $483,750 |
| 12/21/00 | Huang | 45,000 | $12.50 | $23.25 | $483,750 |
| Total | | 352,500 | $12.50 | $23.25 | $3,789,375 |

22
23
24
25
26
27
28

123.    **9/21/01 Stock Option Grant:** During FY01, the public trading price of UTSI common stock ranged from a price of $12.56 to $30.43 per share, with an average closing price of $21 per share.  Howard Kwock ("Kwock") was purportedly granted 50,000 options on 9/21/01 at an exercise price of $13.61 per share, which was *the lowest closing price during the second half of the year* and $7.39 per share less than the average closing price for the year.  As shown in the following chart, this stock grant came immediately after a sharp decline in UTSI's stock and immediately

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                                    - 45 -

before a sharp spike in the Company's stock.  The price of the stock 20 trading days before the grant was $18.80 per share, while the price of the stock 20 trading days after the grant was $20.15 per share.  Based on the $20.15 per share price 20 trading days after the purported 9/21/01 grant date picked with the benefit of hindsight, the backdating of the option grant concealed a $1 million financial benefit to Kwock and caused UTSI to understate compensation expense and overstate net income and EPS in violation of GAAP (APB 25) and the Company's publicly reported accounting policy:



| Date | Executive | No. of Options Granted | Backdated Exercise Price | Stock Price 20 Trading Days After Grant | Concealed Benefit to Kwock and Expense to UTSI |
|------|-----------|------------------------|--------------------------|------------------------------------------|-------------------------------------------------|
| 9/21/01 | Kwock | 50,000 | $13.61 | $20.15 | $1,007,500 |

124.   **SEC filing requirements provide opportunity to backdate:** The admitted grant date manipulations were possible because none of the Individual Defendants or other UTSI

1 executives disclosed the stock option grants until they filed a Form 5 in 2/01, 2/02 and 2/03, months

2 after they had received the actual grants. Lu, Sophie, Wu, Huang, Soloway, Chou, and Toy each

3 filed a Form 5 on 2/13/01 with the SEC, in which they represented they received options to acquire

4 shares of UTSI stock on 10/18/00 at an exercise price of $15, and on 12/21/00, at an exercise price of

5 $12.50. On 2/13/02, Kwock filed a Form 5 with the SEC, in which he represented he received

6 options to purchase 50,000 shares on 9/21/01 at an exercise price of $13.61. On 2/13/03, Lu, Sophie,

7 Wu, Huang, Soloway, Chou and Kwock each filed a Form 5 with the SEC, in which each

8 represented he had received options to acquire shares of UTSI stock on 2/28/02 at an exercise price

9 of $20.25, and on 7/25/02, at an exercise price of $15.72. The Company admitted on 1/4/07 that

10 these options were granted on different dates when the price of UTSI stock was higher. These false

11 Form 5 disclosures constituted violations of federal criminal and civil laws (18 U.S.C. §1001 and 15

12 U.S.C. §78ff(a)). By delaying the disclosure of the option grants until filing the Forms 5 in 2/01,

13 2/02 and 2/03, Lu, Sophie, Wu, Toy and the other UTSI executives were able to cherry-pick the best

14 date in which to grant the Company's executives options.

15 **4. Facts Raising a Strong Inference Lu, Sophie, Toy and Wu Knew UTSI Failed to Disclose and Properly Account for**

16 **Related-Party Transactions**

17 125. Lu, Sophie, Wu and Toy knew or were deliberately reckless in not knowing that

18 UTSI failed to record a $7.5 million impairment charge in 2003 by failing to consolidate the results

19 of MDC. According to the SEC C&D order and the 2003 Form 10-K/A filed on 4/13/05, UTSI

20 entered into a complex transaction in 2003 involving MDC and another customer in China, whereby

21 MDC took ownership of UTSI inventory that had decreased in value by $7.5 million, but failed to

22 record the impairment expense because UTSI failed properly to treat MDC as a consolidated entity.

23 GAAP, specifically Financial Accounting Standards Board ("FASB") Interpretation No. 46 ("FIN

24 46"), required the consolidation of MDC's results with UTSI's results because (1) UTSI had a

25 controlling interest or business or contractual relationship with MDC, (2) MDC was unable to

26 finance its own operations without UTSI's support, and (3) MDC's other investors did not have

27 exposure to the significant risks and rewards of ownership.

28

126.    According to the SEC C&D Order, Lu, Sophie and Toy had been on notice of concerns raised by the Company's auditors about UTSI's failure to adequately disclose related-party transactions entered into by UTSI as early as 3/03 when they personally received a Management Recommendation letter from PWC, detailing internal control weaknesses identified during the 2002 audit.  Moreover, Lu and Sophie received another Management Recommendation letter from PWC in 4/04, detailing internal control weaknesses identified during the 2003 audit.  In that letter, the auditors expressed concerns with many complex related-party transactions entered into by UTSI, and informed UTSI that it did not adequately disclose significant transactions involving joint venture arrangements between UTSI and its customers.  In its written response, UTSI said it had strengthened controls and implemented monitoring procedures to identify significant joint venture transactions.  But UTSI failed to consolidate the operations of MDC and record the $7.5 million impairment charge in the 2003 Form 10-K filed on 3/9/04.

127.    The SEC C&D Order and disclosures in UTSI's 2003 Form 10-K/A filed on 4/13/05 also show that Lu, Sophie, Toy and Wu knew that MDC was a related party and that UTSI was required to treat MDC as a consolidated entity.  It was reported in the SEC C&D Order or the 2003 Form 10-K/A that (1) MDC was formed in 2001 to provide value-added services to UTSI,[6] (2) Wu's father founded MDC, (3) numerous officers and other employees of UTSI-China invested in MDC and acquired a 67% ownership interest, (4) some UTSI employees held management positions at MDC, (5) one UTSI-China executive held an alternate Board of Director position at MDC, (6) certain UTSI-China employees worked for MDC while their salaries were paid by UTSI-China, (7) UTSI employees participated in the 2001 formation and initial capitalization of Beijing MDC Telecommunications Company Ltd. ("Beijing MDC"), an affiliate of MDC,  and (8) UTSI received a warrant in 12/02 to acquire 16% of MDC for $800,000, which UTSI exercised on 12/31/04.

---

[6]    According to http://www.sbaif.com/investmentportfolio_country-china.htm, UTSI and MDC formed a strategic partnership to provide MDC's services to fixed line and mobile operators, and UTSI registered MDC's website.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                                         - 48 -

128.    Lu, Sophie, Toy and Wu knew GAAP required UTSI to treat MDC as a consolidated entity because they each signed UTSI's 2003 Form 10-K filed on 3/9/04, in which it was reported that (1) FIN 46 was issued by the FASB in 1/03, (2) FIN 46 applied to UTSI if it had a controlling interest or business or contractual relationship with a variable interest entity ("VIE"), (3) FIN 46 required consolidation if the VIE was unable to finance its own operations without investor support, or where other investors do not have exposure to the significant risks and rewards of ownership, and (4) the Company had adopted FIN 46 for the quarter ending 12/31/03.

### 5.    Facts Raising a Strong Inference Lu, Sophie, Wu and Toy Knew There Were Significant Internal Control Weaknesses Related to Goodwill

129.    The Company's admission that there were significant internal control weaknesses that prevented UTSI from determining whether goodwill was impaired, a $323 million impairment charge recorded by the Company in 3Q05 to write off 100% of goodwill and the reasons provided for the impairment charge raise a strong inference each of the Individual Defendants was at least deliberately reckless in representing that the Company's financial results in 4Q04, 1Q05 and 2Q05 were fairly presented in all material respects, and that the Company's disclosure controls and procedures were adequate and effective.

130.    UTSI reported $180.6 million of goodwill in 4Q04 and $196 million of goodwill in 1Q05 and 2Q05.  On 4/15/05, however, it was *reported in UTSI's 2004 Form 10-K that the Company's processes and procedures for the assessment of impairment were not sufficiently detailed to identify instances of impairment required under GAAP* (Statement of financial Accounting Standards Nos. 142 and 144).  On 10/6/05, UTSI reported that goodwill was being evaluated for impairment because "circumstances may have changed sufficiently to indicate the fair value of some or all of UTSI's operating segments may be below book value."  Then, on 11/3/05, UTSI wrote off all of the Company's goodwill and $14.2 million of long-lived assets – recording a $219 million impairment charge and a related $103.6 million tax charge (goodwill write-offs of $89.3 million related to the handset segment, $55.7 million related to the wireless segment, $24.7 million related to the PCD segment and $23.2 million related to the broadband segment).

131.   The explanations for the impairment charge strongly infer that each of the Individual Defendants knew or was deliberately reckless in not knowing the impairment charge should have been recorded no later than 4Q04.  In UTSI's 3Q05 Form 10-Q, it was reported that the goodwill impairment charge was due to significant adverse changes in the business outlook, including: (1) a reduction in the rate of growth of PAS subscribers in 3Q05; (2) a delay in the expected granting of 3G (third generation) licenses in China and Japan; (3) challenges with broadband product quality; (4) a narrowing of UTSI's strategic focus; and (5) greater-than-expected revenue and margin declines due to continued pricing pressures.  PAS subscriber growth rates – which Sophie stated during the Company's 10/23/03 conference call was a key metric because it ultimately drove both handset and infrastructure spending – were declining since 4Q03:

|  | 4Q02 | 1Q03 | 2Q03 | 3Q03 | 4Q03 | 1Q04 | 2Q04 | 3Q04 | 4Q04 | 1Q05 | 2Q05 | 3Q05 | 4Q05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| China PAS Subscribers | 12 | 15 | 20 | 28 | 35 | 45 | 54 | 60 | 67 | 73 | 78.5 | 83.8 | 87 |
| Growth Rate | 20% | 25% | 33% | 40% | 25% | 28% | 17% | 11% | 12% | 9% | 7.5% | 6.7% | 4% |

132.   In addition, PAS equipment orders had been declining substantially throughout 2003 and 2004, which caused a subsequent reduction in PAS equipment revenues in 2004 and 2005, and PAS handset revenues had been declining since 1Q04:

|  | 1Q03 | 2Q03 | 3Q03 | 4Q03 | 1Q04 | 2Q04 | 3Q04 | 4Q04 | 1Q05 | 2Q05 | 3Q05 | 4Q05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAS Equipment Contracts | $453 | $245 | $200 | $105 | $377 ($177 after 1/13/04) | $233 | $0 | $67 | $160 | $70 | $167 | $42 |
| PAS Equipment Revenues | $125 | $140 | $192 | $263 | $337 | $428 | $426 | $206 | $110 | $148 | $113 | $128 |
| PAS Handset Revenues | $140 | $187 | $334 | $308 | $236 | $194 | $160 | $158 | $128 | $148 | $106 | $93 |

133.   Indeed, on 9/20/04, the Company reported that revenues from China PAS sales in 2005 were expected to be 20%-25% less than the $2.1 billion expected to be reported in 2004, and on 5/5/05, the Company reported China PAS sales in 2005 would be 40%-50% less than 2004. These facts strongly infer the $89.3 million charge related to the handset segment and the $55.7 million charge related to the wireless segment should have been recorded no later than 4Q04.

134.    As detailed herein, information provided by former UTSI employees, the Company's lawsuit against Passave, Inc. ("Passave"), the terms of the Japan Telecom contract, the failure to report broadband revenues in line with guidance in 2004, the substantial decline in broadband gross margins from 53% in 2003 to 20% in 2004, and other facts establish there were numerous problems with the Company's broadband products throughout 2004 that raise a strong inference the $23.2 million impairment charge related to the broadband segment should have been recorded no later than 4Q04.

**6.    Suspicious Insider Selling Strengthens the Inference Lu, Sophie, Wu and Toy Knew About the Significant Internal Control Weaknesses that Caused UTSI to Report Materially False and Misleading Financial Results**

135.    Lu, Sophie, Wu, Toy and the other UTSI executives sold 1,620,103 shares of their UTSI stock in the first 11 months of the Class Period for $58 million.  The sales were particularly suspicious in both timing and amount.  As shown in the following charts, the Individual Defendants and the other UTSI executives sold in unison when they knew that (1) there were significant internal control weaknesses that caused UTSI to overstate revenues and earnings, (2) China Telecom and China Netcom were substantially reducing orders for PAS systems, (3) there were pervasive and systemic operational problems that were delaying delivery of products and causing the Company to deliver defective products.  Moreover, the sales occurred as UTSI's stock price increased 150% from 2/21/03 to 8/21/03 compared to just a 34% increase in the PPG:

**Hong Liang Lu, CEO, President, Director**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 3/25/03 | 45,000 | $19.90 | $895,500 |
| 7/22/03 | 10,000 | $42.00 | $420,000 |
| 8/1/03 | 10,000 | $42.03 | $420,300 |
| 8/21/03 | 100,000 | $45.24 | $4,524,300 |
| 9/2/03 | 10,000 | $44.00 | $439,970 |
| 10/28/03 | 10,000 | $32.62 | $326,240 |
| 11/3/03 | 10,000 | $31.64 | $316,370 |
| 12/1/03 | 10,000 | $37.83 | $378,340 |
| 1/2/04 | 10,000 | $38.75 | $387,470 |
| **Total** | **215,000** | | **$8,108,490** |

**Michael J. Sophie, CFO, VP**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 3/25/03 | 31,251 | $19.90 | $621,895 |
| 3/25/03 | 4,749 | $19.90 | $94,505 |
| 4/22/03 | 12,000 | $22.86 | $274,322 |
| 5/2/03 | 12,000 | $23.20 | $278,400 |
| 6/3/03 | 12,000 | $28.07 | $336,852 |
| 6/16/03 | 45,000 | $33.21 | $1,494,630 |
| 7/1/03 | 12,000 | $34.28 | $411,348 |
| 8/1/03 | 12,000 | $42.06 | $504,708 |
| 9/2/03 | 12,000 | $43.77 | $525,240 |
| 10/29/03 | 21,839 | $32.25 | $704,308 |
| 11/3/03 | 21,839 | $31.64 | $690,920 |
| 12/1/03 | 21,805 | $37.83 | $824,970 |
| 1/2/04 | 9,839 | $38.75 | $381,232 |
| **Total** | **228,322** | | **$7,143,340** |

**Ying Wu, EVP, Director**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 7/22/03 | 85,000 | $42.00 | $3,570,000 |
| 8/1/03 | 85,000 | $42.06 | $3,575,440 |
| 9/2/03 | 35,000 | $43.18 | $1,511,440 |
| 9/2/03 | 50,000 | $43.18 | $2,159,200 |
| 10/28/03 | 85,000 | $32.62 | $2,773,040 |
| 11/3/03 | 85,000 | $31.64 | $2,689,145 |
| 12/1/03 | 85,000 | $37.83 | $3,215,890 |
| 1/5/04 | 85,000 | $39.86 | $3,387,930 |
| **Total** | **595,000** | | **$22,882,085** |

**Thomas J. Toy, Director**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 7/22/03 | 10,000 | $42.00 | $420,000 |
| 8/1/03 | 10,000 | $42.06 | $420,640 |
| 9/2/03 | 10,000 | $43.61 | $436,090 |
| 11/5/03 | 20,000 | $34.26 | $685,220 |
| 12/1/03 | 10,000 | $37.83 | $378,340 |
| 1/2/04 | 10,000 | $38.75 | $387,470 |
| **Total** | **70,000** | | **$2,727,760** |

**Shao-Ning J. Chou, EVP**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 4/21/03 | 10,000 | $22.73 | $227,300 |
| 4/21/03 | 17,500 | $22.76 | $398,300 |
| 4/21/03 | 8,500 | $22.70 | $192,950 |
| 4/21/03 | 14,000 | $22.74 | $318,360 |
| 5/6/03 | 6,687 | $23.70 | $158,482 |
| 5/6/03 | 13,313 | $23.51 | $312,989 |
| 5/12/03 | 10,000 | $23.55 | $235,500 |
| 5/12/03 | 20,000 | $23.60 | $472,000 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/20/03 | 10,000 | $26.50 | $265,000 |
| 5/29/03 | 10,000 | $29.40 | $294,000 |
| 6/17/03 | 10,000 | $34.50 | $345,000 |
| 6/17/03 | 10,000 | $33.85 | $338,540 |
| 6/17/03 | 10,000 | $34.75 | $347,500 |
| 6/24/03 | 20,000 | $33.01 | $660,200 |
| 7/8/03 | 10,000 | $39.83 | $398,290 |
| 7/8/03 | 10,000 | $39.62 | $396,150 |
| 7/14/03 | 10,000 | $40.50 | $405,000 |
| 7/21/03 | 20,000 | $42.54 | $850,780 |
| **Total** | **220,000** | | **$6,616,341** |

**Gerald S. Soloway, Senior VP**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 3/25/03 | 3,000 | $19.90 | $59,700 |
| 5/14/03 | 5,000 | $26.052 | $130,250 |
| 5/14/03 | 10,000 | $26.00 | $260,000 |
| 5/15/03 | 5,000 | $27.15 | $135,750 |
| 6/6/03 | 5,625 | $29.87 | $167,996 |
| 6/6/03 | 25,000 | $30.00 | $750,000 |
| 7/8/03 | 20,000 | $40.00 | $800,000 |
| 7/8/03 | 11,902 | $39.70 | $472,509 |
| 8/7/03 | 6,698 | $39.65 | $265,576 |
| 8/19/03 | 30,054 | $43.83 | $1,317,117 |
| 9/8/03 | 1,936 | $40.64 | $78,681 |
| 10/28/03 | 2,873 | $32.62 | $93,729 |
| 11/7/03 | 8,947 | $34.33 | $307,106 |
| 11/13/03 | 4,125 | $32.45 | $133,856 |
| 11/14/03 | 4,875 | $32.45 | $158,194 |
| 12/5/03 | 4,374 | $36.55 | $159,870 |
| 1/5/04 | 40,000 | $40.09 | $1,603,800 |
| 1/6/04 | 10,000 | $41.00 | $410,000 |
| 1/7/04 | 10,000 | $41.52 | $415,180 |
| 1/8/04 | 14,372 | $41.84 | $601,281 |
| **Total** | **223,781** | | **$8,320,594** |

**Bill Huang, CTO, Senior VP**

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 4/21/03 | 10,000 | $22.55 | $225,500 |
| 5/22/03 | 10,000 | $27.30 | $273,000 |
| 6/19/03 | 4,000 | $34.00 | $136,000 |
| 7/16/03 | 3,539 | $41.61 | $147,261 |
| 8/13/03 | 4,461 | $41.60 | $185,560 |
| 11/19/03 | 5,000 | $34.75 | $173,750 |
| 11/20/03 | 7,000 | $36.01 | $252,049 |
| 12/2/03 | 4,000 | $37.87 | $151,480 |
| **Total** | **48,000** | | **$1,544,600** |

**Howard Kwock, VP of Engineering**

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                    - 53 -

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/14/03 | 10,000 | $25.25 | $252,500 |
| 8/1/03 | 2,000 | $42.36 | $84,720 |
| 9/2/03 | 2,000 | $43.84 | $87,680 |
| 1/5/04 | 6,000 | $40.25 | $241,500 |
| **Total** | **20,000** | | **$666,400** |

136.   Many of the Individual Defendants and the other UTSI executives sold just about all of their stock and the sales comprised a substantial amount of their holdings and vested options:

| Executive | Shares Sold | Stock Holdings | % of Sales to Stock Holdings | Vested Options as of 2/23/04 | % Sales to Stock Holdings and Vested Options |
|---|---|---|---|---|---|
| Lu | 215,000 | 2,697,961 | 8% | 865,209 | 6% |
| Sophie | 228,322 | 232,324 | 98% | 91,890 | 70% |
| Wu | 595,000 | 1,968,087 | 30% | 402,028 | 25% |
| Toy | 70,000 | 70,000 | 100% | 79,966 | 47% |
| Kwock | 20,000 | 20,000 | 100% | N/R | unknown |
| Chou | 220,000 | 313,946 | 70% | 301,253 | 36% |
| Soloway | 223,781 | 224,372 | 99% | 150,629 | 60% |
| Huang | 48,000 | 687,934 | 7% | 158,753 | 6% |
| Total | 1,620,000 | 6,214,624 | 26% | 2,049,728 | 20% |

137.   The sales in the first 11 months of the Class Period were more than three times the 489,637 shares sold during the 14 months before the Class Period:

| Executive | Shares Sold from 1/1/02 - 2/20/03 | Shares Sold from 2/21/03 - 1/8/04 | Percentage Increase in Shares Sold from 2/21/03 - 1/8/04 |
|---|---|---|---|
| Lu | 135,500 | 215,000 | 59% |
| Sophie | 205,000 | 228,322 | 11% |
| Wu | 0 | 595,000 | N/A |
| Toy | 0 | 70,000 | N/A |
| Kwock | 0 | 20,000 | N/A |
| Chou | 50,000 | 220,000 | 340% |
| Soloway | 75,137 | 223,781 | 200% |
| Huang | 24,000 | 48,000 | 100% |
| Total | 489,637 | 1,620,000 | 230% |

138.   As shown in the following charts, many of the sales by Sophie, Toy, Kwock, Chou and Soloway involved backdated options.  In fact, every single one of Kwock's Class Period sales related to the exercise of backdated stock options.  Combined, the five executives exercised 250,421 backdated options and received an additional $1.6 million in insider trading proceeds due solely to the manipulation of the exercise prices and the grant dates:

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 54 -

**Michael J. Sophie**

| DATE | PURPORTED GRANT DATE | OPTIONS EXERCISED | EXERCISE COST | ACTUAL EXERCISE COST | ADDITIONAL CLASS PERIOD PROCEEDS |
|---|---|---|---|---|---|
| 6/16/03 | 10/18/00 | 25,001 | $375,015 | $475,019 | $100,004 |
| 6/16/03 | 12/21/00 | 19,999 | $249,988 | $464,977 | $214,989 |
| 10/29/03 | 2/28/02 | 4,587 | $92,887 | $115,822 | $22,935 |
| 10/29/03 | 7/25/02 | 1,921 | $30,198 | $39,995 | $9,797 |
| 10/29/03 | 10/18/00 | 1,667 | $25,005 | $31,673 | $6,668 |
| 10/29/03 | 12/21/00 | 1,597 | $19,963 | $37,130 | $17,168 |
| 11/3/03 | 2/28/02 | 4,587 | $92,887 | $115,822 | $22,935 |
| 11/3/03 | 7/25/02 | 1,921 | $30,198 | $39,995 | $9,797 |
| 11/3/03 | 10/18/00 | 1,667 | $25,005 | $31,673 | $6,668 |
| 11/3/03 | 12/21/00 | 1,597 | $19,963 | $37,130 | $17,168 |
| 12/1/03 | 2/28/02 | 4,587 | $92,887 | $115,822 | $22,935 |
| 12/1/03 | 7/25/02 | 1,921 | $30,198 | $39,995 | $9,797 |
| 12/1/03 | 10/18/00 | 1,667 | $25,005 | $31,673 | $6,668 |
| 12/1/03 | 12/21/00 | 1,597 | $19,963 | $37,130 | $17,168 |
| 1/2/04 | 2/28/02 | 4,587 | $92,887 | $115,822 | $22,935 |
| 1/2/04 | 7/25/02 | 1,921 | $30,198 | $39,995 | $9,797 |
| 1/2/04 | 10/18/00 | 1,667 | $25,005 | $31,673 | $6,668 |
| 1/2/04 | 12/21/00 | 1,597 | $19,963 | $37,130 | $17,168 |
| **TOTAL** | | 84,088 | $1,297,212 | $1,838,477 | $541,265 |

**Thomas J. Toy**

| DATE | PURPORTED GRANT DATE | OPTIONS EXERCISED | EXERCISE COST | ACTUAL EXERCISE COST | ADDITIONAL CLASS PERIOD PROCEEDS |
|---|---|---|---|---|---|
| 7/22/03 | 12/21/00 | 7,500 | $93,750 | $174,375 | $80,625 |
| 7/22/03 | 10/18/00 | 2,500 | $37,500 | $47,500 | $10,000 |
| **TOTAL** | | 10,000 | $131,250 | $221,875 | $90,625 |

**Shao-Ning J. Chou**

| DATE | PURPORTED GRANT DATE | OPTION EXERCISED | EXERCISE COST[7] | ACTUAL EXERCISE COST[8] | ADDITIONAL CLASS PERIOD PROCEEDS |
|---|---|---|---|---|---|
| 4/21/03 | 12/21/00 | 1,687 | $21,088 | $39,223 | $18,135 |
| 5/6/03 | 12/21/00 | 10,813 | $135,163 | $251,402 | $116,240 |
| 5/6/03 | 10/18/00 | 2,500 | $37,500 | $47,500 | $10,000 |
| **TOTAL** | | 15,000 | $193,750 | $338,125 | $144,375 |

---

[7]     Exercise cost is based upon the exercise price of the stock option grants on the purported exercise date.

[8]     Actual exercise cost is based upon the exercise price of the stock option grants either on the admitted actual exercise date or at the stock price 20-trading days following the purported grant date.

**Howard Kwock**

| DATE | PURPORTED GRANT DATE | OPTIONS EXERCISED | EXERCISE COST | ACTUAL EXERCISE COST | ADDITIONAL CLASS PERIOD PROCEEDS |
|---|---|---|---|---|---|
| 5/14/03 | 9/21/01 | 10,000 | $136,100 | $201,500 | $65,400 |
| 8/1/03 | 9/21/01 | 2,000 | $27,220 | $40,300 | $13,080 |
| 9/2/03 | 9/21/01 | 2,000 | $27,220 | $40,300 | $13,080 |
| 1/5/04 | 9/21/01 | 6,000 | $81,660 | $120,900 | $39,240 |
| **TOTAL** | | 20,000 | $272,200 | $403,000 | $130,000 |

**Gerald S. Soloway**

| DATE | PURPORTED GRANT DATE | OPTIONS EXERCISED | EXERCISE COST | ACTUAL EXERCISE COST | ADDITIONAL CLASS PERIOD PROCEEDS |
|---|---|---|---|---|---|
| 8/19/03 | 7/25/02 | 10,000 | $157,200 | $208,200 | $51,000 |
| 8/19/03 | 10/18/00 | 351 | $5,265 | $6,669 | $1,404 |
| 9/8/03 | 12/21/00 | 938 | $11,725 | $21,809 | $10,084 |
| 10/28/03 | 12/21/00 | 1,875 | $23,438 | $43,594 | $20,156 |
| 11/7/03 | 10/18/00 | 3,437 | $51,555 | $65,303 | $13,748 |
| 11/7/03 | 7/25/02 | 2,501 | $39,316 | $52,071 | $12,755 |
| 12/5/03 | 10/18/00 | 1,146 | $17,190 | $21,774 | $4,584 |
| 12/5/03 | 12/21/00 | 937 | $11,713 | $21,785 | $10,073 |
| 12/5/03 | 7/25/02 | 833 | $13,095 | $17,343 | $4,248 |
| 1/5/04 | 2/28/02 | 36,667 | $742,507 | $925,842 | $183,335 |
| 1/8/04 | 10/18/00 | 1,145 | $17,175 | $21,755 | $4,580 |
| 1/8/04 | 12/21/00 | 937 | $11,713 | $21,785 | $10,073 |
| 1/8/04 | 7/25/02 | 833 | $13,095 | $17,343 | $4,248 |
| **TOTAL** | | 121,333 | $1,955,304 | $2,674,847 | $719,542 |

139. **Effect on Stock Price:** The increases and decreases in the Company's stock price relative to the PPG and the NASDAQ establish that the false financial results and the Sarbanes-Oxley certifications issued during the Class Period caused the Company's stock price to trade at artificially inflated prices. Some of the artificial price inflation was removed from the stock price after partial disclosures by UTSI that revealed the Company's financial results were not fairly presented in all material respects and that the Company's disclosure controls and procedures were not adequate and effective. As a result, Class members who purchased UTSI stock during the Class Period suffered economic loss, *i.e.*, damages under the federal securities laws.

140. **Loss Causation/Date of Loss:** Class members suffered economic losses on the following dates:

- On 7/28/04, the Company's stock price declined 29.3% to $17.85, compared to a 0.6% decline in both the PPG and the NASDAQ after UTSI revealed on 7/27/04 that there were problems with its disclosure controls and procedures related to revenue

recognition. UTSI reported that it did not recognize $28.7 million of higher margin international revenue because it took longer to deliver new products and receive final acceptance.

- The Company's stock price declined 14% from $17.95 on 8/10/04 to $15.37 on 8/11/04, compared to a 0.5% decline in the PPG and a 1.5% decline in the NASDAQ after UTSI announced that there would be a delay in the filing of the 2Q04 Form 10-Q because the Audit Committee had not completed its review and analysis of the sales transaction that caused the $28.7 million revenue shortfall in 2Q04.

- On 9/20/04, the Company's stock price declined 10% to $13.17, compared to a 1.5% decline in the PPG and a 0.1% decline in the NASDAQ after UTSI announced that it would not be able to recognize $220 million of revenue it expected to recognize in 2004.

- On 1/7/05, the Company's stock price declined 20% from $19.94, to $15.97, compared to a 0.8% increase in the PPG and a 0.1% decline in the NASDAQ after UTSI announced on 1/6/05 that 4Q04 revenues would be $135 million less than the $875-$885 million previously represented on 10/26/04 because revenues from China operations were being adversely impacted by the slowing Chinese economy, the maturation of the China PAS market and delays in the execution of contracts and receipt of final acceptances.

- On 3/31/05, the Company's stock price declined 7.5% from $11.84 to $10.95, compared to a 1.2% increase in the PPG and a 0.3% decline in the NASDAQ after UTSI announced that (1) there would be a delay in filing the 2003 restated financial statements and the 2004 Form 10-K because more time was needed to finalize the assessment of internal control over financial reporting and (2) additional deficiencies had been identified.

- On 10/7/05, the Company's stock price declined 26% to $5.64, compared to a 1.3% increase in the PPG and a 0.3% increase in the NASDAQ after UTSI reported on 10/6/05 that 3Q05 results would be less than the guidance provided on 8/2/05 because UTSI had not completed all elements of a $40 million contract. In addition, the Company revealed that it might need to record an impairment charge to write-off some or all of goodwill, and that the Company had received a notice of formal inquiry from the SEC into certain aspects of UTSI's financial disclosures during prior reporting periods.

- On 2/9/06, the Company's stock price declined 3.2% from $6.81 to $6.59, compared to a 1% decline in the PPG and a 0.5% decline in the NASDAQ after UTSI announced that it had improperly recognized $22 million of revenue between 2003 and 2005 on a contract with a customer in India, and that the Audit Committee had initiated an investigation to determine if the Company's previously issued financial statements needed to be adjusted.

- On 3/17/06, the Company's stock price declined 6.1% from $6.24 to $5.86, compared to a 0.4% decline in the PPG and a 0.3% increase in the NASDAQ after

the Company reported on 3/16/06 that there would be a delay in the filing of the 2005 Form 10-K because the Audit Committee needed additional time to investigate the $22 million of improperly recognized revenue on the contract with a customer in India and certain other transactions.

- On 4/13/06, the Company's stock price declined 4.2%, compared to a 0.1% decline in the PPG and a 0.6% decline in the NASDAQ after UTSI issued a press release announcing Sophie's resignation.

- On 9/22/06, the Company's stock price declined 4.7% from $8.99 to $8.57, compared to no change in the PPG and a 0.8% decline in the NASDAQ after the Center for Financial Research and Analysis ("CFRA") issued a report on 9/21/06, in which it questioned whether the Company had any stock option backdating issues.

- On 11/8/06, the Company's stock price declined 8.4% from $10.23 to $9.37, compared to a 1.3% increase in the PPG and a 0.4% increase in the NASDAQ after UTSI reported on 11/7/06 that it had commenced a review of its historical equity award grant practices under the direction of the Nominating and Corporate Governance Committee with the assistance of independent legal counsel and independent accounting consultants.

- On 1/5/07, the Company's stock price declined 3% from $9.04 to $8.77, compared to a 1.7% decline in the PPG and a 0.8% decline in the NASDAQ after UTSI filed a Form 8-K on 1/4/07 that disclosed (1) stock option grants purportedly made on 2/28/02 with an exercise price of $20.25 were actually made on 3/27/02 when the market price of the stock was $25.25 and (2) stock option grants purportedly made on 7/25/02 with an exercise price of $15.72 were actually made on 7/17/02 when the market price of the stock was $20.82.

- On 2/2/07, the Company's stock price declined 1.1% from $9 to $8.90, compared to a 0.3% decline in the PPG and a 0.3% increase in the NASDAQ after UTSI reported on 2/1/07 that it would have to restate its financial statements because it failed to account for stock option compensation expenses in accordance with APB 25.

- The Company's stock price declined 34.5% from $4.73 on 7/23/07 to $3.10 on 7/30/07, compared to a 3.8% decline in the PPG and a 4% decline in the NASDAQ after UTSI reported on 7/24/07 that (1) it would restate its financial statements and record an additional $28 million of expenses because it failed to account for stock option compensation expenses in accordance with APB 25 and (2) it was reviewing historical sales contracts with some of its customers in China that could impact revenue recognized in previously issued financial statements.

- The Company's stock price declined 8.1% from $4.93 on 10/10/07 to $4.53 on 10/12/07, compared to no change in the PPG and a 0.2% decline in the NASDAQ after UTSI reported on 10/10/07 that the investigation of the China sales contracts would require UTSI to restate and reduce revenues by $270 million and net income by $124 million.

141.   **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock at artificially inflated prices.  If the Company's financial results were accurately reported and the numerous problems with the Company's disclosure controls and procedures or their impact on UTSI were disclosed, investors would have known UTSI's true financial condition and lowered their expectations about the Company's current and future prospects which would have caused the stock price to decline as it did on the dates listed above.

**B.    Lu and Sophie Falsely Represented There Was Strong Demand for the Company's PAS Systems When They Knew China Telecom and China Netcom Were Substantially Reducing Orders and Falsely Represented the Company's Backlog of Orders Provided "Tremendous Visibility" into Future Results When They Knew There Was No Reasonable Basis for the Guidance**

**1.    False and Misleading Statements in 2003**

142.   **Date of Statements and Statements:** On 4/16/03, UTSI issued a press release and held a conference call to report the Company's 1Q03 results.  During UTSI's 4/16/03 conference call, Lu and Sophie made the following statements:

Lu: The company also has the ***tremendous visibility based on our years worth of a backlog in order flow***.  The next three quarters are now in place.

                    *       *       *

Sophie: We came into the quarter with backlog of $605m and we announced contract totaling over $350m during the first quarter. . . .  This all leads to ***a tremendous amount of visibility and we now have backlog in place for the rest of the year***.

                    *       *       *

        Our targets for gross margins as a percentage of revenue for Q1 was approximately 33% to 34%.  And [we] anticipate ***margins will improve*** slightly, perhaps the half percent – 1% ***sequentially each quarter throughout 2003***.  Given Q1 margins exceeded our target, we anticipate Q2 remained consistent with Q1.  Plus or minus a few tenths of a percent with slight sequential improvements in Q3 and Q4. ***For the full year 2003, our target for gross margins as a percent of revenue is between 34% and 35%***.

143.   **Identity of Authors:** Defendants Lu and Sophie made the statements.

144.   **True Facts:** Gross margins did not improve in 2003 from the 34% reported in 1Q03:

| Period | 4/16/03 Guidance | Originally Reported | 4/13/05 Restatement | 6/1/06 Restatement | 10/10/07 Restatement |
|--------|------------------|---------------------|---------------------|--------------------|----------------------|
| 3Q03 | 34% | 31.8% | 31.8% | 31.8% | N/R |
| 4Q03 | 34% | 31.0% | 29.2% | 29.1% | N/R |
| FY03 | 34%-35% | 32.4% | 31.8% | 31.7% | 31.6% |

The failure to report gross margins in line with guidance establishes that the backlog did not provide tremendous visibility into future results in 2003.

145.    **Scienter and Factual Basis for Scienter:** Lu and Sophie knew there was no reasonable basis for the gross margin guidance or the representations that the backlog provided tremendous visibility into the Company's future results because they knew (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were declining due to the reduced demand and aggressive pricing, and (3) gross margins on PAS equipment sales and broadband equipment sales were being negatively impacted by the undisclosed operational problems that were delaying revenue recognition and increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded them from knowing if (1) UTSI was properly recognizing revenue on sales with side agreements supplementing or amending contract terms, (2) UTSI was properly accounting for related-party transactions and (3) UTSI was obtaining sales by bribing foreign government officials in violation of the FCPA.

146.    **Lu and Sophie knew China Telecom and China Netcom were substantially reducing their orders for PAS equipment:** Lu and Sophie knew, as was reported in UTSI's 2002 Form 10-K, that China Telecom and China Netcom were UTSI's largest customers – indeed, the lifeblood of the Company – accounting for 84% or $823 million of the Company's $981.8 million of sales in 2002.  The $823 million included $446 million of revenue from sales of PAS equipment, which generated 40% gross margins and $377 million of revenue from sales of PAS handsets, which generated gross margins of 25%.  Because China Telecom and China Netcom were also UTSI's largest customers in 2003, Lu and Sophie knew, as was reported in the 2002 Form 10-K, that declines in higher margin PAS equipment orders or declines in gross margins on existing orders would cause a material adverse effect on UTSI's financial results.  Therefore, the Company

1    maintained a very close relationship with its two largest customers. During UTSI's 9/25/03

2    conference call, Sophie said, "Obviously, we're very close to both China Telecom and China

3    Netcom.  We've deployed in over 800 cities.  And so we're very much grounds based on what's

4    happening in those cities."  In the 2002 Form 10-K, it was reported that UTSI "established a strong

5    local presence" with the two companies which "enable[d] UTSI to be responsive to them and the

6    specific needs of their subscribers."

7         147.    Because China Telecom and China Netcom were UTSI's largest customers, UTSI

8    tracked their orders for PAS equipment.  The Company also announced specific sales to China

9    Telecom, China Netcom and most of its other customers which are summarized in Exhibit 3.  The

10   dollar amount of reported PAS equipment orders declined substantially from $453 million in 1Q03

11   to $245 million in 2Q03, to $200 million in 3Q03 and to $105 million in 4Q03, and gross margins on

12   PAS equipment sales declined from 40% in 2002 to 32% in 2003.  The importance of China

13   Telecom and China Netcom to the Company's financial results, the admitted close relationship

14   between UTSI and its two largest customers, and the substantial decline in orders in 2003, raise a

15   strong inference Lu and Sophie knew that their plans to substantially reduce PAS equipment orders

16   in 2003 and that PAS equipment gross margins were declining.

17        148.    **Witnesses confirm substantial decline in PAS demand in 2003:** An article in the

18   10/29/07 edition of *The Recorder* strengthens the inference Lu and Sophie knew that China Telecom

19   and China Netcom were substantially reducing orders and that the decline was well known

20   throughout the Company.  In the article, a former employee involved in the preparation of UTSI's

21   public revenue numbers was asked about PAS demand in 2003, and was quoted as stating, "It looked

22   like everything was falling off a cliff in terms of shipments."

23        149.    **Excess capacity contributes to decline in orders and prices:** Lu and Sophie also

24   knew orders were declining because there was excess capacity on existing PAS networks.  Lu

25   acknowledged during the 4/27/04 conference call that the Company knew there was excess capacity

26   on existing PAS networks in 2003 with ***less than 60% utilization*** after UTSI deployed $1.4 billion

27   of PAS systems in 2002 and 1H03.  CW21 said that UTSI was building more PAS infrastructure

28   equipment than was needed in 2003 given the excess capacity.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                          - 61 -

150.   **Aggressive pricing and higher costs reduce PAS equipment gross margins:** Witness accounts and statements by Lu and Sophie during the Company's 4/27/04 and 7/27/04 conference calls establish they knew PAS equipment gross margins would decline in 2003 and 2004. During the 4/27/04 conference call, Lu was asked why PAS equipment gross margins had declined in 2003. He stated that UTSI always had a difficult time generating high gross margins on new PAS equipment orders because of higher design and manufacturing costs. During the same conference call, Lu and Sophie acknowledged they knew prices for PAS equipment were down in 2003 by stating they were just starting to see stabilization on the prices for PAS equipment. In response to a question from Wachovia Securities analyst Stephen Koffler during the 7/27/04 conference call, Sophie also acknowledged that PAS gross margins were low in 2003 because UTSI had to offer aggressive pricing to obtain orders. Lu and Sophie surely would have known about the aggressive pricing on PAS equipment orders received in 2003 as well as the higher design and manufacturing costs and their impact on gross margins in 2003 – given their positions at the Company and the importance of China Telecom and China Netcom to UTSI's financial results.

151.   **Demand for cellular technology contributes to reduced demand for lower quality PAS equipment:** Lu and Sophie knew that the reduced demand for PAS equipment and handsets was a result of PAS systems being low quality, limited mobility telecommunications systems that were rapidly becoming obsolete and being replaced by cellular technology. UTSI's PAS – known as "Little Smart" in China – is a wireless access system that provides fixed-line phone subscribers limited and/or regional mobility (more than fixed line and less than cellular) at a lower price than a cellular subscription. PAS was specifically designed to meet the growing needs of lower and middle income subscribers that desired limited mobility and a lower price than cellular.

152.   Little Smart provided "limited mobility service" compared to regular cell phones because the Chinese government did not allow China Telecom and China Netcom to own or operate cellular telecommunications systems. China Mobile and China Unicom were other government controlled telecommunications companies that were permitted to own and operate cellular telecommunications systems. UTSI's PAS system allowed China Telecom and China Netcom to offer "mobile-like" services, but PAS subscribers could not roam beyond city limits because most

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 62 -

1   handsets did not have a SIM (subscriber identity module) card, and the spatial range of coverage for

2   each Little Smart base station was limited to a couple of hundred meters in radius as opposed to

3   ordinary cellular base stations that cover areas tens of kilometers away.

4        153.    Little Smart's signal is less reliable and less clear – especially in moving vehicles –

5   compared to cellular (GSM and CDMA) systems.  Little Smart services were limited compared to

6   cell phones as shown by the inability of Little Smart subscribers to send or receive SMS (short

7   message service) on their handsets until 2004.  Little Smart handsets were inferior to regular cell

8   phones because they did not include many features like silent and vibration modes.  Indeed, there

9   were numerous derogatory terms used by subscribers to refer to Little Smart, including "Weiwei ko"

10   (Hello-Hello call, because users are always saying hello-hello) and "Shikengtong" (toilet connection,

11   to indicate a very low standard).

12        154.    Lu and Sophie knew competition from cellular service providers was also

13   contributing to the substantially reduced demand for PAS systems.  The Chinese Ministry of

14   Information Industry ("MII") allowed China Unicom to sell mobile services for 10% less than the

15   government set rate which provided a competitive edge and cellular companies were lowering

16   prices.  Lu and Sophie not only knew about the impact but knew UTSI violated Chinese law in an

17   attempt to prop up demand for PAS equipment and handsets.  UTSI began to sell PAS handsets with

18   SIM cards that allowed the handsets to be used in different regions than the area for which the user

19   originally contracted, which violated the "limited mobility" restrictions imposed by the MII.  Indeed,

20   on 3/21/05, the MII issued Directive No. 93 that reiterated PAS was prohibited from offering

21   roaming services.  Lu and Sophie knew about these restrictions.  It was reported in UTSI's SEC

22   filings that the MII decided the services and subscriber rates to be offered to the public, and that the

23   MII ordered service providers to halt new deployments of PAS equipment in 5/00 pending its

24   completion of a review of the PAS technology.  In 6/00, the MII issued a notice allowing PAS

25   deployments, but confirmed citywide deployments in large and medium cities would not be

26   permitted.

27        155.    Lu and Sophie also knew China Telecom and China Netcom were reducing PAS

28   capital expenditures in anticipation of the eventual adoption of 3G mobile technology because UTSI

1    participated in 3G field trials in China.  As the Company reported in its 2002 Form 10-K, UTSI

2    established a global team of hundreds of engineers across China and the U.S. to engage in the

3    different aspects of 3G solutions, was selected by the MII in 11/01 to conduct technical 3G field

4    trials, had successfully passed phase one of the field trials by 3/02 and was in the process of phase

5    two.

6         156.    **Expansion of business plan to include international sales indicates Lu and**

7    **Sophie knew PAS equipment orders would decline:**  According to the SEC C&D order, UTSI

8    expanded the Company's business plan in late 2002 to include growth on an international scale.

9    This expansion of the business plan in late 2002 further supports the inference Lu and Sophie knew

10   China Telecom and China Netcom would be reducing orders for PAS equipment in 2003.

11        157.    **Delivery delays and product quality problems reduce gross margins:** Information

12   provided by former employees, the substantial reduction in PAS equipment gross margins from 40%

13   in 2002 to 32% in 2003 and the failure to report overall gross margins in line with guidance raise a

14   strong inference Lu and Sophie knew there were undisclosed operational problems that were

15   reducing gross margins by delaying revenue recognition and increasing costs of the backlogged sales

16   of PAS equipment and broadband equipment.  CW1, CW2, CW3, CW8, CW13, CW16, CW17,

17   CW19 and CW20 stated there were problems in 2003, including numerous delays in delivering

18   equipment to fulfill orders and quality issues with the equipment once it was delivered that delayed

19   installation and customer acceptance.  CW1 said delivery delays were caused by discrepancies

20   between the part numbers maintained on the UTSI systems in Alameda and China which also

21   precluded the Company from keeping track of inventory.  CW2 and CW3 said there were numerous

22   shipping delays caused by discrepancies between the part numbers on the purchase orders and

23   packing slips and the numbers on the actual parts that prevented the shipments from clearing

24   customs.

25        158.    CW3 said delays in manufacturing equipment and the inability to track component

26   part numbers caused delays in completing orders and shipments, and that the problems were

27   pervasive and systemic.  According to CW3, purchase orders included 50-100 part numbers that

28   would be manufactured in China and then delivered to the customer.  CW3 said the parts and part

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 64 -

1   numbers on the purchase orders often did not match the numbers at the China manufacturing facility

2   because the product had been revised and/or the part number changed.  As a result, shipments

3   included revised parts and parts with numbers that did not match the purchase order (and packing

4   slip) that caused delays in clearing customs.  CW8 said the problems impacted shipments of

5   mVision, NetRing and PAS equipment.

6        159.    CW2 was responsible for product returns in 2003 and said a majority of product

7   returns were due to manufacturing problems, including the inability to procure needed materials, the

8   use of poor quality materials and unqualified personnel that caused the products to not work

9   correctly.

10       160.    CW13, a former UTSI engineering manager, said unrealistic product development

11  schedules combined with a weak and inexperienced engineering team trying to develop very

12  complex products required long hours and compromised the quality of the products.  CW13 said

13  product development schedules were tight and unrealistic because the Company agreed to unrealistic

14  customer delivery demands to make sales that would otherwise go to established vendors such as

15  Cisco Systems, Inc., Lucent Technologies Inc. and Motorola, Inc.

16       161.    CW20 said Reliance Telecom was generally not happy with the features of the AN2k

17  digital loop carrier product purchased from UTSI in 2003 and that as a result, UTSI provided a side

18  letter agreement to deliver additional features that Reliance desired.  The SEC C&D Order shows Lu

19  and Sophie knew about the side letter, and that side letters existed on many other transactions.

20       162.    CW16, a former engineer and project manager, said the Company's R&D engineers

21  in China claimed they had other priorities and would not make repairs or modifications to

22  components that were required for the products to function properly.  CW16 said the failure to make

23  required repairs and modifications caused deals with DSSI and SOFTBANK to fail.  CW16 sent the

24  engineers in China "traces" and "exact proof" of where and why products were failing but said the

25  quality issues were not resolved on timely basis or at all.  CW16 complained to Waranauskas,

26  CW16's boss, who was also fed up with the China-based engineers unwillingness to make necessary

27  repairs and modifications.

28

163.    CW16 said there were huge issues with the Company's mVision software and that the hardware needed to be overhauled. The problems were caused by the failure of the China-based engineers from documenting how the mVision product was designed or developed and by the engineering documents that did exist being written in Chinese. CW16 explained that an "as-built document" and a "statement of work" are required for any engineering project. The "as-built document contains drawings of the network structure and details about how the network is compiled and delivered including the system backups and copies of software used in the network. The "statement of work" includes the method of procedure which details whether the customer or UTSI was responsible for certain areas of the network and the time, personnel and project management requirements for changes to the network. It also includes a test plan for the network and instructions on how project acceptance will be conveyed. CW16 said the "as-built document" and the "statement of work" were crucial to any network project because they document whether UTSI or the customer would be liable if the customer's network was damaged in the process of network changes, maintenance or enhancements. Further, if the product failed, the "as built document" was the starting point for determining how the product can be reconfigured to function effectively.

164.    CW16 said that UTSI's China-based R&D engineers failed to maintain documentation showing what work had been done in development and who was responsible for certain areas of a customer's network. CW16 said there was a chronic failure to consistently create "as-built documents" and "statements of work" which made it impossible to keep track of the configuration of products in the network, how the products interfaced and changes made to the products and interfaces when trying to improve the functionality of the network. For example, CW16 said the failure to document that a UTSI engineer had reduced video speed to 24 frames per second from 32 frames per second caused delays in determining why video was "freezing up" on DSSI's IPTV network and UTSI engineers incorrectly claiming the "freezing up" was not their fault.

165.    CW17, whose group was trying to improve UTSI's product quality and repair process, stated that product quality and repairs were formidable issues for UTSI in 2003 and 2004 because (1) the Company's China-based engineers failed to document the development of products, and (2) the China-based engineers were unwilling to make changes to improve the quality of UTSI's

1   products.  Like CW13 and CW16, CW17 said the China-based engineers were unwilling to make

2   changes, modifications or improvements to the Company's products because they had to spend their

3   time manufacturing product to keep up with the Company's rapid growth.  Indeed, CW17 said the

4   Company's service support organization was next to nothing and in shambles.

5       166.   CW17 said that UTSI did not have a built-in quality review process in manufacturing

6   that led to numerous product quality problems and delays in repairing products.  According to

7   CW17, about 90% of the Company's products were manufactured in China when CW17 joined

8   UTSI in 5/03.  Like CW16, CW17 said that documentation regarding the development of products

9   was insufficient.  There were many instances where CW17 and CW17's peers requested product

10  documentation from the manufacturing personnel in China for use in identifying sources of quality

11  issues and were told that the documentation did not exist or that the documentation did not

12  accurately reflect the component parts included in the product.  For example, CW17 said that the

13  manufacturing personnel in China inappropriately created new part numbers for components and

14  final products as the products evolved from inception to end-of-life and changed serial numbers on

15  component parts without documenting the changes.  These changes made it difficult to identify the

16  vendor that manufactured the component part if it failed.  They also caused delays in parts clearing

17  customs as custom authorities typically tracked products and component parts via serial numbers.

18      167.   Like CW16, CW17 said the engineering employees in China were simply unwilling

19  to make changes to improve the quality of UTSI's products.  According to CW17, engineers in

20  China focused on manufacturing product to keep up with the Company's rapid growth and were not

21  interested in ensuring optimal repair services and support after a sale was made.  Further, even when

22  repairs were made, the changing of part numbers and serial numbers delayed the time it took to

23  repair and then deliver the repaired product.  CW17 explained that China customs required parts

24  returned through China customs have the same part numbers that were subsequently exported but

25  that many repaired products included component parts with different numbers that delayed the

26  shipment from clearing customs.  As a result, it took 3-6 months to repair and return product when

27  typical and expected turnaround times were 30-60 days.

28

168.   CW17 explained that some products manufactured or repaired in China, including IPTV set top boxes, had high failure rates. Some failure rates were 10% when acceptable failure rates were less than 1%. Engineering change orders had to be issued on a wide scale for DSLAMs sold in Japan. In addition, CW17 said there were problems with product sold to SOFTBANK that CW17 believed to be the result of repairs done by manufacturing. Delays in delivering repaired product to SOFTBANK caused by delays in products clearing customs further strained the relationship between UTSI and SOFTBANK. As a result, in approximately 2004 or 2005, the products were repaired at Rolling Meadows or by a vendor in Japan to avoid the 3-6 month delays at Chinese customs caused by the part number problems. In 2006, UTSI established a repair facility in Singapore to avoid the delays.

169.   CW17 said that UTSI with the assistance of Commworks personnel tried to improve product quality and the repair process by implementing a "global worldwide quality plan" but that implementation of the plan took at least three years from the time UTSI acquired Commworks in 5/03. Indeed, CW17 did not witness improvements until mid 2007. CW17 said that the focus of the engineers in China on manufacturing to keep up with UTSI's rapid growth was a major reason for the delays in implementing the "global worldwide quality plan" and actual improvements in product quality and repairs.

170.   CW19 also said there were problems with the Company's products. CW19 said the mVision IPTV product was still not working in 2006 and 2007 and heard from colleagues that UTSI lost a deal with DSSI as a result. CW19 also said the Company's DSLAM product was not viable in North America because the DSLAMs failed to meet size and power usage standards.

171.   **Lu and Sophie knew there were significant internal control weaknesses that caused UTSI to improperly recognize revenue and overstate gross margins:** Lu and Sophie also knew there was no basis for the gross margin guidance or their statements that the backlog provided tremendous visibility into UTSI's future results in 2003 because they knew that revenues were being recorded without sufficient controls in place to ensure contract terms had been satisfied and that related-party transactions were properly reported. Indeed, Lu, Sophie and the UTSI Audit Committee received a Management Recommendation letter from PWC in 3/03, detailing internal

1  control weaknesses identified during the December 31, 2002 year-end audit, including the need to

2  "'strengthen procedures to ensure side letters and contract amendments are communicated and

3  accounted for in a timely manner.'"  PWC also expressed concerns with the many complex related-

4  party transactions entered into by UTSI, and informed UTSI that it did not adequately disclose

5  significant transactions involving joint venture arrangements between UTSI and its customers.

6      172.  **Failure to Report Gross Margins in Line with Guidance:** The substantial decline

7  in PAS equipment gross margins, the failure to report overall gross margins in line with guidance

8  and the subsequent restatements of gross margins confirm there was no reasonable basis for the

9  guidance, and strengthen the inference Lu and Sophie knew it.  After reporting a 40% gross margin

10 on sales of PAS equipment in 2002, the gross margin on sales of PAS equipment declined to 32% in

11 2003.  UTSI originally reported a 31.8% gross margin in 3Q03, a 31% gross margin in 4Q03, and a

12 32.4% gross margin in FY03, substantially less than the 34%-35% they told investors to expect on

13 4/16/03.

14     173.  UTSI restated and reduced the 4Q03 gross margin to 29.2%, and the FY03 gross

15 margin to 31.8% on 4/13/05, after the Company recorded a $7.5 million inventory impairment

16 charge incurred by MDC, a related party whose results should have been consolidated with UTSI's

17 results.  The SEC C&D Order and the explanation for the restatement in the 2003 Form 10-K/A filed

18 on 4/13/05 establish that Lu and Sophie knew that MDC was formed in 2001 by UTSI employees to

19 provide services to UTSI, that UTSI officers and employees owned 67% of MDC, that UTSI entered

20 into a complex transaction in 2003 involving MDC and another customer in China, whereby MDC

21 took ownership of the impaired UTSI inventory, and that UTSI had adopted FIN 46 which required

22 MDC to be treated as a consolidated entity.

23     174.  The 4Q03 and FY03 gross margins were restated and reduced a second time to 29.1%

24 and 31.7% on 6/1/06 after UTSI reversed $7.8 million of revenue that was improperly recognized in

25 4Q03, and $24.1 million of revenue improperly recognized on FY03.  The restatement announced on

26 10/10/07 reduced the FY03 gross margin to 31.6%, and would have reduced the 4Q03 gross margin,

27 but UTSI only restated FY03, not any of the quarters when the 10/10/07 restatement was announced.

28

175. **Bribes to Procure Orders:** Lu and Sophie knew that there was no basis to represent the backlog provided tremendous visibility, and that gross margins would improve in 2003 because, as detailed above, they knew orders were being booked and revenues recognized without controls in place to assure the contracts were not obtained by bribing foreign government officials in violation of the FCPA. The same significant internal control weaknesses that allowed the Company to improperly recognize more than $400 million of revenue between 2000 and 2005 also allowed the bribes to occur. The significant internal control weaknesses at UTSI, the investigations by the Company, the SEC and the DOJ of possible violations of the FCPA, and the unwinding of the Mongolian joint venture transaction, strongly infer that UTSI did obtain sales by bribing foreign government officials in violation of the FCPA.

176. **Belated Admission of Inability to Forecast:** After continuing to miss gross margin guidance in 2003 and 2004, Sophie conceded he could not forecast UTSI's future results by stating during the 1/6/05 conference call that the Company would only provide guidance for one quarter into the future. As detailed herein, Sophie did not have a reasonable basis to provide forecasts for just one quarter into the future given the problems described above. In fact, UTSI failed to report results in line with guidance in 2Q05, 3Q05, 4Q05 and 3Q06.

177. **Insider Selling:** Suspicious insider selling by Lu, Sophie and other UTSI executives – most of which occurred after the false 4/16/03 statements caused the stock price to increase – strengthens the inference Lu and Sophie knew their statements during the 4/16/03 conference call were materially false and misleading.

178. **Effect on Stock Price:** UTSI's stock price increased more than 17% from $19.9 on 4/16/03 to $23.39 on 4/22/03. The PPG declined 0.6% and the NASDAQ increased by 4%.

179. **Loss Causation/Date of Loss:** Class members were damaged by the false and misleading statements when the price of the stock declined after some of UTSI's true financial condition was revealed:

- Between 9/3/03 and 9/26/03, the price of the Company's stock declined 29%, compared to a 1.75% decline in the PPG and a 3.3% decline in the NASDAQ. Analysts attributed the decline to concerns that China Telecom and China Netcom would reduce or stop purchasing UTSI's PAS products, and shift capital expenditures

to 3G infrastructure products in anticipation of receiving 3G licenses from the Chinese government.

- UTSI's stock price declined 8.4% from $34.06 on 10/23/03 to $31.20 on 10/24/03, compared to a 0.5% decline in the PPG and a 1.1% decline in the NASDAQ after the Company revealed that the gross margin in 3Q03 was 31.8%, not 34% as represented on 4/16/03, and that the gross margin was expected to be 30%-32% in 4Q03, not 34%-35% as represented on 4/16/03.

- On 3/31/05, the Company's stock price declined 7.5% from $11.84 to $10.95, compared to a 1.2% increase in the PPG and a 0.3% decline in the NASDAQ after UTSI announced that (1) there would be a delay in filing the 2003 restated financial statements and the 2004 Form 10-K because more time was needed to finalize the assessment of internal control over financial reporting and (2) additional deficiencies had been identified.  Two weeks later, UTSI restated its 2003 financial restatements and consolidated the results of MDC, which caused 4Q03 and FY03 gross margins to decline.

- On 2/9/06, the Company's stock price declined 3.2% from $6.81 to $$6.59, compared to a 1% decline in the PPG and a 0.5% decline in the NASDAQ after UTSI announced that it had improperly recognized $22 million of revenue between 2003 and 2005 on a contract with a customer in India, and that the Audit Committee had initiated an investigation to determine if the Company's previously issued financial statements needed to be adjusted.

- On 3/17/06, the Company's stock price declined 6.1% from $6.24 to $5.86, compared to a 0.4% decline in the PPG and a 0.3% increase in the NASDAQ after the Company reported on 3/16/06 that there would be a delay in the filing of the 2005 Form 10-K because the Audit Committee needed additional time to investigate the $22 million of improperly recognized revenue on the contract with a customer in India and certain other transactions.  Two months later, UTSI announced it would restate and reduce revenues by $49.6 million, including $24 million in 2003 that caused further reductions in the 4Q03 and FY03 gross margins.

- The Company's stock price declined 34.5% from $4.73 on 7/23/07 to $3.10 on 7/30/07, compared to a 3.8% decline in the PPG and a 4% decline in the NASDAQ after UTSI reported on 7/24/07 that it was reviewing historical sales contracts with some of its customers in China that could impact revenue recognized in previously issued financial statements.

- The Company's stock price declined 8.1% from $4.93 on 10/10/07, to $4.53 on 10/12/07, compared to no change in the PPG and a 0.2% decline in the NASDAQ after UTSI reported on 10/10/07 that the investigation of the China sales contracts would require UTSI to restate and reduce revenues reported from 2000 to 2005 by $270 million and net income by $124 million.  This restatement caused the FY03 gross margin to decline to 31.6%.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 71 -

1    180.    **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock at

2    artificially inflated prices after Lu and Sophie assured investors that gross margins would improve in

3    2003, and that the backlog provided a tremendous amount of visibility.  If Lu and Sophie had

4    acknowledged the backlog did not provide tremendous visibility and that they did not know if gross

5    margins would improve in 2003, investors would have known the true condition of UTSI and

6    lowered their expectations about the Company's current and future prospects which would have

7    caused the stock price to decline as it did on the dates listed above.

8    181.    **Date of Statements and Statements:** On 7/17/03, UTSI issued a press release and

9    held a conference call to report the Company's 2Q03 results.  During the 7/17/03 conference call, Lu

10    and Sophie made the following statements:

11    Lu: *[O]ur booking continues to be strong for the quarter, and as such, our visibility
     now extends into Q1 of 2004, an achievement we believe is unmatched in the
12    industry.  Because of this increased visibility, UTStarcom is again raising guidance
     for the year.*

13                                   *       *       *

14
     Sophie: To transition to the balance sheet, I would once again like to point out that
15    *UTStarcom views the rise in inventory and corresponding increase in deferred
     revenues as a powerful indicator and is a direct reflection of the extraordinary
16    strong demand we are seeing for our products and translates into increased
     visibility, revenues and profits*.
17
                                     *       *       *
18
          *Guidance going forward.  We continue to see the strength and growing
19    demand across all product lines, both in mainland China and globally.
     UTStarcom is again raising revenue guidance for both Q3 and the full year 2003.*
20
                                     *       *       *
21
     *[W]e are targeting gross margin as a percentage of revenue for the full year 2003
22    continue [sic] to stay at the current levels, plus or minus a few tenths of a percent.*

23                                   *       *       *

24    Sophie: The other quantitative comment on the backlog is that we have *our backlog
     in place through the balance of the year, and we are starting to schedule backlog
25    now for Q1 2004.  So, again, we are very excited about that.  It gives us a
     tremendous amount of visibility we think is unmatched in the industry*.
26
27    182.    **Identity of Authors:** Lu and Sophie made the statements during the conference call.

28

1    183.    **True Facts:** The substantial decline in PAS orders from $453 million in 1Q03 to

2    $245 million in 2Q03 establishes that there was not strong and growing demand across all product

3    lines and that bookings were not strong for the quarter as Lu and Sophie represented.  Gross margins

4    did not stay at current levels:

| Period | 7/17/03 Guidance | Originally Reported | 4/13/05 Restatement | 6/1/06 Restatement | 10/10/07 Restatement |
|--------|------------------|---------------------|---------------------|---------------------|----------------------|
| 3Q03   | 34%              | 31.8%               | 31.8%               | 31.8%               | N/R                  |
| 4Q03   | 34%              | 31.0%               | 29.2%               | 29.1%               | N/R                  |
| FY03   | 34%-35%          | 32.4%               | 31.8%               | 31.7%               | 31.6%                |

The failure to report gross margins in line with guidance establishes the backlog did not provide

tremendous visibility into UTSI's future results.

184.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew the continuing**

**undisclosed and widespread problems prevented them from providing accurate guidance:** Lu

and Sophie continued to know there was no reasonable basis for their guidance because they knew

(1) China Telecom and China Netcom substantially reduced orders for PAS equipment in 2Q03, (2)

gross margins on PAS equipment sales were declining due to the reduced demand and aggressive

pricing, and (3) gross margins on PAS equipment sales and broadband equipment sales were being

negatively impacted by the undisclosed operational problems that were delaying revenue recognition

and increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were

significant internal control weaknesses that precluded them from knowing if (1) UTSI was properly

recognizing revenue on sales with side agreements supplementing or amending contract terms, (2)

UTSI was properly accounting for related-party transactions and (3) UTSI was obtaining sales by

bribing foreign government officials in violation of the FCPA.

185.    That UTSI originally reported gross margins in 3Q03, 4Q03 and FY03 that were

substantially less than the 34%-35% they told investors to expect on 7/17/03 and then restated and

reduced gross margins on 4/13/05, 6/1/06 and 10/10/07 confirms there was no reasonable basis for

the guidance and strengthens the inference Lu and Sophie knew it.

186.    **Lu and Sophie knew that China Netcom and China Telecom substantially**

**reduced PAS equipment orders in 2Q03:** Lu and Sophie knew by 7/17/03 that *PAS equipment*

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 73 -

1   *orders from China Telecom and China Netcom declined 46% from $453 million in 1Q03 to $245*

2   *million in 2Q03* when they told investors that bookings continued to be strong and that there was

3   extraordinary demand for the Company's products.  The importance of China Telecom and China

4   Netcom to UTSI's financial results, the admitted close relationship between UTSI and the two

5   companies, the expansion of the business plan in late 2002 to include growth on an international

6   scale, the excess capacity on existing PAS networks, the statements by the former UTSI employees

7   that shipments of PAS equipment were falling off a cliff and that UTSI was building more PAS

8   infrastructure equipment than needed, the rapid obsolescence of low quality PAS systems, and the

9   substantial decline in PAS equipment orders in 3Q03 and 4Q03, strongly infer Lu and Sophie knew

10  China Telecom and China Netcom would continue to substantially reduce orders in 2003.  PAS

11  equipment orders declined to $200 million in 3Q03 and to $105 million in 4Q03.

12        187.   **Lu and Sophie knew the decline in PAS equipment orders was unusual:** Lu and

13  Sophie knew that the decline in orders in 2H03 was unusual because as Lu stated during UTSI's

14  9/25/03 conference call, China Netcom's capital expenditures were typically heavier in the second

15  half of the year.

16        188.   **Insider Stock Sales:** Additional sales of UTSI stock by Lu, Sophie and other UTSI

17  executives after 7/17/03 as the Company's stock price was increasing to its Class Period high of

18  $45.36 on 8/21/03 strengthens the inference Lu and Sophie knew there was no reasonable basis for

19  the guidance.

20        189.   **Motive – Need to Raise Funds**: The need to raise funds to diversify the Company's

21  operations away from the declining China PAS market also indicates Lu and Sophie wanted to keep

22  the stock price high by making materially false and misleading statements, and by concealing the

23  adverse information described above.  After the Company filed a Form S-3 Registration Statement in

24  8/03 to register $500 million of securities, Sophie repeatedly assured investors UTSI had not planned

25  to raise funds throughout 2003.  On 1/8/04, however, the Company raised $475 million by issuing

26  12.1 million shares at $39.75 per share.  The funds were used to acquire the handset division of

27  Audiovox, which now comprises a majority of the Company's revenues.

28

190.   **Effect on Stock Price:** In the two days following UTSI's 7/17/03 earnings release and conference call, the Company's stock price increased 10% from $37.98 to $41.83 compared to a 0.2% increase in the PPG and a 1% decline in the NASDAQ.

191.   **Loss Causation/Date of Loss:** As detailed in ¶179, Class members were damaged by the false and misleading statements when the price of the stock declined on 9/3-26/03, 10/24/03, 3/31/05, 2/9/06, 3/17/06, 7/23-30/07 and 10/11-12/07 after some of UTSI's true financial condition was revealed.

192.   **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock at artificially inflated prices after 7/17/03.  If Lu and Sophie had acknowledged that there was not growing and strong demand for the Company's products, that the backlog did not provide tremendous visibility into future results and that they could not accurately forecast future gross margins, investors would have known the true condition of UTSI and lowered their expectations about the Company's current and future prospects which would have caused the stock price to decline as it did on the dates listed above.

193.   **Date of Statements and Statements:** On 9/25/03, UTSI issued a press release and held a conference call – described as extremely positive in a 9/25/03 ThinkEquity Partners LLC report – to "reiterate the strength of the company's outlook" and to address investors' concerns about the impact of 3G on UTSI's sales.  During the conference call, Lu stated that (1) "[t]he purpose of today's call is to *reiterate the strength in the business*, as we stated in the guidance we [] gave on our Q2 earnings call in July," and (2) "UTStarcom *continues to see the strong demand* across China for our PAS solutions."  During the conference call, Sophie stated, "There's been several rumors that the company is coming to market with an offering.  *We have no plans to come to the market with any kind of debt or equity offering*."

194.   **Identity of Authors:** Lu and Sophie made the statements during the conference call.

195.   **True Facts:** The continuing substantial decline in PAS orders from China Netcom and China Telecom from $453 million in 1Q03 to $245 million in 2Q03 to $200 million in 3Q03 establishes that there was not strong demand across China for PAS solutions as Lu represented. UTSI failed to report 3Q03, 4Q03 and FY03 gross margins in line with the 7/17/03 guidance that Lu

1  reiterated on 9/25/03 and subsequently restated and reduced 4Q03 and FY03 gross margins.  The

2  need to diversify away from the undisclosed declining China PAS market and the sale of 12.1

3  million shares of UTSI stock to Banc of America on 1/8/04 – just three months after Sophie said

4  there were no plans to do so – raises a strong inference that the Company did plan to come to market

5  with an equity offering on 9/25/03.

6      196.  **Scienter and Factual Basis for Scienter: Continuing Decline in PAS Equipment**

7  **Orders:** Lu and Sophie knew there did not continue to be strong demand across China for PAS

8  solutions because by 9/25/03, they knew PAS equipment orders received from China Telecom and

9  China Netcom continued to decline in 3Q03.  After declining from $453 million in 1Q03 to $245

10  million in 2Q03, PAS equipment orders declined to $200 million in 3Q03.  The substantial decline in

11  orders from 1Q03 to 3Q03, the importance of China Telecom and China Netcom to the Company's

12  financial results, the close relationship between UTSI and its two largest customers, the excess

13  capacity on existing PAS networks, the description of the decline in PAS equipment shipments by

14  the former UTSI employee quoted in the 10/29/07 edition of *The Recorder* ("It looked like

15  everything was falling off a cliff in terms of shipments."), and the continual decline in orders in

16  4Q03 and 2004, raise a strong inference Lu and Sophie knew China Telecom and China Netcom

17  planned to substantially reduce PAS equipment orders in 4Q03 and 2004.

18      197.  **Lu and Sophie knew the undisclosed and widespread problems prevented them**

19  **from providing accurate guidance:** Lu and Sophie knew there was no reasonable basis to reiterate

20  the 7/17/03 guidance because they knew (1) China Telecom and China Netcom substantially reduced

21  orders for PAS equipment again in 3Q03, (2) gross margins on PAS equipment sales were declining

22  due to the reduced demand and aggressive pricing and (3) gross margins on PAS equipment sales

23  and broadband equipment sales were being negatively impacted by the undisclosed operational

24  problems that were delaying revenue recognition and increasing the costs of the backlogged sales.

25  In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded

26  them from knowing if (1) UTSI was properly recognizing revenue on sales with side agreements

27  supplementing or amending contract terms, (2) UTSI was properly accounting for related-party

28

1    transactions and (3) UTSI was obtaining sales by bribing foreign government officials in violation of

2    the FCPA.

3         198.    That UTSI originally reported gross margins in 3Q03, 4Q03 and FY03 that were

4    substantially less than the 34%-35% they told investors to expect on 9/25/03 and then restated and

5    reduced gross margins on 4/13/05, 6/1/06 and 10/10/07 confirms there was no reasonable basis for

6    the guidance and strengthens the inference Lu and Sophie knew it.

7         199.    **Lowering of Gross Margin Guidance Just Six Days Later:** On 10/1/03, UTSI

8    issued a press release and revealed that gross margins would be 32% in 3Q03 because lower margin

9    PAS handset sales had increased as a percentage of overall sales.  It is implausible Lu and Sophie did

10   not know gross margins would be 32% in 3Q03 on 9/25/03 when there were just five days left in the

11   quarter.  If they did not know it, then they knew their repeated assurances that the Company's

12   backlog provided them with tremendous visibility into future results were false.

13        200.    **Motive – Need to Raise Funds:** Sophie and Lu knew Sophie's assurance that UTSI

14   had "no plans to come to the market with any kind of debt or equity offering" was false.  Just three

15   months later, UTSI sold 12.1 million shares for $475 million.  UTSI needed to raise funds by selling

16   inflated stock to diversify the Company's product offerings and to reduce the Company's

17   dependence on China PAS sales – which each of the Individual Defendants knew would decline due

18   to the substantial decline in orders received from China Telecom and China Netcom.

19        201.    **More Insider Selling:** Additional sales of UTSI stock by Lu, Sophie and other UTSI

20   executives detailed in ¶¶135-138 strengthens the inference Lu and Sophie knew their statements

21   were materially false and misleading.

22        202.    **Effect on Stock Price:** Despite the reassurances made by Lu and Sophie during the

23   9/25/03 conference call, the price of UTSI's stock declined 11.3% from $35.08 on 9/24/03 to $31.24

24   on 9/26/03, compared to a 3.1% decline in the PPG and a 2.8% decline in the NASDAQ.

25        203.    **Loss Causation/Date of Loss:** As detailed in ¶179, Class members were damaged by

26   the false and misleading statements when the price of the stock declined on 10/24/03, 3/31/05,

27   2/9/06, 3/17/06, 7/23-30/07 and 10/11-12/07.  In addition:

28

- UTSI's stock price declined 9.5% from $41.34 on 1/8/04 to $37.40 on 1/9/04, compared to a 1.6% decline in the PPG and a 0.6% decline in the NASDAQ after the Company revealed it had sold 12.1 million shares for $475 million, which was contrary to the representations on 9/25/03 that there were no plans to come to the market with any kind of debt or equity offering.

204.    **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock at artificially inflated prices after 9/25/03.  If Lu and Sophie had admitted that there was not strong demand across China for PAS solutions, that they could not accurately forecast future financial results and that UTSI did in fact plan to come to market with an offering, investors would have known the true condition of UTSI and lowered their expectations about the Company's current and future prospects, which would have caused the stock price to decline as it did on the dates listed above.

205.    **Date of Statements and Statements:** On 10/23/03, UTSI issued a press release and held a conference call to report the Company's 3Q03 results.  During the 10/23/03 conference call, Lu and Sophie made the following statements:

Lu: *[O]ur bookings remain strong for the quarter and our visibility now extends well into 2004. . . .*"

*        *        *

Sophie: Gross margins.  Given the continued upside in handsets and ramping revenues in India, our *gross margins for the fourth quarter of 2003 are anticipated to range between 30 and 32%*. . . .

*        *        *

Our philosophy on *guidance will continue to be conservative*. . . .

*        *        *

*Full-year 2004 guidance is as follows.  Revenues should be in the range of 2.4 to 2.5 billion . . . Full-year 2004 GAAP EPS should be in the range of $1.92 to $1.95 . . . .   Revenues from outside Mainland China are anticipated to be approximately 20 to 25% of total revenues with a growth rate of approximately 85% over 2003.*

*        *        *

In total *we expect international revenues between 500 and 600 million in 2004*. . . . wire line systems should be approximately 15% of revenues . . . .  Handsets should be approximately 55% . . . .  Wireless systems will be approximately 30%, reflecting continued expansion and new deployments of PAS networks, both inside and outside of Mainland China . . . . *Gross margins for 2004 should range between*

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                      - 78 -

**30 and 32% due to continued strong PAS subscriber and handset growth**, a significant ramp in India, and reflective of continued world wide competitive and pricing trends in telecom. . . .

\*         \*         \*

Shelf registration and offering.  Also in July we filed a $500 million universal shelf registration.  **This has raised investor concerns on our need to raise cash.**  As you can see with the Q3 results, the Company was cash flow positive for the quarter and has over 440 million of cash on the balance sheet.  **We do not currently anticipate any need to raise money to fund operations.**  The shelf registration was filed to give the Company flexibility in the future if strategic opportunities presented themselves, that were in the best interests of the Company and our shareholders.

206.    **Identity of Authors:** Lu and Sophie made the statements during the conference call.

207.    **True Facts:** Bookings did not "remain strong for the quarter" as Lu represented. PAS orders from China Netcom and China Telecom continued to decline substantially from $453 million in 1Q03 to $245 million in 2Q03 to $200 million in 3Q03 to $105 million in 4Q03.

208.    UTSI did not report gross margins, international sales and EPS in line with guidance:

| Period | 10/23/03 Guidance | Originally Reported | 4/13/05 Restatement | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|---|
| 4Q03 Gross Margin | 30%-32% | 31.0% | 29.2% | 29.1% | N/R |
| FY03 Gross Margin | 30%-32% | 32.4% | 31.8% | 31.7% | 31.6% |
| 1Q04 Gross Margin | 30%-32% | 28.3% | N/A | 28.3% | N/R |
| 2Q04 Gross Margin | 30%-32% | 25.6% | N/A | 25.8% | N/R |
| 3Q04 Gross Margin | 30%-32% | 21.2% | N/A | 21.1% | N/R |
| 4Q04 Gross Margin | 30%-32% | 15.0% | N/A | 14.9% | N/R |
| FY04 Gross Margin | 30%-32% | 22.3% | N/A | 22.2% | 22.1% |
| FY04 International Revenues (Excluding PCD) | $500-$600 million | $292.9 million | N/A | $273.7 million | $273.8 million |
| FY04 EPS | $1.92-$1.95 | $0.64 | N/A | $0.61 | $0.45 |

209.    The need to diversify away from the undisclosed declining China PAS market and the sale of 12.1 million shares of UTSI stock to Banc of America on 1/8/04 establish that defendants did need to raise money to fund operations.

210.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew PAS equipment orders declined again in 3Q03:** Lu and Sophie knew bookings did not remain strong in 3Q03. After declining from $453 million in 1Q03 to $245 million in 2Q03, PAS equipment orders declined to $200 million in 3Q03.  Lu and Sophie knew about the decline given the importance of China Telecom and China Netcom to UTSI's results and because UTSI tracked orders from the Company's

1  two largest customers. Further, they knew the decline in 3Q03 was unusual because as Lu stated

2  during UTSI's 9/25/03 conference call, China Netcom's capital expenditures were typically heavier

3  in the second half of the year. The substantial decline in orders from 1Q03 to 3Q03, the further

4  decline in orders in 4Q03 and 2004, the importance of China Telecom and China Netcom to the

5  Company's financial results and the close relationship between UTSI and its two largest customers

6  strongly infer Lu and Sophie knew China Telecom and China Netcom planned to substantially

7  reduce PAS equipment orders in 4Q03 and 2004.

8      211.  **Lu and Sophie knew PAS subscriber growth rates declined in 4Q03:** By

9  10/23/03, Lu and Sophie also knew that the decline in PAS equipment orders would continue for

10  another reason – the growth rate in China PAS subscribers was declining from 40% in 3Q03 to 25%

11  in 4Q03. UTSI reported in the 2002 Form 10-K that changes in subscriber growth rates could affect

12  the Company's operating results, and during the 10/23/03 conference call, Sophie stated that

13  "[s]ubscriber growth is the key metric to focus on as this is what ultimately drives both handset and

14  infrastructure spending."

15      212.  **Lu and Sophie knew the undisclosed and widespread product problems**

16  **prevented them from providing accurate guidance:** Lu and Sophie knew there was no basis to

17  represent that their guidance was conservative, and that gross margins would range between 30%

18  and 32% in 4Q03 and throughout 2004 because they knew (1) China Telecom and China Netcom

19  continued to substantially reduce their orders for PAS equipment, (2) gross margins on PAS

20  equipment sales were declining due to the reduced demand and aggressive pricing and (3) gross

21  margins on PAS equipment sales and broadband equipment sales were being negatively impacted by

22  the undisclosed operational problems that were delaying revenue recognition and increasing the

23  costs of the backlogged sales.

24      213.  The fact that UTSI initially reported gross margins, international sales and EPS

25  significantly less than the guidance provided on 10/23/03 and the reasons provided for the shortfalls

26  (shipment delays, the failure to satisfy contract terms and delays in receiving customer acceptance)

27  bolsters the inference Lu and Sophie knew about the problems on 10/23/03 and that the problems

28  precluded Lu and Sophie from providing accurate guidance. Gross margins declined substantially

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                    - 80 -

1  from 2003 to 2004 in all business segments.  PAS equipment gross margins declined from 32% in

2  2003 to 29% in 2004, PAS handset gross margins declined from 25% in 2003 to 18% in 2004 and

3  broadband gross margins declined from 53% in 2003 to 20% in 2004.

4      214.  **Lu and Sophie knew the significant internal control weaknesses prevented them**

5  **from providing accurate guidance:** Lu and Sophie knew there was no reasonable basis for their

6  guidance because they knew (1) UTSI was recognizing revenue without sufficient controls in place

7  to ensure there were not side letters amending or supplementing contract terms that precluded

8  revenue recognition, (2) UTSI did not have sufficient controls in place to ensure stock compensation

9  expenses were being recorded in accordance with GAAP (APB 25), (3) UTSI did not have sufficient

10  controls in place to ensure related-party transactions were reported in accordance with GAAP (FIN

11  46), and (4) UTSI did not have sufficient controls in place to ensure sales were not being obtained by

12  bribing foreign government officials in violation of the FCPA.

13      215.  Gross margins in 4Q03 and FY03 were restated and reduced on 4/13/05 by

14  consolidating the results of MDC and recognizing a $7.5 million impairment charge, reduced again

15  when UTSI restated and reduced 2003 revenue by $24 million on 6/1/06, and by $21 million on

16  10/10/07.  FY04 EPS was restated twice and reduced from $0.64 to $0.45 after the Company restated

17  and reduced 2004 revenue by $19.2 million on 6/1/06 and by $105 million on 10/10/07.  The

18  restatements and Lu's and Sophie's knowledge of the significant internal control weaknesses

19  strengthen the inference Lu and Sophie knew there was no reasonable basis for the guidance.

20      216.  **Lu and Sophie knew there was no reasonable basis to represent international**

21  **revenues would be $500-$600 million in 2004:** The delays in manufacturing, delivery and

22  receiving customer acceptance caused by the problems described as pervasive and systemic by the

23  witnesses, the Company's repeated admissions of product problems, the magnitude of the shortfall in

24  international revenue originally reported in 2004 ($293 million, not $500-$600 million) and the

25  decline in broadband gross margins from 53% in 2003 to 20% in 2004 raise a strong inference Lu

26  and Sophie knew there was no reasonable basis to represent international revenues would increase

27  85% to $500-$600 million in 2004.  These sources establish the problems were widespread and well

28  known throughout the Company.  The witnesses explained that (1) the changing of serial numbers on

1    component parts and products caused delays in shipments clearing customs, (2) a weak and

2    inexperienced engineering team trying to develop complex products in unrealistic time frames

3    resulted in manufacturing delays and the production of defective products, which delayed delivery

4    and receiving customer acceptance, and (3) the failure of engineers to repair or modify defective

5    products or to maintain documentation needed to identify the cause of defects also caused delivery

6    delays and delays in receiving customer acceptance.

7         217.    Throughout 2004, Lu and Sophie acknowledged the problems prevented the

8    Company from reporting revenues, gross margins and EPS in line with the guidance.  On 7/27/04,

9    the Company reported disappointing 2Q04 results and lowered guidance due to delays in shipments

10   clearing customs that precluded the recognition of $28.7 million of higher margin international

11   revenue.  On 9/20/04, the Company lowered guidance again explaining it would not be able to

12   recognize $220 million of revenue on the Japan Telecom transaction because UTSI was obligated to

13   perform sales promotional activities.  The information provided by CW3 and CW8 (CW3 said Japan

14   Telecom insisted it approve all equipment before it was accepted for deployment because UTSI had

15   delivered poor quality products to SOFTBANK affiliates in the past, and CW8 said there were

16   significant quality issues with the iAN-8000 MSAN (Multi-Service Access Node) equipment

17   delivered to Japan Telecom) explains why Japan Telecom insisted upon the sales promotional terms

18   of the deal.  On 10/26/04, the Company revealed that $28 million of revenue from the sale of UTSI's

19   mVision IPTV products would be recognized in 2005 rather than 4Q04.  Information provided by

20   CW6, CW9, CW16 and CW19 establishes there were problems with the mVision IPTV product,

21   CW13 and the Company's lawsuit against Passave confirm there were problems with the Company's

22   GEPON product shipped to SBBC in 7/04.

23        218.    In the 2004 Form 10-K, UTSI reported that it recognized $184.4 million of revenues

24   in 2003 and $143.7 million of revenues in 2004 from sales of ADSL (asynchronous digital

25   subscriber line), GEPON and NetRing broadband products to SBBC, and that it had delivered

26   UTSI's iAN-8000 broadband equipment to Japan Telecom in 2004.  The fact that affiliates of

27   SOFTBANK, the Company's largest shareholder and third largest customer, had issues with product

28   quality in 2003 and comprised a majority of the Company's international and broadband product

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 82 -

1    sales in 2003 and 2004 further strengthens the inference Lu and Sophie knew about the problems and

2    that there was no reasonable basis to represent international revenues would be $500-$600 million in

3    2004.

4        219.    **Additional Insider Selling:** Lu, Sophie, Soloway, Huang, Toy and Wu all sold

5    thousands of shares on 10/28/03 and over the next two months.  Considered with the other facts, the

6    insider sales strengthen the inference Lu and Sophie knew their statements on 10/23/03 were

7    materially false and misleading.

8        220.    **Motive – Need to Raise Funds:** The fact that UTSI raised $475 million on 1/9/04 by

9    selling 12.1 million shares to Banc of America for $39.25 per share raises a strong inference Lu and

10   Sophie knew UTSI did anticipate a need to raise money to fund operations.  Indeed, the $475 million

11   was raised just two months after Sophie represented there was no need to raise funds.  Lu and Sophie

12   knew UTSI needed the funds to diversify the Company's operations away from the undisclosed

13   declining China PAS market which they knew was declining from the overall reduction in PAS

14   orders, particularly new deployment orders.  Defendants also needed to raise funds because in 2Q03,

15   UTSI's cash declined by almost $300 million after it spent approximately $250 million to buy

16   SOFTBANK's UTSI stock ($140 million) and acquire Commworks ($108 million).

17       221.    **Effect on Stock Price:** UTSI's stock price declined 8.4% from $34.06 on 10/23/03 to

18   $31.20 on 10/24/03 after the Company announced 3Q03 results and lowered gross margin guidance

19   on 10/23/03.  By comparison, the PPG declined 0.5% and the NASDAQ declined 1.1%.

20       222.    **Loss Causation/Date of Loss:** As detailed in ¶179, Class members were damaged by

21   the false and misleading statements made on 10/23/03 when the price of the stock declined on

22   1/9/04, 3/31/05, 2/9/06, 3/17/06, 7/23-30/07 and 10/11-12/07, after some of UTSI's true financial

23   condition was revealed.  Class members were also damaged when the stock price declined on 3/30-

24   31/04, 4/28-30/04, 7/28/04, 9/20/04, 1/7/05 and 10/11-12/07 after more of UTSI's true financial

25   condition was revealed:

26       •        UTSI's stock price declined 7% from $30.87 on 3/29/04 to $28.75 on 3/31/04,
                  compared to a 0.4% increase in the PPG and a 3.7% increase in the NASDAQ after
27                the Company issued a press release disclosing that gross margins in 1Q04 were

28

expected to be 28%.  That disclosure directly contradicted the representation on 10/23/03 that gross margins would be 30%-32% in 2004.

- UTSI's stock price declined 13.3% from $30.42 on 4/27/04 to $26.36 on 4/30/04, compared to a 2.6% decline in the PPG and a 5.6% decline in the NASDAQ after the Company reported that the gross margin was 28% in 1Q04 and that gross margins would be 27%-28% in 2Q04, 29%-30% in 3Q04 and 30%-31% in 4Q04.  These disclosures directly contradicted the representations on 10/23/03 that gross margins would be 30%-32% in 2004.

- UTSI's stock price declined 29.3% from $25.25 on 7/27/04 to $17.85 on 7/28/04, compared to a 0.6% decline in the PPG and the NASDAQ after the Company (1) reported the gross margin was 25.4% in 2Q04, (2) lowered gross margin guidance to 27%-28% for 3Q04 and to 27% for FY04, and (3) revealed problems with the China PAS market, including fierce pricing competition in the PAS handset market and significant declines in PAS subscriber growth.  These disclosures contradicted the representations on 10/23/03 that gross margins would be 30%-32% in 2004.

- UTSI's stock price declined 10% from $15.21 on 9/17/04 (Friday) to $13.71 on 9/20/04, compared to a 1.5% decline in the PPG and a 0.1% decline in the NASDAQ after the Company lowered revenue, gross margin and EPS guidance for 3Q04 and FY04 before the market opened on 9/20/04.  UTSI revealed that the gross margin would be 22%-23% in 3Q04, which directly contradicted the representations on 10/23/03 that gross margins would be 30%-32% in 2004.  The Company also revealed that China PAS sales were expected to decline from $2.1 billion in 2004 to $1.5 billion in 2005 because there had been a maturation of the PAS market in China as China Telecom and China Netcom were spending less on new PAS networks and reducing overall PAS capital expenditures in anticipation of next generation (3G) spending.  That disclosure directly contradicted the representation on 10/23/03 that bookings remained strong for the quarter, and that visibility now extended well into 2004.

- On 1/7/05, the Company's stock price declined 20% from $19.94 to $15.97, compared to a 0.8% increase in the PPG and a 0.1% decline in the NASDAQ after UTSI announced on 1/6/05 that 4Q04 revenues would be $135 million less than the $875-$885 million previously represented on 10/26/04, and that the 4Q04 gross margin would be 15% (not 17% as represented on 10/26/04) because of revenues from China operations being adversely impacted by the slowing Chinese economy, the maturation of the China PAS market and delays in the execution of contracts and receipt of final acceptances.

- The Company's stock price declined 8.1% from $4.93 on 10/10/07 to $4.53 on 10/12/07, compared to no change in the PPG and a 0.2% decline in the NASDAQ after UTSI reported on 10/10/07 that the investigation of the China sales contracts would require UTSI to restate FY04 EPS from $0.61 to $0.45 and reduce revenues by $270 million and net income by $124 million.

223.   **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock after 10/23/03 at artificially inflated prices.  If Lu and Sophie had admitted that bookings did not continue to be strong, that they could not accurately forecast future financial results and that UTSI did in fact plan to come to market with an offering, investors would have known the true condition of UTSI and lowered their expectations about the Company's current and future prospects, which would have caused the stock price to decline as it did when these conditions were gradually revealed on the dates listed above.

### 2.   False and Misleading Statements in 2004

224.   **Date of Statements and Statements:** On 1/9/04, UTSI issued a press release increasing 2004 revenue and net income guidance, reiterating gross margin guidance and reducing EPS guidance to reflect the dilutive effect of the 12.1 million-share offering:

   *– Gross Margin guidance remains 30%-32%*

   *– GAAP EPS guidance of $1.87-$1.92 versus previous guidance of $1.92-$1.95*

225.   **Identity of Authors:** The press release was issued on behalf of UTSI, and the statements are also attributable to Sophie, who is quoted in the press release and listed as a source of the press release.

226.   **True Facts:** As shown in the following chart, UTSI did not report gross margins and EPS in line with guidance in 2004:

| Period | 1/9/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 1Q04 Gross Margin | 30%-32% | 28.3% | 28.3% | N/R |
| 2Q04 Gross Margin | 30%-32% | 25.6% | 25.8% | N/R |
| 3Q04 Gross Margin | 30%-32% | 21.2% | 21.1% | N/R |
| 4Q04 Gross Margin | 30%-32% | 15.0% | 14.9% | N/R |
| FY04 Gross Margin | 30%-32% | 22.3% | 22.2% | 22.1% |
| FY04 EPS | $1.87-$1.92 | $0.64 | $0.61 | $0.45 |

227.   **Scienter and Factual Basis for Scienter: Sophie knew the undisclosed and widespread problems prevented him from providing accurate guidance:** Sophie knew there was no reasonable basis for reiterating 2004 gross margin guidance of 32% or telling investors FY04 EPS would be $1.87-$1.92 because he knew (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were declining due

1  to the reduced demand and aggressive pricing and (3) revenues and gross margins on PAS

2  equipment sales and broadband equipment sales were being negatively impacted by the undisclosed

3  operational problems that were delaying revenue recognition and increasing the costs of the

4  backlogged sales.  In addition, Sophie knew there were significant internal control weaknesses that

5  precluded him from knowing if (1) UTSI was improperly recognizing revenue on sales with side

6  agreements supplementing or amending contract terms and (2) UTSI was obtaining sales by bribing

7  foreign government officials in violation of the FCPA.

8       228.   That UTSI reported gross margins and EPS in 2004 that were substantially less than

9  the guidance provided on 1/9/04, and then restated and reduced FY04 EPS twice from $0.64 to $0.45

10 confirms there was no reasonable basis for the guidance and strengthens the inference Lu and Sophie

11 knew it.

12      229.   In addition, as he and Lu explained on 10/23/03, Sophie knew the guidance assumed

13 international revenues would increase 85% to $500-$600 million in 2004.  Sophie knew there was no

14 reasonable basis for this projection because of the delays in manufacturing, delivery and receiving

15 customer acceptance caused by the product problems described by the witnesses.  Indeed, UTSI

16 reported $293 million of international revenue in 2004, well below what Lu and Sophie told

17 investors to expect, and then restated and reduced international revenue to $273.8 million.

18      230.   Sophie received a second Management Recommendation letter from PWC in 4/04

19 that again noted concerns about the use of side letters that were not forwarded to the finance

20 department.  Although the letter was not received until 4/04, it is likely Sophie knew about PWC's

21 findings on 1/9/04 because PWC was in the process of auditing the Company's 2003 financial

22 statements which it completed by 2/27/04 (the date of PWC's audit opinion).  The fact that FY04

23 EPS was restated and reduced twice from $0.64 to $0.45, and that Sophie knew about the significant

24 internal control weaknesses strengthens the inference Sophie knew there was no reasonable basis for

25 the guidance.

26      231.   **Sophie knew PAS handset revenues and gross margins would decline in 2004:** By

27 1/9/04, Sophie also knew sales of PAS handsets and the gross margins on sales of PAS handsets

28 would decline in 1Q04, which would cause overall gross margins to decline.  As disclosed in the

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                           - 86 -

1   Company's 3Q03 Form 10-Q filed on 11/12/03, Sophie knew (1) average selling prices of PAS
2   handsets declined and were expected to decline further as a result of increased competition,
3   aggressive price reductions by competitors, and rapid technological change, (2) UTSI was subject to
4   foreign exchange risk because sales to China were denominated in Renminbi and some costs –
5   including the cost of PAS handset components purchased from Toshiba – were denominated in Yen,
6   and (3) cost reduction efforts might not allow UTSI to keep pace with competitive pricing pressures
7   or improve gross margins.  From 4Q03 to 1Q04, UTSI's share of the PAS handset market declined
8   from 70% to 60%, PAS handset revenues declined from $308 million to $236 million, and gross
9   margins on PAS handset sales declined from 25% to 21%.

10          232.    During UTSI's 4/27/04 conference call, Sophie stated that the decline in PAS handset
11   gross margins in 1Q04 was primarily attributable to higher cost component parts purchased from
12   Toshiba and competitive pressures.  Given the magnitude of the decline in PAS handset revenues
13   and gross margins from 4Q03 to 1Q04 and the admission in the 3Q03 Form 10-Q that PAS handset
14   prices were expected to decline and that Yen denominated costs could adversely impact gross
15   margins, the most plausible inference is that Sophie knew by 1/9/04 that the competitive pressures
16   and the higher cost component parts would reduce PAS handset sales and gross margins in 1Q04.

17          233.    **Effect on Stock Price:** On 1/12/04 (1/9/04 was a Friday), UTSI's stock price
18   increased 4% to $38.90 compared to no change in the PPG and a 1.2% increase in the NASDAQ.

19          234.    **Loss Causation/Date of Loss:** As detailed in ¶222, Class members were damaged by
20   the false and misleading guidance provided on 1/9/04 when the price of the stock declined after
21   some of UTSI's true financial condition was revealed.  The stock price declined after UTSI (1)
22   lowered 1Q04 gross margin guidance on 3/30/04, (2) lowered 2Q04 gross margin guidance on
23   4/27/04, (3) reported a 2Q04 gross margin on 7/28/04 that was less than the guidance and lowered
24   3Q04 gross margin guidance, (4) lowered gross margin and EPS guidance for 3Q04 and FY04 on
25   9/20/04 and (5) lowered 4Q04 revenue, gross margin and EPS guidance on 1/6/05.  In addition, the
26   price of the stock declined after UTSI revealed on 2/9/06, 3/16/06, 7/23/07 and 10/10/07 that FY04
27   EPS would be restated and reduced from $0.64 to $0.45 because the Company had improperly
28   recognized $124 million of revenue in 2004.

235.   **Nature of Loss:** Class members purchased UTSI stock after 1/9/04 at artificially inflated prices because the true condition of UTSI was still concealed.  The market still did not know the impact of the various undisclosed problems – incorrect financial reporting, operational problems delaying revenue recognition and increasing the costs of backlogged sales, the substantial decline in PAS equipment orders and gross margins, the substantial decline in broadband gross margins, and the decline in PAS handset sales and gross margins.  If investors had known of these conditions, they would have lowered their expectations about the Company's current and future prospects, which would have caused the stock price to decline as it did on the dates listed above.

236.   **Date of Statements and Statements:** On 1/22/04, UTSI issued a press release and held a conference call to announce "record revenues and earnings" for 4Q03 and FY03.  The 1/22/04 press release included the following statements:

> "*The record year-end backlog of over $1 billion*, combined with the announcement last week of a $200 million dollar contract with China Telecom, which is incremental to that backlog, *gives us a tremendous amount of visibility in 2004*," . . . .

> \*            \*            \*

> *– GAAP earnings per share for the full-year 2004 is expected to be in the range of $1.90-$1.94, up from previous guidance given of $1.87-$1.92 on January 9, 2004.*

During the 1/22/04 conference call, defendants Lu and Sophie reiterated gross margins would be 30%-32% and improve each quarter in 2004:

> Lu: We have a *backlog of more than $1b giving us a very good visibility into our anticipated revenue and earnings for 2004*.

> \*            \*            \*

> Sophie: *[O]ur record year end backlog of $1.06b.  This backlog . . . gives us tremendous visibility for 2004. . . .*

> \*            \*            \*

> [W]e expect approximately $2b of revenues will come from mainland China *and the other $500m-$600m will come from our global markets*. . . .

> \*            \*            \*

> *Our target for gross margins as a percentage of revenue in 2004 is approximately 30%-32%.  We expect margins will begin the year at the low end of the range and improve slightly each quarter throughout 2004.*

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                            - 88 -

In response to questions about the effect of competition and costs on PAS handset gross margins, Sophie stated that margins would be 25%:

> Sophie: *[W]e are still maintaining our gross margin to this point right around 25% on the handsets* and we think no matter how tough the competition gets that we will be able to maintain market share above 50% and *we don't see any scenario where our gross margin on handsets will drop below the low 20s* . . . .

In response to a question from Lehman Brothers, Inc. analyst Tim Luke, Sophie again stated UTSI was seeing tremendous PAS infrastructure orders:

> Sophie: *But we're in a cycle right now where we're seeing a tremendous amount of infrastructural orders as Hong pointed out.  You guys saw the signing, we've got other contracts that you haven't seen announced yet.*

237.    **Identity of Authors:** The press release was issued on behalf of UTSI and the statements are also attributable to Lu and Sophie, who are quoted in the press release.  Sophie is also listed as a source of the press release.  Lu and Sophie made the statements during the conference call.

238.    **True Facts:** UTSI did not report gross margins, international revenues and EPS in line with guidance in 2004:

| Period | 1/22/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 1Q04 Gross Margin | 30%-32% | 28.3% | 28.3% | N/R |
| 2Q04 Gross Margin | 30%-32% | 25.6% | 25.8% | N/R |
| 3Q04 Gross Margin | 30%-32% | 21.2% | 21.1% | N/R |
| 4Q04 Gross Margin | 30%-32% | 15.0% | 14.9% | N/R |
| FY04 Gross Margin | 30%-32% | 22.3% | 22.2% | 22.1% |
| FY04 International Revenues (Excluding PCD) | $500-$600 million | $292.9 million | $273.7 million | $273.8 million |
| FY04 EPS | $1.90-$1.94 | $0.64 | $0.61 | $0.45 |

239.    The restatements, the admitted problems with the Company's disclosure controls and procedures, the delays in manufacturing, shipment and installation and product quality problems that were delaying revenue recognition and increasing the costs of backlogged sales and UTSI reporting gross margins and EPS substantially less than guidance establish that the backlog did not provide tremendous visibility into UTSI's future financial results.

240.     UTSI did not report PAS handset gross margins in line with the 25% guidance provided.  PAS handset gross margins declined substantially in every quarter in 2004, from 25% in 4Q03 to 21% in 1Q04, 18% in 2Q04, 14% in 3Q04 and 12% in 4Q04.

241.     **Scienter and Factual Basis for Scienter:** Numerous facts raise a strong inference Lu and Sophie knew there was no reasonable basis to represent on 1/22/04 that (1) gross margins would begin the year at the low end of 30%-32% and improve slightly each quarter throughout 2004, (2) the backlog gave them a tremendous amount of visibility in 2004, (3) international revenues would be $500-$600 million in 2004, (4) GAAP EPS would be $1.90-$1.94 in 2004, and (5) they were seeing a tremendous amount of infrastructure orders.

242.     **Lu and Sophie knew the continued undisclosed and widespread problems prevented them from providing accurate guidance:** Lu and Sophie knew there was no reasonable basis for their statements because they continued to know that (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were declining due to the reduced demand and aggressive pricing, (3) revenues and gross margins on PAS handset sales were declining due to competition and increased costs of component parts purchased from Toshiba and (4) revenues and gross margins on PAS equipment sales and broadband equipment sales were being negatively impacted by the undisclosed operational problems that were delaying revenue recognition and increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded them from knowing if (1) UTSI was properly recognizing revenue on sales with side agreements supplementing or amending contract terms and (2) UTSI was obtaining sales by bribing foreign government officials in violation of the FCPA.

243.     That UTSI reported gross margins, international revenues and EPS in 2004 that were substantially less than the guidance provided on 1/22/04 and then restated and reduced FY04 EPS twice from $0.64 to $0.45 on 10/10/07 confirms there was no reasonable basis for the guidance and strengthens the inference Lu and Sophie knew it.

244.     **Lu and Sophie knew there were not a tremendous amount of infrastructure orders because they knew China Telecom and China Netcom continued to substantially reduce**

1   **orders for PAS equipment:** Lu and Sophie knew the substantial reduction in PAS equipment orders

2   was continuing with the Company receiving just $105 million of orders in 4Q03 – less than 25% of

3   the $453 million of orders received in 1Q03.  Although UTSI announced a $200 million order with

4   China Telecom on 1/13/04, UTSI received just $477 million of PAS equipment orders the rest of the

5   year.  The importance of China Telecom and China Netcom to UTSI's financial results, the admitted

6   close relationship between UTSI and its two largest customers, the decline in PAS subscriber growth

7   rates, and the continuing decline in orders in 2004 strongly infer that Lu and Sophie knew that China

8   Telecom and China Netcom would continue to reduce PAS equipment orders in 2004, and that it was

9   misleading to represent they were seeing a tremendous amount of infrastructure orders.

10          245.    **Effect on Stock Price:** On 1/23/04, UTSI's stock price increased 1.1% to $36.32 –

11   similar to the 1.4% increase in the PPG and the 0.2% increase in the NASDAQ.

12          246.    **Loss Causation/Date of Loss:** Class members were damaged by the false and

13   misleading statements made on 1/22/04 when the price of the stock declined after some of UTSI's

14   true financial condition was revealed.  The stock price declined after UTSI (1) lowered 1Q04 gross

15   margin guidance on 3/30/04, (2) lowered 2Q04 gross margin guidance on 4/27/04, (3) reported a

16   2Q04 gross margin on 7/28/04 that was less than the guidance and lowered 3Q04 gross margin

17   guidance, (4) lowered gross margin and EPS guidance for 3Q04 and FY04 on 9/20/04 and (5)

18   lowered 4Q04 revenue, gross margin and EPS guidance on 1/6/05.  In addition, the price of the stock

19   declined after UTSI revealed on 2/9/06, 3/16/06, 7/23/07 and 10/10/07 that FY04 EPS would be

20   restated and reduced from $0.64 to $0.45 because the Company had improperly recognized $124

21   million of revenue in 2004.

22          247.    **Nature of Loss:** Class members purchased UTSI stock after 1/22/04 at artificially

23   inflated prices because the true condition of UTSI was still concealed.  The market still did not know

24   the impact of the various undisclosed problems – incorrect financial reporting, operational problems

25   delaying revenue recognition and increasing the costs of backlogged sales, the substantial decline in

26   PAS equipment orders, the declining market share and declining gross margins on PAS handset sales

27   and problems with UTSI's recently developed broadband products.  If investors had known of these

28   conditions, they would have lowered their expectations about the Company's current and future

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 91 -

1   prospects, which would have caused the stock price to decline as it did when these conditions were

2   gradually revealed on the dates listed above.

3        248.   **Date of Statements and Statements:**   On 4/27/04, UTSI issued a press release and

4   held a conference call to report the Company's 1Q04 results.  During the 4/27/04 conference call,

5   defendants Lu and Sophie increased revenue guidance and reiterated international revenues would be

6   $500-$600 million in 2004:

7        Sophie: ***Full-year 2004 guidance is approximately [$]2.75 billion***, which is an
         increase of 40 percent over 2003.  ***We expect*** in excess of [$]2.1 billion of revenues
8        will come from mainland China and the other ***5 to 600 [m]illion will come from our
         global markets***.

9   Lu and Sophie also represented that the PAS market would continue to be strong:

10       Lu: So ***we see a very, very strong infrastructure business towards the Q4 and Q1***.

11                              *        *        *

12       Sophie: ***And obviously, with this high of a utilization rate [70%], that means as the
13       sub numbers continue to increase, they are going to be buying a lot of additional
         infrastructure and a lot more handsets.***

14       Lu: I think maybe I wanted to add one more point.  Typically, if any company –
15       when they are running the infrastructure in any similar environment, if they are about
         60 percent, 65 percent, that's pretty much they will have to add more infrastructure is
16       because no system can handle 100 percent of the capacities.  And typically, the
         capacity is at the range of 70 percent.  So that means that ***we are very – looking
17       forward to a more expansion business that's coming***.

18   Lu and Sophie also assured investors UTSI would report higher gross margins than the disappointing

19   28% reported in 1Q04 because infrastructure pricing was stabilizing and UTSI was taking steps to

20   reduce the costs of infrastructure and handset sales:

21       Sophie: Gross margin as a percent came in as revised at 28 percent of sales.  This
         decrease . . . is primarily attributable to higher cost of goods on component purchases
22       denominated in Yen as a result of the appreciation of the Yen versus the dollar. . . .
         In addition, competitive pressures brought handset margins in at 20 to 21 percent of
23       sales and infrastructure gross margins came in at approximately 33 percent of sales.
         . . . ***[W]e are confident we will be able to improve gross margins later in the year.
24       . . .***

25                              *        *        *

26       ***Gross margin guidance . . . .  [W]e see Q2 gross margin percent consistent
         with Q1 levels in the 27 to 28 percent range, and Q3 gross margins should increase
27       slightly to 29 to 30 percent and we should see further improvement in Q4 to 30 to
         31 percent. . . .  We are introducing internally designed ASICS in Q3 that will
28       significantly reduce costs and exposure to Yen.  Three, infrastructure pricing on***

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                          - 92 -

*PAS is stable and contracts we are currently signing will be recognized as revenue in Q3 and Q4 with higher margins. . . .*

\*       \*       \*

*Full-year 2004 earnings should be approximately $1.85*, inclusive of acquisition-related charges. . . .

\*       \*       \*

Lu: The *infrastructure pricing – we're seeing stabilizing* . . . . [W]hen Mike was saying about towards . . . *Q2, Q3 and Q4, our margin will be increasing, is because we have been seeing – we can take advantage of cost reduction and our price will be pretty much stabilized, therefore, we will see that margin increase*.

\*       \*       \*

Lu: Yes.  I think we are talking about the *PAS infrastructure, we have been seeing stabilization on that*.  And then we were really moving towards – we have a lot of cost reduction programs, putting them together.  And if you can imagine that some of our contract has been signed much earlier, so we know we have to use up some of our inventory.  And then we're *looking forward, we have a very, very clear picture of how we are going to be able to improve that margin*.

249.    **Identity of Authors:** Lu and Sophie made the statements during the conference call.

250.    **True Facts:** UTSI did not report gross margins and EPS in line with guidance in 2004:

| Period | 4/27/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 2Q04 Gross Margin | 27%-28% | 25.6% | 25.8% | N/R |
| 3Q04 Gross Margin | 29%-30% | 21.2% | 21.1% | N/R |
| 4Q04 Gross Margin | 30%-31% | 15.0% | 14.9% | N/R |
| FY04 International Revenues (Excluding PCD) | $500-$600 million | $292.9 million | $273.7 million | $273.8 million |
| FY04 Revenues | $2.75 billion | $2.7 billion | $2.68 billion | $2.58 billion |
| FY04 EPS | $1.85 | $0.64 | $0.61 | $0.45 |

251.    The continuing substantial decline in PAS orders and the subsequent decline in PAS equipment revenues and gross margins establish that the PAS infrastructure market was not "very, very strong," and that UTSI did not receive more expansion business as PAS network capacity utilization increased from 60% to 70%.  As shown in Exhibit 3, UTSI received just $143 million of China PAS equipment orders the rest of the year: $76 million during the remainder of 2Q04, no orders in 3Q04 and $67 million in 4Q04.  The reduced demand lowered prices and the undisclosed

1    operational problems were delaying revenue recognition and increasing the costs of the backlogged

2    sales.  As a result, PAS equipment gross margins declined to 28% in 2Q04 and to 25% in 3Q04.

3    These facts also establish that the PAS infrastructure market was not stabilizing, and that Lu and

4    Sophie did not have a "very, very clear picture" of how UTSI was going to improve PAS equipment

5    margins.

6        252.    Problems with the development of the ASIC prevented UTSI from significantly

7    reducing costs and exposure to the Yen.  Those problems contributed to continuing substantial

8    declines in PAS handset gross margins in every quarter in 2004, from 25% in 4Q03 to 21% in 1Q04,

9    to 18% in 2Q04, to 14% in 3Q04 and to 12% in 4Q04.

10       253.    **Scienter and Factual Basis for Scienter:** Numerous facts raise a strong inference Lu

11   and Sophie knew there was no reasonable basis to represent on 4/27/04 that (1) gross margins would

12   be 27%-28% in 2Q04, 29%-30% in 3Q04 and 30%-31% in 4Q04, (2) the introduction of internally

13   designed ASICs in 3Q04 would significantly reduce costs and improve PAS handset margins, (3)

14   they saw a very, very strong infrastructure business in 4Q04 and 1Q05, (4) the 70% utilization rate

15   of existing PAS networks would result in China Telecom and China Netcom buying a lot of

16   additional infrastructure and a lot more handsets, (5) PAS equipment margins would improve in

17   2Q04, 3Q04 and 4Q04, and (6) GAAP EPS would be $1.85 in 2004.

18       254.    **Lu and Sophie knew the undisclosed and widespread problems prevented them**

19   **from providing accurate guidance:** Lu and Sophie continued to know there was no reasonable

20   basis for their statements because they knew (1) China Telecom and China Netcom were

21   substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were

22   declining due to the reduced demand and aggressive pricing, (3) revenues and gross margins on PAS

23   handset sales had declined and would continue to decline due to competition and increased costs of

24   component parts purchased from Toshiba and (4) revenues and gross margins on PAS equipment

25   sales and broadband equipment sales were being negatively impacted by the undisclosed operational

26   problems that were delaying revenue recognition and increasing the costs of the backlogged sales.

27   In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded

28   them from knowing if (1) UTSI was properly recognizing revenue on sales with side agreements

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 94 -

1    supplementing or amending contract terms and (2) UTSI was obtaining sales by bribing foreign

2    government officials in violation of the FCPA. Indeed, the SEC C&D Order establishes that they

3    received another Management Recommendation letter from PWC in 4/04, detailing multiple internal

4    control weaknesses (many classified as material) identified during the December 31, 2003 year-end

5    audit, including concerns about related-party transactions and the use of side letters that were not

6    forwarded to the finance department.

7        255.    That UTSI reported gross margins, international revenues and EPS in 2004 that were

8    substantially less than the guidance provided on 4/27/04 and then restated and reduced FY04 EPS

9    twice from $0.64 to $0.45 on 10/10/07 confirms there was no reasonable basis for the guidance, and

10   strengthens the inference Lu and Sophie knew it.

11       256.    **Lu and Sophie knew China Telecom and China Netcom continued to reduce**

12   **PAS equipment orders:** Lu and Sophie knew the substantial reduction in PAS equipment orders

13   would continue. Although UTSI reported $377 million of PAS equipment orders in 1Q04, the

14   Company received just $300 million of PAS equipment orders the rest of the year. The Company

15   received just $143 million of PAS equipment orders after 4/27/04, including $76 million in the

16   remainder of 2Q04, no orders in 3Q04 and $67 million in 4Q04. The importance of China Telecom

17   and China Netcom to UTSI's financial results, the admitted close relationship between UTSI and its

18   two largest customers and the magnitude of the decline strongly infer that Lu and Sophie knew

19   China Telecom and China Netcom planned to substantially reduce orders for PAS equipment in the

20   remainder of 2004.

21       257.    **Lu and Sophie expected further declines in PAS subscriber growth rates:** Lu and

22   Sophie expected the decline in China PAS subscriber growth rates to continue. Although the growth

23   rate increased from 25% in 4Q03 to 28% in 1Q04, Lu admitted during the 4/27/04 conference call

24   that subscriber growth rates in 1Q04 were driven by Chinese New Year and additional promotional

25   spending by China Telecom and China Netcom and were expected to decline: "in Q2, Q3, we are

26   seeing it will be slowing down." They did. PAS subscriber growth rates declined from 28% in

27   1Q04 to 17% in 2Q04, to 11% in 3Q04 and to 12% in 4Q04. Lu and Sophie knew, as Sophie stated

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                          - 95 -

1    during the 10/23/03 conference call, that subscriber growth drove both PAS equipment and PAS

2    handset spending by China Telecom and China Netcom.

3         258.    **Lu and Sophie knew there was no reasonable basis to represent PAS handset**

4    **gross margins would improve in 2004:** After the Company reported steep declines in PAS handset

5    sales and gross margins in 1Q04, Lu and Sophie said PAS handset gross margins would improve

6    after UTSI introduced internally designed ASICs in 3Q04.  Information provided by former UTSI

7    employees directly involved in the development of the ASICs strongly infers Lu and Sophie knew

8    there was no basis for making these representations.

9         259.    CW1, CW2, CW3, CW8, CW13, CW16, CW17 and CW19 said that (1) UTSI had

10   young and inexperienced engineers tasked with developing products in an unrealistic amount of time

11   because the Company agreed to unrealistic customer delivery demands to make the sales, (2) the

12   engineers failed to document the development of products, (3) the engineers were unwilling to make

13   changes to improve the quality of UTSI's products, and (4) there were numerous product quality

14   issues as a result.  Given these problems, Lu and Sophie knew it was speculative at best that UTSI

15   would introduce internally designed ASICs by 3Q04.  And, of course, UTSI did not.

16        260.    According to CW4, the manager of the ASIC engineering group who oversaw the

17   development of the ASICs to be used in PAS handsets, there were delays in getting the ASICs ready

18   for mass production.  CW4 stated that the original expectation was that the ASICs would be mass

19   produced by 9/04 but that the production date was pushed to *the end of 2004* because the ASICs had

20   not completed the quality assurance phase.  As a result, CW4 said UTSI continued to buy ASICs

21   from Toshiba.

22        261.    CW15, a former production manager responsible for managing the contractors who

23   were manufacturing the ASIC chips for inclusion in the Company's PAS handsets, said the delays

24   were even longer. According to CW15, UTSI's Shanghai facility was dedicated to the design and

25   development of the ASICs.  UTSI designed the ASICs and outside vendors including Amco, ASE

26   and SMIC manufactured the ASICs.  Once manufactured, the ASICs were shipped to the Company's

27   Hangzhou facility for incorporation into the PAS handsets. *CW15 said that UTSI's first successful*

28   *shipment of internally developed ASICs to Hangzhou did not occur until 9/05.*  As a result, UTSI

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                              - 96 -

1   continued to buy ASICs from Toshiba.  CW15 also said that UTSI continued to purchase ASICs

2   from Toshiba and a company named Atheros after UTSI was able to develop and produce its own

3   ASICs.  CW15 stated that defendant Lu spent time in the Hangzhou facility where the ASICs were

4   incorporated into the PAS handsets.

5       262.    Without the internally designed ASICs, the Company's PAS handset sales and gross

6   margins continued to decline in 2004.  As shown in the following chart, from 4Q03 to 4Q04, UTSI's

7   share of the PAS handset market declined from 70% to 55%, PAS handset revenues declined from

8   $308 million to $158 million, and gross margins on PAS handset sales declined from 25% to 12% ($

9   in millions):

| | 4Q03 | 1Q04 | 2Q04 | 3Q04 | 4Q04 |
|---|---|---|---|---|---|
| PAS Handset Revenues | $308 | $236 | $194 | $160 | $158 |
| PAS Handset Gross Margin | 25% | 21% | 18% | 14% | 12% |
| PAS Handset Market Share | 70% | 60% | 55% | 55% | 55% |

16      263.    **Effect on Stock Price:** In the three days following the 4/27/04 disclosures, UTSI's

17  stock price declined 14% from $30.42 to $26.36, compared to a 2.6% decline in the PPG and a 5.6%

18  decline in the NASDAQ.

19      264.    **Loss Causation/Date of Loss:** Class members were damaged by the false and

20  misleading statements made on 4/27/04 when the price of the stock declined after some of UTSI's

21  true financial condition was revealed.  The stock price declined after UTSI (1) reported a 2Q04 gross

22  margin on 7/28/04 that was less than the guidance and lowered 3Q04 gross margin guidance, (2)

23  lowered gross margin and EPS guidance for 3Q04 and FY04 on 9/20/04 and (3) lowered 4Q04

24  revenue, gross margin and EPS guidance on 1/6/05.  In addition, the price of the stock declined after

25  UTSI revealed on 2/9/06, 3/16/06, 7/23/07 and 10/10/07 that FY04 EPS would be restated and

26  reduced from $0.64 to $0.45 because the Company had improperly recognized $124 million of

27  revenue in 2004.

28

265.   **Nature of Loss:**  Lead Plaintiffs and Class members purchased UTSI stock at artificially inflated prices after 4/27/04 because the true condition of UTSI was still concealed.  The market still did not know the impact of various other undisclosed problems – incorrect financial reporting, operational problems delaying revenue recognition and increasing the costs of backlogged sales, the substantial decline in PAS equipment orders and gross margins, and the decline on PAS handset sales and gross margins.  If investors had known of these conditions, they would have lowered their expectations about the Company's current and future prospects, which would have caused the stock price to decline as it did when these conditions were gradually revealed on the dates listed above.

266.   **Date of Statements and Statements:**  On 7/27/04, UTSI issued a press release and held a conference call to announce disappointing 2Q04 results.  After assuring investors on 4/27/04 that gross margins would increase to 28% in 2Q04 and improve thereafter, the Company reported a gross margin of just 25.4% due to "'continued pricing pressure in China as well as supply chain constraints that delayed recognition of some higher-margin international revenues.'"  UTSI reported that higher-margin international revenues were $71.3 million, $28.7 million less than the $100 million expected, because "[i]t took [UTSI] longer than expected to deliver new products to international customers and achieve final acceptance."

267.   The Company also began to reveal problems with the China PAS market.  During the conference call, Lu stated there was "fierce pricing competition" in the PAS handset market that challenged UTSI to "reduce costs for [PAS] handsets."  After assuring investors on 4/27/04 that strong PAS subscriber growth and high capacity utilization rates (70%) of existing PAS networks would lead to very, very strong infrastructure business in 2004 and into 1Q05, defendants reported that PAS subscriber growth had declined significantly in 2Q04, with the Company having added one-third less new PAS subscribers during 2Q04 than it had guided it was on track to add in the quarter during the 4/27/04 conference call, and that China Telecom and China Netcom had not added additional capacity through expansions or upgrades even though utilization of PAS network capacity exceeded 70% in some locations.

268.   In an attempt to mitigate the impact of the declining gross margins and the declining profitability of the China PAS business, it was represented in the 7/27/04 press release that "***gross margins have reached a low point in Q2 2004 and will improve throughout the balance of 2004.***" The initial guidance for 2005 indicated substantial revenue growth and stabilized gross margins:

| Revenue Range: | 3Q04: | $695-$700 million |
| | FY04: | $2.95-$3 billion |
| | FY05: | $4-$4.3 billion |
| | | |
| Gross Margins: | 3Q04: | 27%-28% |
| | FY04: | 27% |
| | FY05: | 27%+ |

\*   \*   \*

| GAAP EPS Range: | 3Q04: | $0.34-$0.35 |
| | FY04: | $1.65-$1.70 |
| | FY05: | $2.20 |

269.   Lu and Sophie told investors during the 7/27/04 conference call that UTSI would report higher gross margins than the disappointing 25% reported in 2Q04 because UTSI would report $600 million of higher-margin international revenues:

> Lu: We have projected ***600 million in international revenues*** outside of China in 2004. . . .
>
> ***International bookings remain on track to make our revenue goal over (ph) 2004***.   As of June 30, we have booked more than 400 million in international contracts; ***nearly 300 million were booked in Q2 alone.***  This is greater than our total international revenues for all of the year 2003.
>
> \*        \*        \*
>
> Sophie: ***Our confidence in improved margin percentage is driven by*** the following factors. One, ***a significant ramp in international revenues in the second half of '04, which typically carry a higher gross margin in the range of 45 to 50 percent***.

270.   During the 7/27/04 conference call, Lu stated that a "key challenge [was] to reduce costs for [PAS] handsets," and both Lu and Sophie assured investors the introduction of UTSI's internally designed ASICs would reduce handset costs and improve gross margins:

> Sophie: Our confidence in improved margin percentage is driven by the following factors. . . .  Three, ***the gradual introduction of our internally designed ASICs that will significantly reduce handset costs and exposure to the yen***, as well as stabilization in the handset pricing in China.
>
> \*        \*        \*

1    *To improve our competitive cost structure and our profitability, UTStarcom will*
2    *begin the introduction of its own Asics and PAS handsets throughout the balance*
     *of the year with the full benefit realized in 2005 of approximately 4 to $6 per*
3    *handset.*

4                              *        *        *

5    Lu: And we will see – *the margin will be improved* in the second part of the next
     year and *because we will start shipping our own ASICs*.

6        271.    Lu and Sophie also told investors the introduction of internally manufactured CDMA

7    handsets would improve future results:

8    Lu: *We are on schedule with the CDG, XEC and customer approval process in*
     *introducing three handset designs and manufactured by UTStarcom into Audiovox*
9    *channels.  We expect to introduce these handsets in volume in the first quarter of*
     *2005.*
10
                             *        *        *
11
     Sophie: As Hong mentioned, we continue to work to bring our own CDMA handsets
12   to market.  *We plan to introduce three CDMA handsets in late Q4 or early Q1 . . . .*

13       272.    Lu and Sophie represented that UTSI would capitalize on the "continued tremendous

14   growth potential" in the China PAS market, and that gross margins would improve because of

15   continued stabilization of infrastructure pricing:

16   Sophie: While we are dedicating resources that support growth and international
     sales, *we also remain focused on the China market.  We intend to capitalize on its*
17   *continued tremendous growth potential*.

18                             *        *        *

19       *Our confidence in improved margin percentage is driven by* the following
     factors. . . .  Four, *the continued stabilization of infrastructure pricing on PAS in*
20   *China*.

21                             *        *        *

22   Lu: *From an infrastructure point of view, we have already seen the stabilization of*
     *our margin, so in the second half of this year, we will see the improvement and*
23   *continuing into the next year.*

24       273.    **Identity of Authors:** The press release was issued on behalf of UTSI and the

25   statements are also attributable to Lu and Sophie who are quoted in the press release, and Sophie is

26   also listed as a source of the press release.  Lu and Sophie made the statements during the conference

27   call.

28

274.    **True Facts:** UTSI did not report 3Q04, FY04 or FY05 financial results in line with guidance:

| Period | 7/27/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 3Q04 Revenues | $695-$700 million | $645 million | $642 million | N/R |
| 3Q04 Gross Margin | 27%-28% | 21.2% | 21.1% | N/R |
| 3Q04 EPS | $0.34-$0.35 | $0.04 | $0.04 | N/R |
| FY04 Revenues | $2.95-$3.0 billion | $2.7 billion | $2.68 billion | $2.58 billion |
| FY04 China Revenues | $2.35-$2.4 billion | $2.1 billion | $2.1 billion | $2.0 billion |
| FY04 International Revenues (Excluding PCD) | $600 million | $292.9 million | $273.7 million | $273.8 million |
| FY04 Gross Margin | 27% | 22.3% | 22.2% | 22.1% |
| FY04 EPS | $1.65-$1.70 | $0.64 | $0.61 | $0.45 |
| FY05 Revenues | $4-$4.3 billion | $2.93 billion | N/A | $2.87 billion |
| FY05 Gross Margin | 27% | 15.8% | N/A | 15.2% |
| FY05 EPS | $2.20 | ($4.16) | N/A | ($4.55) |

275.    Gross margins did not improve in 2004 from the shipment of PAS handsets with the internally developed ASICs because problems with the development of the ASIC delayed their introduction until 2005, which prevented UTSI from significantly reducing costs.  Those problems contributed to continuing substantial declines in PAS handset gross margins in every quarter in 2004, from 25% in 4Q03 to 21% in 1Q04, to 18% in 2Q04, to 14% in 3Q04 and to 12% in 4Q04.

276.    The continuing substantial decline in PAS orders and the subsequent decline in PAS revenues and gross margins establish that there was not "continued tremendous growth potential" in the China market, and that there had not been a stabilization in the PAS infrastructure business that would improve gross margins.  PAS equipment gross margins declined to 25% in 3Q04.

277.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew the undisclosed and widespread problems prevented them from providing accurate guidance:** Lu and Sophie continued to know there was no reasonable basis for their statements because they knew (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross

1    margins on PAS equipment sales were declining due to the reduced demand and aggressive pricing,

2    (3) revenues and gross margins on PAS handset sales had declined and would continue to decline

3    due to competition and increased costs of component parts purchased from Toshiba and (4) revenues

4    and gross margins on PAS equipment sales and broadband equipment sales were being negatively

5    impacted by the undisclosed operational problems that were delaying revenue recognition and

6    increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were significant

7    internal control weaknesses that precluded them from knowing if (1) UTSI was properly recognizing

8    revenue on sales with side agreements supplementing or amending contract terms and (2) UTSI was

9    obtaining sales by bribing foreign government officials in violation of the FCPA.

10           278.     That UTSI reported revenues, China revenues, international revenues, gross margins

11   and EPS in 2004 that were substantially less than the guidance provided on 7/27/04 and then restated

12   and reduced FY04 revenues and EPS twice confirms there was no reasonable basis for the guidance,

13   and strengthens the inference Lu and Sophie knew it.  Further, the failure of UTSI to originally

14   report revenues, gross margins and EPS in 2005 in line with the guidance, and then restating and

15   reducing FY05 revenues, gross margins and EPS confirms there was also no reasonable basis for the

16   guidance and strengthens the inference Lu and Sophie knew it.

17           279.     **Lu and Sophie knew that PAS equipment orders were continuing to decline**

18   **substantially:** Lu and Sophie knew there was not "continued tremendous growth potential" in the

19   China PAS market because they knew that (1) China Telecom and China Netcom, the Company's

20   two largest customers, ordered just $76 million of PAS equipment in 5/04 and 6/04 and that no PAS

21   equipment was ordered in 7/04, and (2) PAS subscriber growth rates drove PAS equipment and PAS

22   handset sales and continued their downward trend by declining from 28% in 1Q04 to 17% in 2Q04.

23   The importance of China Telecom and China Netcom to the Company's results, the clear downward

24   trend in PAS equipment orders and PAS subscriber growth rates, and the further reduction in orders

25   in 3Q04 and 4Q04 strongly infer Lu and Sophie knew that China Telecom and China Netcom would

26   not order any PAS equipment in 3Q04 and just $67 million of PAS equipment in 4Q04.  Lu and

27   Sophie also knew the substantial decline in PAS equipment orders in 2003 and 2004 would cause the

28

1   Company's PAS equipment revenues to plummet in 4Q04 and 2005 as the reduced amount of

2   backlogged PAS equipment orders were recognized as revenue.

3          280.   **Lu and Sophie knew that PAS equipment margins would not improve in the**

4   **second half of 2004 and in 2005:** PAS equipment margins declined to 25% in 3Q04 and were 29%

5   in FY04.  After increasing to 34% in 1Q05, they declined to 29% in 2Q05 and 3Q05.  As detailed

6   above, numerous former employees stated that product problems and delivery delays were delaying

7   revenue recognition and increasing the costs of backlogged sales.  The Company admitted on 1/6/05

8   that $135 million of revenues from China operations would not be recognized in 2004 because of

9   delays in the execution of contracts and customer acceptances.  The magnitude of the declines in

10  PAS equipment orders and gross margins, the information provided by the witnesses and the

11  Company's admissions on 1/6/05 strongly infer Lu and Sophie knew there was no basis to represent

12  that they were confident gross margins would improve, and that they had already seen stabilization

13  of margins.

14         281.   **Lu and Sophie also knew that the substantial decline in PAS equipment orders**

15  **and PAS handset sales would prevent UTSI from reporting $2.35-$2.4 billion of revenues from**

16  **China in 2004:** In 2004, UTSI reported $2.1 billion of revenues from China, $300 million less than

17  what they told investors to expect on 7/27/04.  The $2.1 billion included $1.39 billion of PAS

18  equipment revenues and $749 million of PAS handset revenues.  By 7/27/04, Lu and Sophie knew

19  the substantial decline in PAS equipment orders in 2003 and 2004 would cause a substantial decline

20  in PAS equipment revenues by 4Q04 – which it did.  UTSI reported PAS equipment revenues of

21  $336.5 million in 1Q04, $427.6 million in 2Q04, $425.8 million in 3Q04 and $205.6 million in

22  4Q04.  Quarterly PAS equipment revenues averaged $120 million in 2005, $105 million in 2006,

23  and just $75 million in 2007.  Lu and Sophie knew the decline in PAS equipment orders would cause

24  a subsequent decline in revenues because UTSI's backlog of purchase orders could not be

25  recognized as revenue until the customer provided final acceptance, which was not provided until the

26  PAS equipment was manufactured, delivered, installed, and implemented, a process that could take

27  up to one year.  In addition, Lu and Sophie also knew there was no reasonable basis to represent

28  China revenues would be $2.4 billion in 2004 because they knew PAS handset revenues were

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                    - 103 -

1  declining due to reduced demand and increased competition.  In fact, on 9/20/04, Lu and Sophie

2  admitted China revenues would be $2.1 billion in 2004 and $1.5 billion in 2005.

3          282.  **Lu and Sophie knew the introduction of PAS handsets with internally designed**

4  **ASICs would be delayed:** Lu and Sophie also knew there was no reasonable basis to represent that

5  UTSI would improve PAS handset gross margins by introducing handsets with internally designed

6  ASICs, that would significantly reduce handset costs and exposure to the Yen because they did not

7  know when the new handsets would be introduced or whether they would improve gross margins.

8  CW4 stated that the original expectation was that the ASICs would be mass produced by 9/04, but

9  that the production date was pushed to the end of 2004.  CW15 said the first successful shipment of

10  internally developed ASICs to the Company's Hangzhou facility for incorporation into the PAS

11  handset did not occur until 9/05.  The importance of the ASICs to the Company's PAS handset gross

12  margins and the fact that the expected 9/04 mass production date was just one month away strongly

13  infer Lu and Sophie knew by 7/27/04 that mass production of the ASICs would be delayed, which in

14  turn would delay any improvement in PAS handset gross margins.

15          283.  **Lu and Sophie knew UTSI was not on schedule to introduce internally**

16  **manufactured CDMA handsets:**  Information provided by CW5 and admissions by UTSI in 2005

17  show that there were problems with the development of the CDMA handsets *before* 7/27/04, and

18  that UTSI was not on schedule with the customer approval process or for introducing the CDMA

19  handsets in volume in 1Q05 as Lu and Sophie assured investors on 7/27/04.  According to CW5, a

20  UTSI contract employee who worked on the development of the CDMA handsets, in 1Q04, the

21  Company projected selling the CDMA handsets in 4Q04 and generating as much as $7-$10 million

22  of revenue.  But CW5 stated the Company designed, developed and manufactured the handsets

23  without first consulting with prospective customers like Verizon and Sprint about what features and

24  performance standards were required or desired.  As a result, CW5 stated that UTSI was unable to

25  sell the handsets to top tier wireless carriers like Verizon and Sprint because the handsets did not

26  meet their quality standards.  CW5 explained that qualifying a cellular phone involved several

27  distinct testing phases referred to as CDG-1, CDG-2 and CDG-3.  CDG-1 and CDG-2 involve

28

1   testing the phones with technology providers and are followed by the CDG-3 phase, which involves

2   extensive field testing by the carrier to determine whether the phones meet their requirements.

3          284.    Due to the rejection of the handsets by Verizon and Sprint, CW5 said that UTSI tried

4   to sell the handsets to MetroPCS, a lower tier carrier.  But CW5 said that in 5/04, MetroPCS sent

5   UTSI a letter rejecting the CDMA handsets.  CW5 characterized the feedback received from

6   MetroPCS as "horrible" and said MetroPCS told UTSI the handsets were not user friendly and of

7   poor quality.  CW5 also said the handsets were ugly, too expensive and did not offer customers any

8   special features that would make them attractive to purchase. For example, CW5 stated the CDM-

9   7000 handset could at best be described as an emergency phone because of the very basic level of

10  features and performance it provided and that the higher-end handsets, the CDM 7001 and 7002, did

11  not offer any features that made it stand out in comparison to competing handsets.  CW5 stated that

12  none of the UTSI CDMA handsets offered anything that was not already available at cheaper prices.

13         285.    According to CW5, everything went back to the drawing board after MetroPCS

14  rejected the CDMA handsets and by 7/04, it was well known inside the Company that any sales

15  would be delayed three to four months.  CW5 also said that personnel from Audiovox were actively

16  involved in the efforts to sell the CDMA handsets after UTSI acquired Audiovox.  CW5 stated that

17  the Audiovox personnel including the CEO were frustrated and dismayed at UTSI's development of

18  the handsets and actually proposed that UTSI sell the phones at a loss to get in the market with the

19  hope of realizing profits in the future. According to CW5, during a 10/04 meeting, the Audiovox

20  CEO was holding one of the phones and shaking his head saying that he simply did not know what

21  to do with it.  That was the "moment of truth" for CW5 about how the effort had failed.

22         286.    On 5/5/05 and 8/2/05, Lu and Sophie admitted that UTSI had "made a lot of

23  mistakes," and that shipments would be lower due to delays in the design and qualification process.

24  In the 2005 Form 10-K, the Company reported that most of the handsets sold by the PCD segment

25  were designed and built by other manufacturers.  Further, gross margins on handset sales actually

26  declined.  The internally designed CDMA handsets were part of the Company's PCD segment that

27  was created in 4Q04 after the Audiovox acquisition was completed.  After reporting a 4.7% gross

28  margin on PCD handset sales in 4Q04, UTSI reported lower margins in 2005 – 4.3% in 1Q05, 4.7%

1   in 2Q05, 3.6% in 3Q05 and 2.9% in 4Q05.  UTSI reported that gross margins declined due to

2   product returns and increased warranty reserves – further corroborating the concealed problems with

3   the internally designed CDMA handsets.

4       287.  **Lu and Sophie knew product problems would prevent UTSI from reporting**

5   **$600 million of higher margin international sales in 2004:** The magnitude of the shortfall in

6   international revenues in 2004 ($293 million compared to the $600 million guidance), the witness

7   accounts, the substantial decline on broadband gross margins to 20% in 2004, and the terms of the

8   Japan Telecom transaction show that Lu and Sophie knew there was no reasonable basis to represent

9   UTSI would report $600 million of higher margin (45%-50%) international revenues in 2004, that

10  would cause gross margins to improve from the 25.4% the Company reported in 2Q04.

11      288.  As detailed above, many of the witnesses stated that the Company's broadband

12  products did not function properly due to (1) unrealistic product development schedules, (2) a weak

13  and inexperienced engineering team trying to develop very complex products, (3) the unwillingness

14  of the Company's China-based engineers to fix the problems because they were inexperienced

15  and/or too busy manufacturing products for new sales, and (4) the Company's other engineers'

16  inability to fix the problems in a timely manner or at all because the China-based engineers failed to

17  adequately document the design and development of the products, which was needed to identify the

18  cause of the product defects.  In addition, the witnesses explained how there were numerous delays

19  in shipping products to customers outside of China because of delays at Chinese customs caused by

20  the changing of part numbers.  Indeed, CW17 said the Company's service support organization was

21  next to nothing and in shambles, and CW3 said the delays in manufacturing equipment and delays in

22  shipment caused by the inability to track component parts were pervasive and systemic.

23      289.  Several witnesses described problems with specific transactions that had arisen before

24  7/27/04.  For example, CW17 said there were quality issues with the Company's Moving Media

25  2000 product that UTSI began to sell after it acquired TELOS in 4/04.  Moving Media 2000 was

26  used in emergency response circumstances, and was transported by Humvee to permit cellular

27  communications in locations where cellular infrastructure had been destroyed.  The product was sold

28  to the U.S. government and used in Louisiana after Hurricane Katrina and was also sold to Movical,

1   a customer in Africa.  CW17 said that repairs of the Moving Media 2000 product took considerable

2   time, sometimes as long as 12-18 months.  CW17 also said there were flaming issues with Moving

3   Media 2000 component parts manufactured by Unity Wireless.  In fact, CW17 said these problems

4   caused inventory shortages that prevented UTSI from delivering product already sold.

5          290.    CW3 said Japan Telecom insisted that it approve the quality of the Company's iAN-

6   8000 MSAN equipment it agreed to purchase in 5/04 before it was accepted for deployment because

7   UTSI delivered poor quality products to SOFTBANK in the past.  According to CW8, UTSI

8   promised the equipment would be delivered in three months after Japan Telecom ordered the

9   equipment in 5/04 or 6/04.

10         291.    According to the SEC C&D order, in 2Q04, Reliance proposed side agreement

11   requiring UTSI to upgrade the system after the end of the quarter that Lu and Sophie were aware of

12   and CW20 said Reliance required the side letter because it was not happy with the AN2k digital loop

13   carrier product purchased from UTSI in 2003.

14         292.    The contract between UTSI and Japan Telecom and other witness accounts confirm

15   Lu and Sophie knew SOFTBANK and Japan Telecom were concerned about the quality of UTSI's

16   iAN-8000 MSAN equipment and UTSI's ability to deliver the equipment when promised.  GTSM, a

17   Japanese subsidiary of UTSI, and Japan Telecom executed a contract on 8/20/04 that stated (1)

18   delivery of the goods would not be deemed complete – and transfer of ownership would not occur –

19   until Japan Telecom provided GTSM a notice of satisfaction after inspecting the goods, (2) GTSM

20   was required to pay Japan Telecom damages if they were responsible for delays in delivery, (3)

21   GTSM had to repair or replace defective equipment or refund the price, and (4) GTSM had to

22   comply with quality assurance standards and to maintain a quality assurance system – and improve

23   both if Japan Telecom told GTSM to do so.

24         293.    More importantly, according to the contract, Japan Telecom would not purchase

25   UTSI's equipment unless UTSI had already lined up customers that would purchase the services

26   Japan Telecom offered through the addition of the equipment to its next-generation communications

27   network.  Article 16 of the contract required GTSM to perform "sales promotion activities" for

28   which GTSM would receive "no additional consideration":

1    Article 16 (Sales Promotion Related to Services)

2    In order to promote and expand future sales of the goods of sale to [Japan Telecom],
     [GTSM] shall perform sales promotion activities, wherein the purchases of goods of
3    sale by [Japan Telecom] are reflective of the performance by [GTSM] of said sales
     promotion activities to be made in order to enhance telecommunications equipment
4    needs of [Japan Telecom], to attain further growth of the business of [GTSM] by
     supplying goods for sale in response to such needs.  Hence, [GTSM] shall perform
5    such sales promotion activities . . . for the services for no additional consideration.

6    294.    In addition, according to Articles 1 and 17 of the contract, Japan Telecom and GTSM

7    would negotiate and enter into "Independent Sale and Purchase Agreements" for each specific

8    equipment purchase by Japan Telecom, but only when "the performance ratio of the goods of sale

9    reaches around [] owing to the increase of users of the services."  Although UTSI did not publicly

10   disclose the required performance ratio, the above terms show that Japan Telecom purchases were

11   contingent on GTSM procuring customers for Japan Telecom.  Thus, the contract would only

12   generate revenues for UTSI if UTSI delivered non-defective equipment and customers to Japan

13   Telecom.

14   295.    CW8 said that everything in the field went wrong due to the hurry to deliver the

15   equipment.  CW8 said that UTSI began shipping the equipment in 9/04, but Japan Telecom

16   immediately discovered significant quality issues with the hardware and software that were so bad

17   that Ernie McClatchie, UTSI's hardware manager responsible for the iAN-8000 MSAN equipment,

18   was let go in 1/05.

19   296.    On 9/20/04, Lu and Sophie acknowledged that $220 million of revenue from the

20   Japan Telecom transaction was included in the guidance provided on 7/27/04, and that UTSI would

21   not be able to recognize any revenue on the transaction until the Company delivered and installed the

22   equipment and completed the purported sales promotional activities.  CW20, the former revenue

23   controller reviewed historical data on the Japan Telecom transaction, and said GTSM was used to

24   pass through money to Japan Telecom and did not do a lot of marketing.  On 2/8/05, Sophie stated

25   that UTSI decided to exit the promotional services element of the contract, which would enable

26   UTSI to recognize $260 million of revenue in 1Q05, and on 5/5/05, Sophie stated that UTSI had paid

27   $150 million to distributors to exit the promotional services element of the contract.  These facts

28   strongly infer that the promotional services element of the contract was part of the risk-free

1    contingent nature of the deal required by Japan Telecom, and that UTSI purchased revenue for itself

2    by indirectly paying Japan Telecom at least $150 million.

3         297.    **Effect on Stock Price:** Investors reacted with alarm to the news of the significant

4    decline in PAS growth in China, the sharply reduced gross margins resulting from the previously

5    undisclosed supply chain problems and the resulting lowered guidance going forward, as those

6    disclosures called into question many of the prior statements by Lu and Sophie regarding the

7    strength of the Company's business in China and what UTSI's future financial results would be.  On

8    7/28/04, UTSI's stock price declined 29.3% to $17.85 on volume of more than 31 million shares.

9    By comparison, the PPG and NASDAQ both declined just 0.6%.

10        298.    **Loss Causation/Date of Loss:** Class members were damaged by the false and

11   misleading statements made on 7/27/04 when the price of the stock declined after some of UTSI's

12   true financial condition was revealed.  The stock price declined after UTSI (1) lowered gross margin

13   and EPS guidance for 3Q04 and FY04 on 9/20/04 and (2) lowered 4Q04 revenue, gross margin and

14   EPS guidance on 1/6/05.  In addition, the price of the stock declined after UTSI revealed on 2/9/06,

15   3/16/06, 7/23/07 and 10/10/07 that FY04 EPS would be restated and reduced from $0.64 to $0.45

16   because the Company had improperly recognized $124 million of revenue in 2004, and that FY05

17   revenues, gross margins and EPS would be restated and reduced because the Company had

18   improperly recognized $58.2 million of revenues and improperly failed to record $2.8 million of

19   stock compensation expenses.  Class members were also damaged by the false and misleading 2005

20   guidance as follows:

21          •      On 5/6/05, UTSI's stock price declined 31% to $7.24, compared to a 1% decline in
                   the PPG and a 0.3% increase in the NASDAQ after the Company reported on 5/5/05
22                 that (1) revenues from sales of PAS equipment and handsets in China would be 40%-
                   50% less than 2004 revenues and (2) it was implementing a restructuring plan,
23                 including a 17% or 1,400-person reduction in force and an expansion of outsourcing
                   the Company's supply chain and IT operations.
24

25          •      On 8/3/05, UTSI's stock price declined 7.5% to $7.90, compared to no change in the
                   PPG and the NASDAQ after the Company reported on 8/2/05 that (1) 2Q05 results
26                 were less than the guidance provided on 5/5/05, (2) revenues would decline from
                   $723 million in 2Q05 to $660-$680 million in 3Q05, (3) gross margins would be
27                 15%-18% in 3Q05 and (4) GAAP EPS would be a negative $0.35-$0.40.

28

- On 10/7/05, the Company's stock price declined 26% to $5.64, compared to a 1.3% increase in the PPG and a 0.3% increase in the NASDAQ after UTSI reported on 10/6/05 that 3Q05 results would be less than the guidance provided on 8/2/05 because UTSI had not completed all elements of a $40 million contract. In addition, the Company revealed that it might need to record an impairment charge to write off some or all of goodwill, and that the Company had received a notice of formal inquiry from the SEC into certain aspects of UTSI's financial disclosures during prior reporting periods.

- On 9/22/06, the Company's stock price declined 4.7% from $8.99 to $8.57, compared to no change in the PPG and a 0.8% decline in the NASDAQ after the CFRA issued a report on 9/21/06, in which it questioned whether the Company had any stock option backdating issues.

- On 11/8/06, the Company's stock price declined 8.4% from $10.23 to $9.37, compared to a 1.3% increase in the PPG and a 0.4% increase in the NASDAQ after UTSI reported on 11/7/06 that it had commenced a review of its historical equity award grant practices under the direction of the Nominating and Corporate Governance Committee with the assistance of independent legal counsel and independent accounting consultants.

- On 1/5/07, the Company's stock price declined 3% from $9.04 to $8.77, compared to a 1.7% decline in the PPG and a 0.8% decline in the NASDAQ after UTSI filed a Form 8-K on 1/4/07 that disclosed (1) stock option grants purportedly made on 2/28/02 with an exercise price of $20.25 were actually made on 3/27/02 when the market price of the stock was $25.25 and (2) stock option grants purportedly made on 7/25/02 with an exercise price of $15.72 were actually made on 7/17/02 when the market price of the stock was $20.82.

- On 2/2/07, the Company's stock price declined 1.1% from $9 to $8.90, compared to a 0.3% decline in the PPG and a 0.3% increase in the NASDAQ after UTSI reported on 2/1/07 that it would have to restate its financial statements because it failed to account for stock option compensation expenses in accordance with APB 25.

299. **Nature of Loss:** Class members purchased UTSI stock after 7/27/04 at artificially inflated prices because the market did not know that (1) the significant internal control weaknesses caused UTSI to report false financial results and would cause UTSI to report false results in the future, and (2) revenues, gross margins and EPS would decline because of the operational problems, the reduction in PAS equipment orders, competition in the PAS handset market, the increasing costs of manufacturing the handsets, the undisclosed problems with the development of the ASICs and CDMA handsets, and the undisclosed problems with the quality of UTSI's broadband equipment. These conditions would be gradually revealed on the dates listed above.

300.    **Date of Statements and Statements:** On 9/20/04, before the market opened, UTSI issued a press release and held a conference call to announce a substantial reduction in guidance for the remainder of 2004.  UTSI announced that (1) it could not recognize revenues on the $290 million Japan Telecom contract in 2H04 ($220 million of which had been included in the Company's 7/27/04 guidance), (2) there had been a "maturation of the PAS market in China," and "[a]s many current telecom networks in China are reaching critical mass, the carriers are spending less on the [] new networks and more on expansion and optimization of their existing networks which tend to be smaller projects," (3) PAS capital expenditures were slowing "in [a]nticipation of [n]ext-[g]eneration [n]etwork [s]pending," (4) some PAS networks were experiencing capacity usage as high as 80%, but neither expansion nor upgrades were being announced, and (5) due to the maturation of the PAS market, China PAS sales were expected to be $2.1 billion in 2004 and $1.5 billion in 2005. Specifically, the guidance was revised as follows:

|  | 7/27/04 | 9/20/04 |
|---|---|---|
| 3Q04 Revenues | $695-$700 million | $590-$600 million |
| 3Q04 Gross Margin | 27%-28% | 22%-23% |
| 3Q04 EPS | $0.34-$0.35 | $0.02-$0.04 |
| FY04 Revenues | $2.95-$3 billion | $2.75 billion |
| FY04 Gross Margin | 27% | not provided |
| FY04 EPS | $1.65-$1.70 | $0.80-$0.85 |
| FY05 Revenues | $4-$4.3 billion | $4-$4.3 billion |
| FY05 EPS | $2.20 | $2-$2.20 |

During the 9/20/04 conference call, defendant Lu assured investors that international demand was quickly accelerating:

> Lu: While PAS is [] maturing in China, ***international demand is quickly accelerating.  Non-China demand and booking continue to be very strong***.

Regarding the Japan Telecom contract that was the primary reason for the revised guidance, Sophie stated the following:

> Sophie: At the time we provided guidance for Q3 and the remainder of 2004 on the 27th of July, we had already received initial purchase orders for the equipment from Japan Telecom and it then based our guidance on those purchase orders.  However, ***the original agreement was limited to equipment only***.  We had anticipated recording approximately 220 million revenues in the third and fourth quarters of 2004 against these purchase orders.  However, ***over the course of the contract development, Japan Telecom increased the equipment value and added a strategic***

> *services element which increased the dollar amount and profitability of the contract to UTStarcom.* But since those services are considered linked to the equipment, it ultimately leads to a longer period of time before we can recognize revenue. We now expect to recognize the entire 290 million of both equipment and services revenue in the second or third quarter of 2005.

During the conference call, Lu represented that China Netcom would increase PAS spending after completing their IPO:

> Lu: *[A]fter the IPO, we are very probable that they would be coming back and spending more in the future.*

Lu and Sophie continued to represent that UTSI was "on track" to introducing ASICs that would reduce PAS handset costs and improve gross margins:

> Lu: Having said that, *we are also on track on introducing our new our own ASIC and UTStarcom handsets in late Q4, which will reduce the cost of production by up to 20 percent. This should help to mitigate the recent decline of our handsets margins.* While there may be a continued short-term pressure on our handsets gross margin, we do anticipate PAS handsets gross margin will improve in 2005.
>
> \*      \*      \*
>
> Sophie: *Our ASICS will be introduced in the fourth quarter of 2004, which will drive gross margin improvements in 2005.*

They also assured investors that the certification process of UTSI's CDMA handsets was "progressing fairly smoothly" and was "doing quite well."

301. **Identity of Authors:** The press release was issued on behalf of UTSI and the statements are also attributable to Lu and Sophie, who were quoted in the press release. Lu and Sophie made the statements during the conference call.

302. **True Facts:** UTSI did not report 3Q04, FY04 and FY05 results in line with the revised guidance provided on 9/20/04:

| Period | 9/20/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 3Q04 Revenues | $590-$600 million | $645 million | $642 million | N/R |
| 3Q04 Gross Margin | 22%-23% | 21.2% | 21.1% | N/R |
| 3Q04 EPS | $0.02-$0.04 | $0.04 | $0.04 | N/R |
| FY04 Revenues | $2.75 billion | $2.7 billion | $2.68 billion | $2.58 billion |
| FY04 China Revenues | $2.1 billion | $2.1 billion | $2.1 billion | $2.0 billion |
| FY04 EPS | $0.80-$0.85 | $0.64 | $0.61 | $0.45 |

| FY05 Revenues | $4-$4.3 billion | $2.93 billion | N/A | $2.87 billion |
| FY05 China Revenues | $1.5 billion | $928.9 million | N/A | $870.6 million |
| FY05 EPS | $2.00-$2.20 | ($4.16) | N/A | ($4.55) |

303.    International demand was not accelerating because $290 million of the $600 million of international orders received by 9/20/04 was attributable to the Japan Telecom transaction.  In addition, the witnesses stated that international orders were obtained by agreeing to unrealistic customer delivery dates that were necessary to prevent the sale from going to more established competitors.  The resulting unrealistic development schedules combined with the Company's weak and inexperienced engineering team resulted in numerous problems with the newly developed broadband products that delayed customer acceptance and revenue recognition and increased the costs of the sales.

304.    UTSI did not introduce the ASIC PAS handsets in 4Q04 as represented, and PAS handset gross margins did not improve.  The ASIC PAS handsets were not introduced until 3Q05 due to the undisclosed development problems, and PAS handset gross margins declined throughout 2004 and 2005 to as low as 9.7%.

305.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew the undisclosed and widespread problems prevented them from providing accurate guidance:** Lu and Sophie continued to know there was no reasonable basis for their statements because they knew (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were declining due to the reduced demand and aggressive pricing, (3) revenues and gross margins on PAS handset sales had declined and would continue to decline due to competition, increased costs of component parts purchased from Toshiba and the problems with the development of the ASIC PAS handsets and the CDMA handsets, (4) revenues and gross margins on PAS equipment sales and broadband equipment sales were being negatively impacted by the undisclosed operational problems that were delaying revenue recognition and increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded them from knowing if (1) UTSI was properly recognizing revenue on sales with side agreements supplementing or amending contract terms, (2) UTSI was properly

1    accounting for stock compensation expenses, and (3) UTSI was obtaining sales by bribing foreign

2    government officials in violation of the FCPA.

3         306.    That UTSI reported FY04 revenue and EPS that were substantially less than the

4    guidance provided on 9/20/04, and then restated and reduced FY04 revenues and EPS twice

5    confirms there was no reasonable basis for the guidance, and raises a strong inference Lu and Sophie

6    knew it.  Further, the failure of UTSI to originally report FY05 revenues and EPS in line with the

7    guidance, and then restating and reducing FY05 revenues and EPS confirm there was no reasonable

8    basis for the guidance and raise a strong inference Lu and Sophie knew it.

9         307.    **Lu and Sophie knew international demand was not strong:** The information

10   provided by CW3 and CW8, and the terms of the 8/20/04 contract between UTSI and Japan

11   Telecom, establish that Lu and Sophie knew by 9/20/04 that there were problems with the quality of

12   products delivered to SOFTBANK.  Sophie falsely stated the strategic services element was added to

13   the Japan Telecom contract and would increase the profitability of the deal for UTSI.  The strategic

14   services element was actually part of the risk-free contingent nature of the deal required by Japan

15   Telecom because UTSI had historically delivered defective products to SOFTBANK affiliates.

16        308.    The Company's lawsuit against Passave strongly infers Lu and Sophie also knew by

17   9/20/04 that there were problems with the GEPON product shipped to SBBC in 7/04.  In its lawsuit

18   filed against Passave on 11/17/05, UTSI alleged that Passave delivered defective Gigabit-ethernet

19   semiconductor devices that caused failures of UTSI's FTTH telecommunications products

20   incorporating such devices.  Specifically, UTSI alleged that it purchased in excess of 100,000 units

21   of Passave's PAS5001M3 chip *in 2003* for more than $10 million, and incorporated the chips into its

22   FTTH product line, a majority of which (96,320 chips) were *shipped to SBBC in 7/04*.  *By 10/04,*

23   *SBBC notified UTSI that there were problems with the FTTH products, including data*

24   *interruptions and resulting failures*.  Lu's and Sophie's knowledge about the problems on 9/20/04

25   is strongly inferred from (1) the chips being shipped to SBBC in 7/04, (2) the history of problems

26   with products delivered to SOFTBANK affiliates on prior occasions, (3) and the allegations in

27   UTSI's lawsuit against Passave that SBBC notified UTSI of the problems by 10/04.

28

1    309.    On 10/26/04, UTSI reported that $28 million of international revenue would not be

2    recognized in 4Q04 because of delays in receiving final acceptance.  That this announcement came

3    less than one month after 9/20/04 strongly infers Lu and Sophie knew about the problem on 9/20/04.

4    310.    The substantial decline in broadband gross margins from 53% in 2003 to 20% in 2004

5    is additional evidence Lu and Sophie knew there were problems with UTSI's broadband products

6    and that international demand was not strong.

7    311.    **Lu and Sophie knew that UTSI was not "on track" to introduce internal ASICs**

8    **in 2004:** As detailed above, several witnesses stated the Company had a weak and inexperienced

9    engineering team.  CW4 stated that the original expectation was that the ASICs would be mass

10   produced by 9/04, but that the production date was pushed to the end of 2004, and CW15 said the

11   first successful shipment of internally developed ASICs to the Company's Hangzhou facility for

12   incorporation into the PAS handset did not occur until 9/05.  These facts and the importance of the

13   ASICs to the Company's PAS handset gross margins strongly infer Lu and Sophie knew on 9/20/04

14   that UTSI was not on track to introduce the PAS handsets incorporating the internally designed

15   ASICs in 4Q04, or that gross margins would improve in 2005.

16   312.    **Lu and Sophie knew the certification process of the CDMA handsets was not**

17   **"progressing fairly smoothly" or "doing quite well":** As detailed above, information provided by

18   CW5 and admissions by UTSI in 2005 show that there were problems with the development of the

19   CDMA handsets.  The problems were so bad that Audiovox personnel were proposing the handsets

20   be sold at a loss to get in the market with the hope of realizing profits in the future.  In 2005, Lu and

21   Sophie began to admit that the handsets would not be introduced until 3Q05, and that other models

22   would not be introduced until 2006.

23   313.    **Lu and Sophie knew that China Netcom would not increase capital expenditures**

24   **on PAS following its IPO:** By 9/20/04, there were only ten days left in 3Q04 and UTSI had not

25   received – and would not receive – any PAS equipment orders.  In 4Q04, UTSI only received $67

26   million of PAS equipment orders.  Thus, Lu and Sophie knew there would be a sharp decline in PAS

27   equipment revenues in 4Q04.  Moreover, as UTSI reported on 1/6/05, China Netcom was delaying

28   executing contracts and would not provide final acceptance and pay UTSI for existing orders that

1   would delay recognition of $135 million of revenue until 2005.  CW21 said that China Netcom was

2   typically very slow in paying UTSI and during UTSI's 5/5/05 conference call, Lu and Sophie

3   admitted that the Chinese government mandated *in 2004* that China Telecom and China Netcom

4   begin waiting six months following final acceptance before making future payments for PAS

5   infrastructure.

6         314.   **Effect on Stock Price:** Investors again reacted with alarm to the substantially revised

7   guidance, the significant decline in PAS growth in China and the sharply reduced gross margins

8   resulting from the previously undisclosed problems as those disclosures called into question many of

9   the prior statements by Lu and Sophie regarding the strength of UTSI's business in China, its

10  international business and what UTSI's future results would be.  On 9/20/04, UTSI's stock price

11  declined 10% to $13.71 on volume of more than 25 million shares.  By comparison, the PPG

12  declined 1.5% and the NASDAQ declined 0.1%.

13        315.   **Loss Causation/Date of Loss:** Class members were damaged by the false and

14  misleading statements made on 9/20/04 when the price of the stock declined after some of UTSI's

15  true financial condition was revealed.  The stock price declined after (1) UTSI lowered 4Q04

16  revenue, gross margin and EPS guidance on 1/6/05, (2) UTSI reduced PAS equipment and PAS

17  handset revenue guidance on 5/5/05, (3) UTSI reported on 8/2/05 that 2Q05 results were less than

18  guidance, that 3Q05 revenues would decline and that 3Q05 EPS would be a negative $0.35-$0.40,

19  (4) UTSI reported on 10/6/05 that 3Q05 revenues would be less than guidance, that the Company

20  might need to record a goodwill impairment charge and that the Company had received a formal

21  inquiry from the SEC, (5) UTSI reported on 2/9/06 that it had improperly recognized $22 million of

22  revenue between 2003 and 2005, (6) UTSI reported on 3/16/06 that there would be a delay in filing

23  the 2005 Form 10-K because the Audit Committee needed more time to investigate revenues that

24  were improperly recorded, (7) the CFRA reported on 9/21/06 that UTSI might have stock option

25  backdating issues, (8) UTSI reported on 11/7/06 that it was investigating stock options, (9) UTSI

26  reported on 1/4/07 that two stock options had been backdated, (10) UTSI reported on 2/1/07 that it

27  would have to restate its financial statements because it failed to account for stock options in

28

1   accordance with APB 25, and (11) UTSI revealed on 7/24/07 and 10/10/07 that FY04 and FY05

2   results would be restated.

3          316.   **Nature of Loss:** Class members purchased UTSI stock after 9/20/04 at artificially

4   inflated prices because the market did not know that (1) the significant internal control weaknesses

5   caused UTSI to report false financial results and would cause UTSI to report false results in the

6   future, and (2) revenues, gross margins and EPS would decline significantly more than Lu and

7   Sophie represented because of the operational problems, the reduction in PAS equipment orders,

8   competition in the PAS handset market, the increasing costs of manufacturing the handsets, the

9   undisclosed problems with the development of the ASICs and CDMA handsets, and the undisclosed

10  problems with the quality of UTSI's broadband equipment. These conditions would be gradually

11  revealed on the dates listed above.

12         317.   **Date of Statements and Statements:** On 10/26/04, UTSI issued a press release and

13  held a conference call to announce UTSI's 3Q04 results.   In the press release and during the

14  conference call, Lu and Sophie provided the following guidance:

15  | | | |
    |---|---|---|
    | Revenue Range: | 4Q04: | $875-$885 million* |
    | | FY04: | $2.8 billion* |
    | | FY05: | $4 billion* |
    | Gross Margins: | 4Q04: | 17% (core company 22%, ACC 4.5%) |
    | | FY04: | 22% |
    | | FY05: | 25% |
    | GAAP EPS Range: | 4Q04: | break-even |
    | | FY04: | $0.76-$0.80 |
    | | FY05: | $2 |

21         (*includes anticipated revenue of $250 million + in Q4 and full-year 2004 and $900
           million in 2005 related to the acquisition of Audiovox Communications Corporation)

22  During the conference call, Sophie told investors that defendants were confident with their financial

23  guidance for 2005 due to the visibility provided by the Company's backlog:

25         Sophie: Since our mid quarter update call, we've had more time to analyze our
           backlog, as well as revenue opportunity from the contracts currently in discussion.
           *This has given us more visibility into next year*, and *we continue to remain*
26         *confident with a revenue guidance of 4 billion*. . . .   Breaking these revenues down
           by product types, *PAS hand sets and infrastructure, 1.5 to 1.6 billion*; CDMA
27         handsets, 900 million to a billion; *broadband, which included our IP-DSLAMs,
           MSTP, [GEPON] and CPE 1.2 to 1.3 billion*; and non-PAS wireless which would be
28         probably like TDCMA and CDMA, approximately 300 million.

Lu and Sophie again stated that the introduction of CDMA handsets would improve UTSI's gross margins:

> Sophie: *We expect to drive improvements in the Audiovox gross margins by introducing our own design[ed] and manufactured handsets into the channel throughout 2005. . . .*

> *                    *          *          *

> Lu: [O]ut of $900 million that we've projected from Audiovox that we are hoping *UTStarcom will be able to contribute about 200-300 million dollars of the revenues from UTStarcom's handset*. So we'll hope in the latter part of Q1 or Q2 we will be able to start shipping some of our products to them.

During the conference call, Lu and Sophie stated that 3Q04 was a landmark quarter because UTSI had booked $600 million of international contracts, including the Japan Telecom contract:

> Lu: *As of September 30th, we have [] booked more than $600 million in contract outside of China for the year. This was the landmark quarter with numbers of substantial deals signing [] new product areas for UTStarcom.* These details form a foundation for the additional contract with these contracts as well as new contracts with other leading carriers in those and other geographics. . . .

> *We announced contract with [] Japan Telecom for our IAN 8000 broadband access platforms and with [] Softbank for [both the] NetRing multi services optical transport solutions and our first gigabit IPON win. The combined value of these contracts is approximately $370 million.*

> *                    *          *          *

> Sophie: In the third quarter, we announced nearly *$400 million of contracts*. *These bookings are indicative of the tremendous amount of demand [we're] seeing globally, and contribute to our visibility for 2005.*

Lu assured investors there was still strong consumer demand for PAS in China:

> Lu: Our third key challenge is to implement cost reduction program and gross margin improvement in the China market. As we discussed in our mid quarter conference call, *China Telecom and China Netcom continue to see strong consumer demand for PAS*.

318.    **Identity of Authors:** The press release was issued on behalf of UTSI and the statements are attributable to Lu and Sophie because Lu was quoted in the press release and because the statements were repeated during the conference call that Lu and Sophie attended. Lu and Sophie made the statements during the conference call.

319.    **True Facts:** UTSI did not report 4Q04, FY04 or FY05 financial results in line with guidance:

| Period | 10/26/04 Guidance | Originally Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| 4Q04 Revenues | $875-$885 million | $746.6 million | $748.1 million | N/R |
| 4Q04 Gross Margin | 17% | 15% | 14.9% | N/R |
| 4Q04 EPS | break-even | ($0.22) | ($0.27) | N/R |
| FY04 Revenues | $2.8 billion | $2.7 billion | $2.68 billion | $2.58 billion |
| FY04 Gross Margin | 22% | 22.3% | 22.2% | 22.1% |
| FY04 EPS | $0.76-$0.80 | $0.64 | $0.61 | $0.45 |
| FY05 Revenues | $4 billion | $2.93 billion | N/A | $2.87 billion |
| FY05 PAS & PHS Revenues | $1.5-$1.6 billion | $968 million | N/A | $909.5 million |
| FY05 Broadband Revenues | $1.2-$1.3 billion | $507.7 million | N/A | $449 million |
| FY05 Gross Margin | 25% | 15.8% | N/A | 15.2% |
| FY05 EPS | $2.00 | ($4.16) | N/A | ($4.55) |

320.    The failure to report results in line with guidance shows that (1) the backlog did not give Lu and Sophie more visibility into 2005, (2) UTSI did not improve Audiovox gross margins by introducing internally designed handsets in 2005, (3) the booking of $600 million of broadband contracts outside China was not indicative of tremendous demand for UTSI's products and (4) there was not strong consumer demand for PAS in China.

321.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew the undisclosed and widespread problems prevented them from providing accurate guidance:** Lu and Sophie continued to know there was no reasonable basis for their statements because they knew (1) China Telecom and China Netcom were substantially reducing orders for PAS equipment, (2) gross margins on PAS equipment sales were declining due to the reduced demand and aggressive pricing, (3) revenues and gross margins on PAS handset sales had declined and would continue to decline due to competition, increased costs of component parts purchased from Toshiba and the problems with the development of the ASIC PAS handsets and the CDMA handsets, (4) revenues and gross margins on PAS equipment sales and broadband equipment sales were being negatively impacted by the undisclosed operational problems that were delaying revenue recognition and increasing the costs of the backlogged sales.  In addition, Lu and Sophie knew there were significant internal control weaknesses that precluded them from knowing if (1) UTSI was properly recognizing revenue

1   on sales with side agreements supplementing or amending contract terms, (2) UTSI was properly

2   accounting for stock compensation expenses and (3) UTSI was obtaining sales by bribing foreign

3   government officials in violation of the FCPA.

4        322.    That UTSI reported FY04 revenue and EPS that were substantially less than the

5   guidance provided on 10/26/04, and then restated and reduced FY04 revenues and EPS twice

6   confirms there was no reasonable basis for the guidance, and raises a strong inference Lu and Sophie

7   knew it.  Further, the failure of UTSI to originally report FY05 revenues and EPS in line with the

8   guidance, and then restating and reducing FY05 revenues and EPS confirm there was no reasonable

9   basis for the guidance and raise a strong inference Lu and Sophie knew it.

10        323.    UTSI reported $2.93 billion of revenue in 2005 that was subsequently restated and

11   reduced to $2.87 billion.  The $2.87 billion was $1.13 billion or 28% less than the $4 billion Lu and

12   Sophie told investors they were confident UTSI would report.  PAS equipment and handset revenues

13   were $909 million, not $1.5-$1.6 billion, and broadband revenues were $508 million, not $1.2-$1.3

14   billion.  The magnitude of the misses bolsters the inference Lu and Sophie knew there was no

15   reasonable basis for these representations.

16        324.    UTSI reported 4Q04 revenues of $742 million, which was $133-$143 million or 15%

17   less than the $875-$885 million guidance.  On 1/6/05, Lu and Sophie reported the shortfall was

18   caused by delays in the execution of contracts and final acceptances on a PAS equipment contract in

19   China, which Lu and Sophie knew were long-standing problems at the Company.  Indeed, on 5/5/05,

20   they would acknowledge that the Chinese government mandated *in 2004* that China Telecom and

21   China Netcom wait six months following final acceptance to make payments for PAS infrastructure.

22        325.    **Lu and Sophie knew consumer demand for PAS was not strong because PAS**

23   **equipment orders and PAS subscriber growth rates were continuing to decline:** By 10/26/04,

24   Lu and Sophie knew UTSI did not receive any PAS equipment orders in 3Q04.  UTSI received just

25   $67 million of orders in 4Q04.  Further, the decline in PAS subscriber growth rates continued,

26   declining from 17% in 2Q04 to 11% in 3Q04.  After reporting $428 million of PAS equipment

27   revenues in 2Q04 and $426 million of PAS equipment revenues in 3Q04, UTSI's PAS equipment

28   revenues plummeted to $206 million in 4Q04 and to $110 million in 1Q05.  UTSI originally

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)     - 120 -

1   reported just $495 million of PAS equipment revenues in 2005, which was restated and reduced to

2   $473.3 million on 10/10/07.  The substantial decline in PAS equipment orders and revenues, the

3   importance of China Telecom and China Netcom to the Company's financial results, the close

4   relationship between UTSI and its two largest customers, the decline in PAS subscriber growth rates

5   and the receipt of just $67 million of orders in 4Q04, strongly infer Lu and Sophie knew that China

6   Telecom and China Netcom planned to substantially reduce PAS equipment orders in 4Q04, and that

7   consumer demand for PAS was not strong.

8       326.   **Lu and Sophie knew that the $600 million of international contracts booked in**

9   **1Q04-3Q04 was not indicative of tremendous demand, and that there was no reasonable basis**

10  **to represent broadband revenues would be $1.2-$1.3 billion in 2005:** The reporting of $508

11  million of broadband revenues in 2005 compared to the guidance of $1.2-$1.3 billion, and

12  information provided by the witnesses and the Company's lawsuit against Passave show that Lu and

13  Sophie knew the $600 million of international contracts booked in 1Q04-3Q04 was not indicative of

14  tremendous demand, and that there was no reasonable basis to represent broadband revenues would

15  be $1.2-$1.3 billion in 2005.  In the Passave lawsuit, UTSI alleged that SBBC had notified UTSI *by*

16  *10/04* that there were problems with the GEPON product shipped to SBBC in 7/04.  CW3 said Japan

17  Telecom insisted it approve all equipment before it was accepted for deployment because UTSI had

18  delivered poor quality products to SOFTBANK affiliates in the past, and CW8 said there were

19  significant quality issues with the iAN-8000 MSAN equipment delivered to Japan Telecom.  As a

20  result, Japan Telecom required contract terms (no acceptance until goods inspected and approved,

21  damages for delivery delays, right to impose quality assurance standards on UTSI, requirement for

22  UTSI to perform sales promotional activities) that made the transaction a risk-free deal for Japan

23  Telecom.  CW6, CW9, CW16 and CW19 said there were problems with the mVision IPTV product,

24  and CW13 said there were problems with the NetRing product sold to Japan Telecom in late 2004.

25  The disclosure by UTSI on 10/26/04 that $28 million of revenue from the sale of UTSI's mVision

26  IPTV products would be recognized in 2005 rather than 4Q04 also shows Lu and Sophie knew about

27  the product problems.

28

327. **Lu and Sophie knew delays in the introduction of internally designed CDMA handsets would prevent improvements in Audiovox gross margins in 2005:** The problems with the development of the CDMA handsets show that Lu and Sophie knew their introduction would be delayed, and therefore would not improve UTSI's gross margins in 2005. In subsequent conference calls, Lu and Sophie acknowledged the introduction of the handsets would be delayed. After reporting a 4.7% gross margin on sales of all cellular handsets in 4Q04, UTSI reported lower margins in 2005 – 4.3% in 1Q05, 4.7% in 2Q05, 3.6% in 3Q05 and 2.9% in 4Q05. On 11/3/05 and 2/9/06, defendants stated that product returns and increased warranty reserves contributed to the decline.

328. **Lu and Sophie knew significant internal control weaknesses related to goodwill prevented them from providing accurate guidance:** Lu and Sophie knew that UTSI reported $180.6 million of goodwill in 4Q04, and that UTSI did not have the ability to determine if goodwill was impaired, which in turn prevented them providing accurate guidance. This significant internal control weakness was acknowledged in the Company's 2004 Form 10-K filed on 4/15/05, and UTSI recorded $323 million of impairment charges to write off 100% of the Company's goodwill on 11/3/05 for reasons that existed in 4Q04.

329. **Effect on Stock Price:** On 10/27/04, UTSI's stock price increased 0.7%, which was similar to the 0.9% increase in the PPG and less than the 2.1% increase in the NASDAQ.

330. **Loss Causation/Date of Loss:** Class members were damaged by the false and misleading statements made on 10/26/04 when the price of the stock declined after some of UTSI's true financial condition was revealed. The stock price declined after (1) UTSI lowered 4Q04 revenue, gross margin and EPS guidance on 1/6/05, (2) UTSI reduced PAS equipment and PAS handset revenue guidance on 5/5/05, (3) UTSI reported on 8/2/05 that 2Q05 results were less than guidance, that 3Q05 revenues would decline and that 3Q05 EPS would be a negative $0.35-$0.40, (4) UTSI reported on 10/6/05 that 3Q05 revenues would be less than guidance, that the Company might need to record a goodwill impairment charge and that the Company had received a formal inquiry from the SEC, (5) UTSI reported on 2/9/06 that it had improperly recognized $22 million of revenue between 2003 and 2005, (6) UTSI reported on 3/16/06 that there would be a delay in filing

1   the 2005 Form 10-K because the Audit Committee needed more time to investigate revenues that

2   were improperly recorded, (7) the CFRA reported on 9/21/06 that UTSI might have stock option

3   backdating issues, (8) UTSI reported on 11/7/06 that it was investigating stock options, (9) UTSI

4   reported on 1/4/07 that two stock options had been backdated, (10) UTSI reported on 2/1/07 that it

5   would have to restate its financial statements because it failed to account for stock options in

6   accordance with APB 25, and (11) UTSI revealed on 7/24/07 and 10/10/07 that FY04 and FY05

7   results would be restated.

8          331.   **Nature of Loss:** Class members purchased UTSI stock after 10/26/04 at artificially

9   inflated prices because the market did not know that (1) the significant internal control weaknesses

10  caused UTSI to report false financial results and would cause UTSI to report false results in the

11  future, and (2) revenues, gross margins and EPS would decline significantly because of the

12  operational problems, the reduction in PAS equipment orders, competition in the PAS handset

13  market, the increasing costs of manufacturing the handsets, the undisclosed problems with the

14  development of the ASICs and CDMA handsets, and the undisclosed problems with the quality of

15  UTSI's broadband equipment. These conditions would be gradually revealed on the dates listed

16  above.

17              **3.      False and Misleading Statements in 2005**

18         332.   On 1/6/05, UTSI issued a press release and held a conference call to announce that

19  4Q04 revenues would be $740-$745 million or $135 million less than the $875-$885 million Lu and

20  Sophie told investors to expect on 10/26/04.  It was stated in the press release that "'[t]he primary

21  reason behind the lower than expected financial results was the challenging market environment that

22  UTStarcom faced in [China],'" "revenues from China operations were adversely impacted by several

23  factors, including an overall slowing of the Chinese economy, maturation of the PAS market, and

24  decreased capital spending," and "there were disruptions associated with changes in senior

25  management at the main carriers in China, and the shift of decision-making away from regional

26  entities and towards carrier headquarters, which caused delays in both the execution of contracts and

27  final acceptances."

28

333.    **Date of Statements and Statements**: During the 1/6/05 conference call, Sophie reiterated the FY05 revenue guidance, and Lu said UTSI was experiencing strong international demand:

> Sophie: ***We remain confident in our full year 2005 revenue guidance, which we have targeted at 4 billion***, representing approximately 50 percent annual growth over 2004. . . .
>
> *            *            *
>
> Lu: ***UTStarcom is experiencing strong demands in our international market[s] such as Japan, India, the US, and Latin America.*** We are pleased that international business is on track this quarter and is showing momentum as we move into 2005.
>
> In Q4, we ***announced the number of important contract wins that support our vision of globalization and diversification. Selected transactions included our first contract for our mVision TV over IP solution and mSwitch with a US-based CLEC DSSI***.

334.    **Identity of Authors:** Lu and Sophie made the statements during the conference call.

335.    **True Facts:** UTSI did not report $4 billion of revenues in 2005. It originally reported $2.9 billion, which was restated and reduced to $2.87 billion on 10/10/07. The various product problems described by the witnesses and confirmed by the Company's lawsuit against Passave establish that UTSI was not experiencing strong demand in its international markets.

336.    **Scienter and Factual Basis for Scienter: Lu and Sophie knew there was no reasonable basis to reiterate the $4 billion revenue guidance for 2005:** The magnitude of the revenue shortfall in 2005, the witness accounts, the allegations in the Passave lawsuit, the continuing substantial decline in PAS equipment orders, PAS equipment revenues and PAS handset revenues and the significant internal control weaknesses raise a strong inference Lu and Sophie knew there was no reasonable basis for the guidance.

337.    **Magnitude of Revenue Shortfall:** UTSI originally reported $2.93 billion of revenue in 2005, which was subsequently restated and reduced to $2.87 billion – $1.13 billion less than the $4 billion guidance. The Company reported $909.5 million of PAS equipment and handset revenue in 2005, which was $690 million or 43% less than the $1.5-$1.6 billion guidance provided on 10/26/04 and reiterated on 1/6/05. UTSI reported $508 million of broadband revenues in 2005, which was $800 million or 62% less than the $1.3 billion guidance provided on 10/26/04 and

1    reiterated on 1/6/05.  The magnitude of the shortfalls confirms there was no reasonable basis for the

2    guidance, and raises a strong inference Lu and Sophie knew it.

3          338.  **Lu and Sophie knew PAS equipment revenues and PAS handset revenues would**

4    **decline in 2005:** Lu and Sophie knew PAS equipment revenues would decline substantially in 2005

5    (as they did in 4Q04) because China Telecom and China Netcom had substantially reduced their

6    PAS equipment orders throughout 2003 and 2004, including no orders in 3Q04 and just $67 million

7    of orders in 4Q04.  China Telecom and China Netcom ordered $160 million in 1Q05, $70 million in

8    2Q05, $167 million in 3Q05 and $42 million in 4Q05.

9          339.  **Lu and Sophie knew there was not strong international demand:** Lu and Sophie

10   misled investors by stating important contract wins announced in 4Q04 supported their contentions

11   that there was strong international demand for their products, and by reiterating 2005 revenues

12   would be $4 billion, knowing that guidance assumed $1.2-$1.3 billion of broadband revenues.  The

13   reporting of $508 million broadband revenues in 2005, the information provided by the witnesses

14   and the Company's admissions of product problems in 2005 show why Lu and Sophie knew there

15   was no reasonable basis for their statements.  Information provided by CW13 and the Company's

16   lawsuit against Passave establish Lu and Sophie knew there were problems with the GEPON product

17   shipped to SBBC in 7/04.  Indeed, UTSI alleged in the Passave lawsuit that SBBC notified UTSI in

18   10/04 that the product did not work and that in 1/05, UTSI had determined the problem was a failure

19   of the Passave chip to interface properly with a Broadcom Corporation ("Broadcom") switching

20   device that operated within the FTTH products.  Specifically, the Passave chip was erroneously

21   interpreting some of the data received through the ten-bit interface from the Broadcom switch as

22   illegal and, therefore, dropped the data causing failures.

23         340.  Lu and Sophie also knew there were problems with the iAN-8000 equipment sold to

24   Japan Telecom that led to Japan Telcom insisting on contract terms that, among other things,

25   allowed them to inspect the equipment before accepting delivery, and to impose additional quality

26   assurance standards on UTSI.  Moreover, Japan Telecom would only purchase the equipment if

27   UTSI increased Japan Telecom's customers through sales promotion activities for which UTSI

28   received no additional consideration.

341.    CW6, CW9 and CW16 stated there were problems with the mVision equipment sold to DSSI in 11/04 that CW16 said were never resolved.  According to CW6, DSSI was never comfortable with the performance of the mVision equipment and refused to pay for it.  CW6 stated that DSSI planned to offer TVoIP services to multi-dwelling end users in northern Alabama but the IPTV picture was jittery and unclear.  Prior to resigning in 10/05, CW6 said that DSSI returned all of the mSwitch equipment that was also part of the transaction and demanded that UTSI "completely redo the mSwitch."  CW6 said that UTSI experienced similar problems with the mVision equipment sold to SOFTBANK.

342.    CW9 also said UTSI delivered defective mSwitch and mVision equipment that DSSI intended to use to offer IPTV services to residential and commercial customers.  CW9 said UTSI was never able to get the mSwitch to work.  For example, CW9 said the UTSI mSwitch was unable to offer "centrex features" which would allow incoming calls to ring at every receptionist's desk at DSSI's commercial customers and allow DSSI to offer conference capabilities, extensions on one line and other features.  CW9 said the mSwitch used "direct current" rather than "alternating current" because the alternating current switch was not rated in the United States.  The DC switch only worked 95% which was unacceptable.  In mid-2005, CW9 said DSSI returned the servers and blades for the mSwitch to UTSI so an upgraded version of software could be installed.

343.    CW9 said there were numerous problems with the mVision TVoIP equipment including language translation issues, problems with the menu prompt and "lip synch" issues that resulted in a long lag between the picture and sound.  CW9 said UTSI engineers, including Frank Kao, spent thousands of hours at DSSI trying to get mVision to work properly and that defendant Lu and DSSI executives traveled to China to meet with the UTSI development team to try and resolve the problems.  But according to CW9, the mVision equipment never worked properly and DSSI had not paid for the equipment by 9/05 when CW9 left DSSI.

344.    CW16 said that UTSI's efforts to deliver IPTV to DSSI were horribly mismanaged and caused the Company to ultimately lose the deal.  CW16 was assigned to the DSSI account in 2005 because DSSI had become increasingly upset with UTSI's inability to deliver a quality mVision system.  The problems were never resolved, DSSI refused to pay $3 million for the

1    equipment that was installed and as a result, UTSI began to repossess the equipment in 6/07.  CW16

2    said there were two main issues that prevented UTSI from delivering IPTV to DSSI.  First, CW16

3    said that UTSI's R&D engineers in China often claimed the system components were working when

4    they were not working.  Second, CW16 said that the R&D engineers in China were unwilling to

5    make modifications to component parts that were required for the parts to function effectively in

6    DSSI's network.   For example, CW16 said that when the mVision system components

7    malfunctioned or required modification to work properly in DSSI's network, the R&D engineers in

8    China claimed they had other priorities and would not repair or modify the components.

9        345.   **Lu and Sophie knew the significant internal control weaknesses prevented them**

10   **from providing accurate guidance:**  Lu and Sophie knew there was no reasonable basis for their

11   guidance because they knew UTSI was recognizing revenue without sufficient controls in place to

12   ensure there were not side letters amending or supplementing contract terms that precluded revenue

13   recognition, and because they knew UTSI did not have sufficient controls in place to assure stock

14   compensation expenses were being recorded in accordance with GAAP.  Lu and Sophie had been on

15   notice from the Company's auditors since 3/03 that there were significant internal control

16   weaknesses, including the need to "'strengthen procedures to ensure side letters and contract

17   amendments are communicated and accounted for in a timely manner,'" received a second

18   Management Recommendation letter from PWC in 4/04, that again noted concerns about the use of

19   side letters that were not forwarded to the finance department, and received a third Management

20   Recommendation letter from PWC in 2005 in connection with the 2004 audit.  The fact that UTSI

21   restated and reduced revenues and EPS in FY05, and that Lu and Sophie knew about the significant

22   internal control weaknesses strengthens the inference they knew there was no reasonable basis for

23   the guidance.

24       346.   The significant internal control weaknesses at UTSI, the investigations by the

25   Company, the SEC and the DOJ into whether the Company obtained sales by bribing foreign

26   government officials in violation of the FCPA, and the unwinding of the Mongolian joint venture

27   transaction strongly infer that UTSI did obtain sales by bribing foreign government officials in

28

1    violation of the FCPA, and that Lu and Sophie knew these undisclosed problems also prevented

2    them from providing accurate guidance.

3        347.    **Effect on Stock Price:** On 1/7/05, UTSI's stock price declined 20% from $19.94 to

4    $15.97 compared to a 0.8% increase in the PPG and a 0.1% decline in the NASDAQ.  Because the

5    1/6/05 disclosures revealed additional problems with the China PAS market – including reduced

6    capital expenditures by China Telecom and China Netcom and their refusal to provide final

7    acceptance and pay UTSI $135 million – that had previously been concealed, the decline in UTSI's

8    stock price that resulted from these disclosures provides a measurement of the economic damages

9    that were caused by the false and misleading statements before 1/6/05.

10       348.    **Loss Causation/Date of Loss:** Class members were damaged by the false and

11   misleading statements made on 1/6/05 when the price of the stock declined after some of UTSI's

12   true financial condition was revealed.  The stock price declined after (1) UTSI reduced PAS

13   equipment and PAS handset revenue guidance on 5/5/05, (2) UTSI reported on 8/2/05 that 2Q05

14   results were less than guidance, that 3Q05 revenues would decline and that 3Q05 EPS would be a

15   negative $0.35-$0.40, (3) UTSI reported on 10/6/05 that 3Q05 revenues would be less than

16   guidance, that the Company might need to record a goodwill impairment charge and that the

17   Company had received a formal inquiry from the SEC, (4) UTSI reported on 2/9/06 that it had

18   improperly recognized $22 million of revenue between 2003 and 2005, (5) UTSI reported on 3/16/06

19   that there would be a delay in filing the 2005 Form 10-K because the Audit Committee needed more

20   time to investigate revenues that were improperly recorded, (6) the CFRA reported on 9/21/06 that

21   UTSI might have stock option backdating issues, (7) UTSI reported on 11/7/06 that it was

22   investigating stock options, (8) UTSI reported on 1/4/07 that two stock options had been backdated,

23   (9) UTSI reported on 2/1/07 that it would have to restate its financial statements because it failed to

24   account for stock options in accordance with APB 25, and (10) UTSI revealed on 7/23/07 and

25   10/10/07 that FY05 results would be restated.

26       349.    **Nature of Loss:** Class members purchased UTSI stock at artificially inflated prices

27   after 1/6/05 because the market did not know that (1) the significant internal control weaknesses

28   caused UTSI to report false financial results and would cause UTSI to report false results in the

1  future, and (2) revenues, gross margins and EPS would decline significantly because of the

2  operational problems, the reduction in PAS equipment orders, competition in the PAS handset

3  market, the increasing costs of manufacturing the handsets, the undisclosed problems with the

4  development of the ASICs and CDMA handsets, and the undisclosed problems with the quality of

5  UTSI's broadband equipment.  If investors had known of these conditions, they would have lowered

6  their expectations about the Company's current and future prospects, which would have caused the

7  stock price to decline as it did on the dates listed above.

8        350.    On 5/5/05, UTSI issued a press release and held a conference call to announce 1Q05

9  results.  But UTSI also disclosed (1) a massive restructuring that would result in a 17% or 1,400

10  person reduction in force, (2) China PAS revenues in 2005 would be 40%-50% lower than the $2.1

11  billion reported in 2004, rather than 30% lower as represented on 9/20/04, 10/26/04 and 1/6/05, (3)

12  PAS handset and PCD gross margins had declined, (4) delays in the design and qualification process

13  of UTSI's CDMA handsets would cause shipment volumes to decline, and (5) the introduction of the

14  ASIC PAS handset would be delayed to 3Q05.

15        351.    **Date of Statements and Statements:** In the 5/5/05 press release, the following

16  guidance for 2Q05 was provided:

17        Consolidated Second Quarter 2005 Guidance

18              Total Revenues:              Approximately $740 million
      Gross Profit Margins:        15-18%
19
                                    *          *          *
20
21              GAAP EPS:                    Loss of Approximately ($0.70-$0.80),
                                    inclusive of non-cash tax and restructuring
22                                    charges

23        352.    **Identity of Authors:** The press release was issued on behalf of UTSI and the

24  statements are also attributable to Lu and Sophie who were quoted in the press release.

25        353.    **True Facts:** UTSI did not report 2Q05 revenues and gross margins in line with

26  guidance:

27

28

| | 5/5/05 Guidance | 8/2/05 Results | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| Revenues | approx. $740 million | $723.0 million | $179.8 million | $700.5 million |
| Gross Margin | 15%-18% | 15% | 15.6% | 14.7% |
| GAAP EPS | ($0.70-$0.80) | ($0.65) | ($0.64) | ($0.75) |

GAAP EPS in 2Q05 was still overstated because UTSI failed to write off goodwill.

354. **Scienter and Factual Basis for Scienter:** Lu and Sophie also knew there was no reasonable basis for the guidance provided on 5/5/05 due to the undisclosed product problems that delayed revenue recognition and increased the cost of backlogged sales, and the significant internal control weaknesses that caused UTSI to improperly recognize revenue, understate stock compensation expenses and fail to record goodwill impairment charges.

355. **Continuation of Product Quality Problems:** The witness accounts and the Company's lawsuit against Passave raise a strong inference Lu and Sophie knew there was no reasonable basis for the 2Q05 guidance because of the numerous problems with the Company's broadband products. The GEPON product shipped to SBBC in 7/04 did not work, and UTSI determined in 1/05 that the problem was caused by defective Passave chips. These problems continued and eventually led to SBBC demanding the defective chips be replaced in 8/05. The mVision equipment sold to DSSI in 11/04 did not work and DSSI refused to pay for it. The NetRing product sold to Japan Telecom in 2004 did not function properly and the problems had not been fixed by 5/06.

356. **Lu and Sophie knew the significant internal control weaknesses prevented them from providing accurate guidance:** Lu and Sophie knew there was no reasonable basis for their guidance because they knew UTSI was recognizing revenue without sufficient controls in place to ensure there were not side letters amending or supplementing contract terms that precluded revenue recognition, and because they knew UTSI did not have sufficient controls in place to assure stock compensation expenses were being recorded in accordance with GAAP. Lu and Sophie had been on notice from the Company's auditors since 3/03 that there were significant internal control deficiencies, including the need to "'strengthen procedures to ensure side letters and contract amendments are communicated and accounted for in a timely manner,'" received a second

1   Management Recommendation letter from PWC in 4/04, that again noted concerns about the use of

2   side letters that were not forwarded to the finance department, and received a third Management

3   Recommendation letter from PWC in 2005 in connection with the 2004 audit.  The fact that UTSI

4   restated and reduced revenues, gross margins and EPS for 2Q05, and that Lu and Sophie knew about

5   the significant internal control deficiencies strengthens the inference they knew there was no

6   reasonable basis for the guidance.

7         357.    In addition, by 5/5/05, Lu and Sophie knew there was no reasonable basis for the

8   guidance because they knew there were significant internal control weaknesses related to goodwill

9   that prevented the Company from identifying instances of goodwill impairment.  Indeed, UTSI

10  disclosed this problem in the 2004 Form 10-K filed on 4/15/05, and then recorded a $323 million

11  impairment charge in 3Q05.

12        358.    The significant internal control weaknesses at UTSI, the investigations by the

13  Company, the SEC and the DOJ into whether the Company obtained sales by bribing foreign

14  government officials in violation of the FCPA, and the unwinding of the Mongolian joint venture

15  transaction strongly infer that UTSI did obtain sales by bribing foreign government officials in

16  violation of the FCPA, and that Lu and Sophie knew these undisclosed problems also prevented

17  them from providing accurate guidance.

18        359.    **Effect on Stock Price:** On 5/6/05, UTSI's stock price declined 31% to $7.24

19  compared to a 1% decline in the PPG and a 0.3% increase in the NASDAQ.  Because the 5/5/05

20  disclosures revealed additional problems that had been previously concealed, including the impact of

21  the matured PAS market on UTSI's future results and the continued decline in PAS revenues and

22  gross margins, the decline in UTSI's stock price provides a measure of the economic damages that

23  were caused by the false and misleading statements before 5/5/05.

24        360.    **Loss Causation/Date of Loss:** Class members were damaged by the false and

25  misleading statements made on 5/5/05 when the price of the stock declined after some of UTSI's

26  true financial condition was revealed.  The stock price declined after (1) UTSI reported on 8/2/05

27  that 2Q05 results were less than 5/5/05 guidance, that 3Q05 revenues would decline and that 3Q05

28  EPS would be a negative $0.35-$0.40, (2) UTSI reported on 2/9/06 that it had improperly recognized

$22 million of revenue between 2003 and 2005, (3) UTSI reported on 3/16/06 that there would be a delay in filing the 2005 Form 10-K because the Audit Committee needed more time to investigate revenues that were improperly recorded, (4) the CFRA reported on 9/21/06 that UTSI might have stock option backdating issues, (5) UTSI reported on 11/7/06 that it was investigating stock options, (6) UTSI reported on 1/4/07 that two stock options had been backdated, (7) UTSI reported on 2/1/07 that it would have to restate its financial statements because it failed to account for stock options in accordance with APB 25, and (8) UTSI revealed on 7/23/07 and 10/10/07 that 2Q05 results would be restated.

361. **Nature of Loss:** Class members purchased UTSI stock at artificially inflated prices after 5/5/05 because the market did not know that (1) the significant internal control weaknesses caused UTSI to report false financial results and would cause UTSI to report false results in the future, and (2) revenues, gross margins and EPS would decline because of the operational problems, the reduction in PAS equipment orders, competition in the PAS handset market, the increasing costs of manufacturing the handsets, the partially disclosed problems with the development of the ASICs and CDMA handsets, and the undisclosed problems with the quality of UTSI's broadband equipment. These conditions would be gradually revealed on the dates listed above.

362. **Date of Statements and Statements:** On 8/2/05, UTSI issued a press release and held a conference call to announce 2Q05 results, including revenues below the guidance provided on 5/5/05 due to weak PAS and broadband revenues. In the press release and during the conference call, Lu and Sophie provided guidance for 3Q05 as follows:

Consolidated Third Quarter 2005 Guidance

| | |
|---|---|
| Total Revenues | Approximately $660-$680 million |
| Gross Profit Margins | Total Company: 15%-18% |
| | Not Including PCD: 30%-32% |
| Restructuring Charges | Approximately $5-$10 million |
| GAAP EPS | Loss of Approximately ($0.35-$0.40), |
| | inclusive of restructuring charges |

During the 8/2/05 conference call, Lu also stated that UTSI's new broadband products – particularly the mVision IPTV product – were being well received:

Lu: ***Our new products are [being] well received by carriers globally.*** We have [] deploy[ed] our mVision IP TV platform with [Softbank] broadband in Japan to

support their new BBTV service . . . . ***Our IP TV deployments with the [Softbank] BB demonstrate that success of UTStarcom's strategy*** of the working with our customer to build the comprehensive platform of a scalable solution to ensure their long-term growth.

Following Softbank's footsteps, ***DSSI, a CLEC serving communities in the southern, eastern United States is scheduled to [] launch the commercial IP TV and triple play services later this summer***.

363.   **Identity of Authors:** The press release was issued on behalf of UTSI and the statements are attributable to Lu and Sophie who were quoted in the press release.  Lu made the statements during the conference call that Sophie also attended.

364.   **True Facts:** UTSI did not report 3Q05 results in line with guidance:

|  | 8/2/05 Guidance | Reported | 6/1/06 Restatement | 10/10/07 Restatement |
|---|---|---|---|---|
| Revenues | $660-$680 million | $635.3 million | $632.0 million | $597.4 million |
| Gross Margin | 15%-18% | 8.5% | 8.4% | 6.3% |
| GAAP EPS | ($0.35-$0.40) | ($3.40) | ($3.43) | ($3.70) |

365.   The numerous problems with the Company's broadband products and the admissions on 10/6/05 that the revenue shortfall in 3Q05 was due to the delay in recognizing $40 million of revenue on a contract with SBBC for the Company's mVision equipment establish that UTSI's products were not being well received.

366.   **Scienter and Factual Basis for Scienter: Problems with mVision Product Sold to SBBC in 5/05, the SEC Suit Against Shey and Wells Notice to Lu:**  The SEC's investigation of insider trading at UTSI and its suit against Chauncey Shey ("Shey"), a co-founder and former officer and director of UTSI, raise a strong inference Lu and Sophie knew ***by 8/05*** that there were problems with the mVision IPTV product sold to SBBC in 5/05, that would cause the Company to report disappointing results in 3Q05.  On 12/22/06, the Company reported that Lu received a "Wells Notice" from the staff of the SEC on 12/18/06 in connection with an ongoing investigation into trading activities by third parties, that stated the staff intended to recommend to the SEC that it file a civil injunctive action alleging Lu violated §10(b) of the 1934 Act.

367.   On 9/6/07, the SEC announced it had filed insider trading charges against Shey because he and his wife sold 600,000 shares of UTSI stock between 10/3/05 and 10/6/05 after Shey had several telephone conversations with a UTSI senior executive (with whom Shey had co-founded

1   the Company) on 10/1/05, during which he learned that UTSI was going to pre-announce it had

2   missed revenue and earnings guidance for the quarter.  The SEC alleged that UTSI had included $40

3   million of projected revenue from a 5/05 sale of IPTV network equipment in its financial guidance to

4   securities analysts for 3Q05, and that *by 8/05, performance problems with the IPTV network had*

5   *arisen, which resulted in the customer refusing to provide final acceptance*.  By the end of 3Q05,

6   the UTSI executive knew that the $40 million of revenue could not be recognized because the

7   problems were not fixed, and that UTSI planned to pre-announce disappointing 3Q05 results the

8   following week.  Shey learned of the revenue shortfall during the telephone calls on 10/1/05.

9       368.    Shey agreed to settle the lawsuit by disgorging $420,226.60, the amount of losses

10  Shey avoided by selling the stock, and paying a civil penalty of $420,226.60.  The only plausible

11  inference from the above is that Lu and Sophie knew about the problems, and that Lu was the senior

12  UTSI executive that tipped off Shey so he could dump his stock.

13      369.    **Lu and Sophie knew there were problems with other broadband products:**

14  Information provided by the witnesses and the Company's lawsuit against Passave show that Lu and

15  Sophie also knew the problems with the mVision product sold to DSSI in 2004 and the problems

16  with the GEPON products sold to SBBC were getting worse.  According to UTSI lawsuit against

17  Passave, *by 7/05, UTSI learned of additional and more severe problems caused by the Passave*

18  *chip* – the defective chip was causing FTTH products to freeze entirely due to complete data

19  stoppages that were not recoverable, and SBBC was suffering epidemic-level freezing failures due to

20  Passave's chips.  In 2H05, CW13 also knew that SBBC had informed UTSI that the chips in the

21  GEPON product were failing.  As a result, and as UTSI alleged in the Passave suit, the Company

22  was forced to spend significant money, time and resources trying to find solutions for the problems,

23  but *by 8/05, SBBC demanded UTSI to replace the defective Passave chips.*  Passave told UTSI that

24  it would not be able to provide chips that resolved the problems until mid-2006.  CW13 also said the

25  defects required UTSI to replace all the GEPON chips in SBBC's FTTH network in 2006.  Both

26  CW13 and the Company's lawsuit said replacing the defective chips cost more than $30 million.

27      370.    The information provided by CW6, CW9 and CW16 establishes that the mVision

28  equipment sold to DSSI in 11/04 was still not working in 8/05 and that DSSI had returned the

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                              - 134 -

1    product and demanded UTSI fix it.  CW6 said that DSSI returned all of the mSwitch equipment to

2    UTSI before CW6 resigned in 10/05 and demanded that UTSI "completely redo the mSwitch."

3    CW9 said DSSI returned the servers and blades for the mSwitch to UTSI  in mid-2005 so an

4    upgraded version of software could be installed.  CW16 was assigned to the DSSI account in 2005

5    because DSSI had become increasingly upset with UTSI's inability to deliver a quality mVision

6    system.

7         371.   **Lu and Sophie knew the significant internal control weaknesses prevented them**

8    **from providing accurate guidance:** Lu and Sophie knew there was no reasonable basis for their

9    guidance because they knew (1) UTSI was recognizing revenue without sufficient controls in place

10   to ensure there were not side letters amending or supplementing contract terms that precluded

11   revenue recognition, and (2) UTSI did not have sufficient controls in place to assure stock

12   compensation expenses were being recorded in accordance with GAAP.  Lu and Sophie had been on

13   notice from the Company's auditors since 3/03 that there were significant internal control

14   deficiencies, including the need to "'strengthen procedures to ensure side letters and contract

15   amendments are communicated and accounted for in a timely manner,'" received a second

16   Management Recommendation letter from PWC in 4/04, that again noted concerns about the use of

17   side letters that were not forwarded to the finance department, and received a third Management

18   Recommendation letter from PWC in 2005 in connection with the 2004 audit.  The fact that UTSI

19   restated and reduced revenues and EPS in FY05 and that Lu and Sophie knew about the significant

20   internal control deficiencies strengthens the inference they knew there was no reasonable basis for

21   the guidance.

22        372.   Lu and Sophie also knew there was no reasonable basis for the guidance because they

23   knew there were significant internal control weaknesses related to goodwill that prevented the

24   Company from identifying instances of goodwill impairment.  Indeed, UTSI disclosed this problem

25   in the 2004 Form 10-K filed on 4/15/05, revealed on 10/6/05 that the Company might have to record

26   a goodwill impairment charge and then recorded a $323 million impairment charge in 3Q05, that

27   caused UTSI to report a loss per share of $3.40 compared to the guidance of a loss per share of

28   $0.35-$0.40.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 135 -

373.   The significant internal control weaknesses at UTSI, the investigations by the Company, the SEC and the DOJ into whether the Company obtained sales by bribing foreign government officials in violation of the FCPA, and the unwinding of the Mongolian joint venture transaction strongly infer that UTSI did obtain sales by bribing foreign government officials in violation of the FCPA, and that Lu and Sophie knew these undisclosed problems also prevented them from providing accurate guidance.

374.   **Effect on Stock Price:** On 8/3/05, UTSI's stock price declined 7.5% to $7.90 compared to no change in the PPG and the NASDAQ.  Analysts attributed the decline to revenues being less than guidance and less than expected revenue guidance for 3Q05.

375.   **Loss Causation/Date of Loss:** Class members were damaged by the false and misleading statements made on 8/2/05 when the price of the stock declined after some of UTSI's true financial condition was revealed.  The stock price declined after (1) UTSI reported on 10/6/05 that 3Q05 revenues would be less than guidance, that the Company might need to record a goodwill impairment charge and that the Company had received a formal inquiry from the SEC, (2) UTSI reported on 2/9/06 that it had improperly recognized $22 million of revenue between 2003 and 2005, (3) UTSI reported on 3/16/06 that there would be a delay in filing the 2005 Form 10-K because the Audit Committee needed more time to investigate revenues that were improperly recorded, (4) the CFRA reported on 9/21/06 that UTSI might have stock option backdating issues, (5) UTSI reported on 11/7/06 that it was investigating stock options, (6) UTSI reported on 1/4/07 that two stock options had been backdated, (7) UTSI reported on 2/1/07 that it would have to restate its financial statements because it failed to account for stock options in accordance with APB 25, and (8) UTSI revealed on 7/23/07 and 10/10/07 that 3Q05 results would be restated.

376.   **Nature of Loss:** Lead Plaintiffs and Class members purchased UTSI stock at artificially inflated prices after 8/2/05 because the market did not know that (1) the significant internal control weaknesses caused UTSI to report false financial results and would cause UTSI to report false results in the future, and (2) revenues, gross margins and EPS would decline significantly because of the reduction in PAS equipment orders, competition in the PAS handset market, the increasing costs of manufacturing the handsets, the partially disclosed problems with the

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 136 -

1  development of the ASICs and CDMA handsets, and the undisclosed problems with the quality of

2  UTSI's broadband equipment.  These conditions would be gradually revealed on the dates listed

3  above.

4  377.  **Date of Statements and Statements**: On 11/3/05, UTSI issued a press release and

5  held a conference call to report the Company's 3Q05 results and give 4Q05 guidance as follows:

6  ***Gross Profit Margin:  Total Company:  12-15%***

7  378.  **Identity of Authors:**  The press release was issued on behalf of UTSI and the

8  statement is also attributable to Lu who was quoted in the press release.  UTSI's new CFO, Barton,

9  reiterated the guidance during the 11/3/05 conference call in the presence of Lu and Sophie.

10  379.  **True Facts:** UTSI originally reported a gross margin of 12.1% in 4Q05 on 2/9/06

11  that was restated and reduced to 9.0% on 6/1/06 and restated to 9.2% on 10/10/07:

|              | 2/9/06   | 6/1/06   | 10/10/07 |
|--------------|----------|----------|----------|
| Revenue      | $685.5   | $675.6   | $681.1   |
| Cost of sales| $602.6   | $614.5   | $618.4   |
| Gross Profit | $82.9    | $61.1    | $62.7    |
| Gross Margin | **12.1%**| **9.0%** | **9.2%** |

16  380.  **Scienter and Factual Basis for Scienter:** Lu and Sophie knew there was no

17  reasonable basis for their guidance because they knew (1) UTSI was recognizing revenue without

18  sufficient controls in place to ensure there were not side letters amending or supplementing contract

19  terms that precluded revenue recognition, and (2) UTSI did not have sufficient controls in place to

20  ensure stock compensation expenses were being recorded in accordance with GAAP.  Lu and Sophie

21  had been on notice from the Company's auditors since 3/03 that there were significant internal

22  control deficiencies, including the need to "'strengthen procedures to ensure side letters and contract

23  amendments are communicated and accounted for in a timely manner,'" and received additional

24  Management Recommendation letters from PWC in 4/04 (that again noted concerns about the use of

25  side letters that were not forwarded to the finance department) and 2005.  The fact that UTSI restated

26  and reduced the 4Q05 gross margin from 12.1% to 9.2%, and that Lu and Sophie knew about the

27  significant internal control deficiencies strengthens the inference they knew there was no reasonable

28  basis for the guidance.

381.    The significant internal control weaknesses at UTSI, the investigations by the Company, the SEC and the DOJ into whether the Company obtained sales by bribing foreign government officials in violation of the FCPA, and the unwinding of the Mongolian joint venture transaction strongly infer that UTSI did obtain sales by bribing foreign government officials in violation of the FCPA, and that Lu and Sophie knew these undisclosed problems also prevented them from providing accurate guidance.

382.    **Effect on Stock Price:** UTSI's stock price increased from $5.44 on 11/3/05 to $6.47 on 11/4/05, a 19.6% increase, as compared to the 0.7% increase in the PPG and a 0.4% increase in the NASDAQ.

383.    **Loss Causation/Date of Loss:** Class members were damaged by the false and misleading statements made on 11/3/05 when the price of the stock declined after some of UTSI's true financial condition was revealed.  The stock price declined after (1) UTSI reported on 2/9/06 that it had improperly recognized $22 million of revenue between 2003 and 2005, (2) UTSI reported on 3/16/06 that there would be a delay in filing the 2005 Form 10-K because the Audit Committee needed more time to investigate revenues that were improperly recorded, and (3) UTSI revealed on 7/23/07 and 10/10/07 that the need to restate revenues improperly recognized in 4Q05 would cause the 4Q05 gross margin to decline from 12.1% to 9.2%.

384.    **Nature of Loss:** Class members purchased UTSI stock at artificially inflated prices after Lu and Sophie gave the 4Q05 guidance because the market still did not know that UTSI was recognizing revenues without sufficient controls in place to assure they were properly recognized and that gross margins were accurately reported.  If Lu and Sophie had acknowledged that they had no reasonable basis for giving guidance for gross margins, investors would have known the true condition of UTSI and lowered their expectations about the Company's current and future prospects which would have caused the stock price to decline as it did on the dates listed above.

### 4.    False and Misleading Statements in 2006

385.    **Date of Statements and Statements**: On 8/9/06, UTSI issued a press release and held a conference call to report the Company's 2Q06 results and give 3Q06 guidance as follows:

1                  ***Gross Profit Margin: Total Company: 16.5-18.5%***

2                          \*      \*      \*

3               ***GAAP EPS:***            ***Loss of approximately ($0.23) to ($0.33)***

4        386.     **Identity of Authors:** The press release was issued on behalf of UTSI and the

5 statement is also attributable to Lu, who was quoted in the press release. UTSI's new CFO, Barton,

6 reiterated the guidance during the 11/3/05 conference call in the presence of Lu.

7        387.     **True Facts:** On 10/10/07, UTSI reported gross margins of 12.4% for 3Q06,

8 substantially less than the 16.5%-18.5% guidance, and GAAP EPS of ($0.36), substantially less than

9 ($0.23) to ($0.33).

10        388.     **Scienter and Factual Basis for Scienter:** Lu knew there was no reasonable basis for

11 the guidance because he knew (1) UTSI was recognizing revenue without sufficient controls in place

12 to ensure there were not side letters amending or supplementing contract terms that precluded

13 revenue recognition, and (2) UTSI did not have sufficient controls in place to ensure stock

14 compensation expenses were being recorded in accordance with GAAP. Lu had been on notice from

15 the Company's auditors since 3/03 that there were significant internal control deficiencies, including

16 the need to "'strengthen procedures to ensure side letters and contract amendments are

17 communicated and accounted for in a timely manner,'" and received additional Management

18 Recommendation letters from PWC in 4/04 (that again noted concerns about the use of side letters

19 that were not forwarded to the finance department) and in 2005 and 2006. The fact that UTSI

20 reported 3Q06 gross margins and EPS substantially less than the guidance after the Company

21 restated its financial statements through 2Q06 and that Lu knew about the significant internal control

22 weaknesses strengthens the inference he knew there was no reasonable basis for the guidance.

23        389.     The significant internal control weaknesses at UTSI, the investigations by the

24 Company, the SEC and the DOJ into whether the Company obtained sales by bribing foreign

25 government officials in violation of the FCPA, and the unwinding of the Mongolian joint venture

26 transaction strongly infer that UTSI did obtain sales by bribing foreign government officials in

27 violation of the FCPA, and that Lu knew these undisclosed problems also prevented them from

28 providing accurate guidance.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                       - 139 -

1    390.   **Effect on Stock Price:** UTSI's stock price increased from $6.61 on 8/9/06 to $7.47

2    on 8/10/08, a 13.0% increase compared to a 0.6% decrease in the PPG and a 0.6% increase in the

3    NASDAQ.

4    391.   **Loss Causation/Date of Loss:** Class members were damaged by the false and

5    misleading statements made on 8/9/06 when the price of the stock declined after some of UTSI's

6    true financial condition was revealed.   The stock price declined after (1) the CFRA reported on

7    9/21/06 that UTSI might have stock option backdating issues, (2) UTSI reported on 11/7/06 that it

8    was investigating stock options, (3) UTSI reported on 1/4/07 that two stock options had been

9    backdated, (4) UTSI reported on 2/1/07 that it would have to restate its financial statements because

10   it failed to account for stock options in accordance with APB 25, and (5) UTSI revealed on 7/23/07

11   and 10/10/07 that 3Q06 results were less than the guidance provided on 8/9/06.

12   392.   **Nature of Loss:** Class members purchased UTSI stock at artificially inflated prices

13   after Lu provided the 3Q06 gross margin and EPS guidance on 8/9/06 because the market still did

14   not know that UTSI was recognizing revenues without sufficient controls in place or what the impact

15   of the stock compensation expense restatement would be on 3Q06 results.   If Lu acknowledged that

16   he had no reasonable basis for the guidance, investors would have known the true condition of UTSI

17   and lowered their expectations about the Company's current and future prospects, which would have

18   caused the stock price to decline as it did on the dates enumerated above.

19   **VI.   LOSS CAUSATION/ECONOMIC LOSS**

20   393.   During the Class Period, as detailed above, the Individual Defendants engaged in a

21   fraudulent scheme to deceive the market.   The scheme included a course of conduct that artificially

22   inflated UTSI's stock price and operated as a fraud or deceit on Class Period purchasers of UTSI

23   securities by misrepresenting the Company's current operations, business success and future

24   business prospects.   Later, however, when the prior misrepresentations and fraudulent conduct could

25   no longer be explained away as temporary set-backs and ***some*** of UTSI's true condition began to be

26   revealed to the market, UTSI's stock price declined and the amount of artificial inflation also began

27   to come out of the Company's stock price.   As a result, Class members who purchased UTSI stock

28   during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                              - 140 -

1    394.    The false and misleading statements and omissions caused and maintained the

2    artificial inflation in UTSI's stock price throughout the Class Period.  During the Class Period, UTSI

3    reported materially false and misleading financial results and falsely represented the Company's

4    financial reporting controls were effective when in fact there were numerous material weaknesses in

5    all aspects of the Company's operations, that were causing UTSI to report false and misleading

6    financial results.   Lu and Sophie also falsely represented that strength and growth in PAS

7    infrastructure spending in China was leading to strong PAS equipment sales at UTSI when they

8    knew orders had declined, there was excess capacity on existing PAS networks, and the growth rate

9    of PAS subscribers was declining.  Lu and Sophie falsely represented UTSI would report improved

10   gross margins on PAS handset sales by selling PAS handsets with lower cost internally developed

11   ASICs and by sales of internally manufactured CDMA handsets when they knew there were

12   undisclosed problems with the development of both that delayed their introduction.  Lu and Sophie

13   falsely represented UTSI's sales outside of China would increase the Company's revenues when

14   they knew most of these sales were related party transactions with defendant SOFTBANK and that

15   product quality problems and problems with the Company's supply chain were causing delivery

16   delays and delays in customers accepting and paying for the equipment.

17   395.    The false and misleading statements and omissions caused UTSI's stock to trade at

18   artificially inflated prices.  From 2/21/03 to 8/21/03, UTSI's stock price increased 150% – compared

19   to a 34% increase in the PPG and a 32% increase in the NASDAQ – and reached a Class Period high

20   of $45.36.  The increases in UTSI's stock price compared to the increases in the PPG and the

21   NASDAQ confirm that the false and misleading statements caused the price increase and negates

22   any inference the price increases were caused by market or industry conditions.  The Individual

23   Defendants took advantage of the inflated stock price by selling more than $40 million of their UTSI

24   stock, and registering and selling 12.1 million additional inflated shares for $475 million to acquire

25   cellular technologies and the handset division of Audiovox to diversify UTSI's product offerings and

26   reduce dependence on the declining China PAS market.

27   396.    Neither Lu, Sophie nor the other Individual Defendants made a complete corrective

28   disclosure confessing they were making false and misleading statements and concealing material

1  adverse inside information.  But they did gradually walk the stock down by partially disclosing *some*

2  of the previously concealed problems and *some* of the impact those problems were having on UTSI's

3  current financial condition and would have on the Company's future results.   These partial

4  disclosures were made on 10/23/03, 1/8/04, 3/29/04, 4/27/04, 7/27/04, 8/10/04, 9/20/04, 1/6/05,

5  3/31/05, 5/5/05, 8/2/05, 10/6/05, 2/9/06, 3/16/06, 4/13/06, 9/22/06, 11/7/06, 1/4/07, 2/1/07, 7/24/07

6  and 10/10/07, and caused UTSI's stock price to decline significantly more than the changes in the

7  PPG and the NASDAQ.  As a result, the price declines following the partial disclosures provide a

8  measurement of Class members' economic losses.

9      397.   The declines in UTSI's stock price following the partial disclosures compared to the

10  changes in the PPG and the NASDAQ negate any inference the losses suffered by Class members

11  were caused by changed market or industry conditions or Company-specific facts unrelated to the

12  fraudulent conduct.  The following chart (which is also attached hereto in foldout form) illustrates

13  the changes in UTSI's stock price during the Class Period compared to the PPG and the NASDAQ:



FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 142 -

1

**VII.  CLASS ACTION ALLEGATIONS AND FRAUD ON THE MARKET PRESUMPTION OF RELIANCE**

2

3          398.  Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

4    of Civil Procedure on behalf of all persons who purchased UTSI publicly traded securities on the

5    open market during the Class Period, and were damaged thereby (the "Class").  Excluded from the

     Class are defendants, directors and officers of UTSI and their families and affiliates.

6

7          399.  The members of the Class are so numerous that joinder of all members is

8    impracticable.  During the Class Period, the number of outstanding shares owned by hundreds if not

9    thousands of persons ranged between 102.9 million and 120.8 million.  Thus, the disposition of their

10   claims in a class action will provide substantial benefits to the parties and the Court.

11         400.  There is a well-defined community of interest in the questions of law and fact

12   involved in this case.  Questions of law and fact common to the members of the Class which

13   predominate over questions which may affect individual Class members include:

14         (a)    Whether the federal securities laws were violated by defendants;

15         (b)    Whether defendants engaged in a fraudulent scheme and omitted and/or

16   misrepresented material facts;

17         (c)    Whether defendants' statements omitted material facts necessary to make the

18   statements made, in light of the circumstances under which they were made, not misleading;

19         (d)    Whether defendants knew or deliberately disregarded that their statements

20   were false and misleading;

21         (e)    Whether the prices of UTSI's publicly traded securities were artificially

22   inflated;

23         (f)    Whether defendants' fraudulent scheme, misrepresentations and omissions

24   caused Class members to suffer economic losses, *i.e.*, damages; and

25         (g)    The extent of damage sustained by Class members and the appropriate

26   measure of damages.

27         401.  Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

28   purchased UTSI securities during the Class Period and sustained damages from defendants'

1    wrongful conduct.  Plaintiffs will adequately protect the interests of the Class and have retained

2    counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which

3    conflict with those of the Class.

4         402.    A class action is superior to other available methods for the fair and efficient

5    adjudication of this controversy.  A class action will achieve economies of time, effort and expense

6    and provide uniformity of decision to the similarly situated members of the Class without sacrificing

7    procedural fairness or bringing about other undesirable results.  Class members have not indicated an

8    interest in prosecuting separate actions.  The number of Class members and the relatively small

9    amounts at stake for individual Class members make separate suits impracticable.  No difficulties are

10   likely to be encountered in the management of this action as a class action.

11        403.    In addition, a class action is superior to other methods of fairly and efficiently

12   adjudicating this controversy because the questions of law and fact common to the Class

13   predominate over any questions affecting only individual Class members.  Although individual Class

14   members have suffered disparate damages, the fraudulent misrepresentations and omissions causing

15   damages are common to all Class members.  Further, there are no individual issues of reliance that

16   could make this action unsuited for treatment as a class action because all Class members relied on

17   the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

18        404.    The market for UTSI's common stock was open, well-developed and efficient at all

19   relevant times.  UTSI's stock met the requirements for listing, and was listed and actively traded on

20   the NASDAQ, a highly efficient and automated market.  UTSI filed periodic public reports with the

21   SEC and the NASDAQ.  UTSI regularly communicated with public investors via established market

22   communication mechanisms, including through regular disseminations of press releases on the

23   national circuits of major newswire services and through other wide-ranging public disclosures, such

24   as communications with the financial press and other similar reporting services.

25        405.    As alleged above, the change in the price of UTSI's stock – compared to the changes

26   in the PPG and the NASDAQ – in response to the release of unexpected material positive and

27   negative information about the Company, shows there was a cause and effect relationship between

28   the public release of the unexpected information about UTSI and the price movement in the

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                                    - 144 -

1    Company's stock.  The average weekly trading volume of UTSI's stock during the Class Period was

2    approximately 15.2 million shares or 12.9% of total outstanding shares.  Numerous analysts

3    followed UTSI, attended the Company's conference calls and issued reports throughout the Class

4    Period.  The Company was eligible to – and did – register securities on Form S-3 during the Class

5    Period.  There were numerous market makers for UTSI's stock.  Hundreds of institutions owned

6    between 53% and 75% of UTSI's outstanding shares during the Class Period and an even higher

7    percentage of the public float which was approximately 10-20 million shares lower than total

8    outstanding shares.

9        406.   As a result of the foregoing, the market for UTSI's common stock promptly digested

10   current information regarding UTSI from all publicly available sources and reflected such

11   information in UTSI's stock price.  Under these circumstances, all purchasers of UTSI's securities

12   during the Class Period suffered similar injury through their purchase of UTSI's securities at

13   artificially inflated prices and the subsequent revelations concerning declines in price, and a

14   presumption of reliance applies.

15   **VIII.   GROUP PLEADING AND CONTROL**

16       407.   Because of their senior executive and managerial positions with UTSI and UTSI's

17   Board and the numerous related party transactions between UTSI and SOFTBANK, the Individual

18   Defendants (as detailed in ¶¶30-33) and SOFTBANK (through Son) had access to the adverse

19   undisclosed information described herein.  The Individual Defendants and SOFTBANK obtained

20   such information through internal corporate documents, conversations and connections with other

21   corporate officers and employees, attendance at management and/or board of directors meetings and

22   committees thereof and through reports and other information provided to them in connection

23   therewith.  The Individual Defendants and SOFTBANK knew and with deliberate disregard ignored

24   the adverse information had not been disclosed to, and was being concealed from, the investing

25   public.

26       408.   It is appropriate to treat the Individual Defendants as a group for pleading purposes

27   and to presume that the false, misleading and incomplete information contained in the Company's

28   public filings, releases and other publications as alleged herein were the collective actions of the

1    narrowly defined group of Individual Defendants identified above. The Individual Defendants were

2    the most senior executives of UTSI, managed the day-to-day operations and had access to

3    confidential, proprietary information concerning the Company and its business, operations, products,

4    growth, financial statements, and financial condition, as alleged herein. The Individual Defendants

5    were involved in drafting, producing, reviewing and/or disseminating the false and misleading

6    statements and information alleged herein, were aware of or deliberately disregarded that the false

7    and misleading statements were being issued regarding the Company, and approved or ratified these

8    statements, in violation of the federal securities laws.

9           409.   As officers and/or directors and controlling persons of a publicly held company

10   whose common stock was, and is, registered with the SEC pursuant to the Securities Act of 1933

11   ("1933 Act"), traded on NASDAQ, and governed by the provisions of the federal securities laws, the

12   Individual Defendants and SOFTBANK each had a duty to disseminate promptly accurate and

13   truthful information with respect to the Company's financial condition and performance, growth,

14   operations, financial statements, business, products, markets, management, earnings and present and

15   future business prospects, and to correct any previously issued statements that had become

16   materially misleading or untrue, so that the market price of the Company's common stock would be

17   based upon truthful information. The Individual Defendants' misrepresentations and omissions

18   during the Class Period violated these specific requirements and obligations.

19          410.   Each of the Individual Defendants is liable as a direct participant with respect to the

20   wrongs complained of herein. In addition, the Individual Defendants and SOFTBANK, by reason of

21   their status as senior officers and/or directors (including SOFTBANK through Son and his

22   ownership in and business ties to UTSI), were "controlling persons" within the meaning of §20 of

23   the 1934 Act and §15 of the 1933 Act, and had the power and influence to cause the Company to

24   engage in the unlawful conduct complained of herein. Because of their positions of control, the

25   Individual Defendants and SOFTBANK were able to and did, directly or indirectly, control the

26   conduct of UTSI's business.

27

28

**FIRST CLAIM FOR RELIEF**

**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
Against UTSI and the Individual Defendants**

411.    Plaintiffs incorporate all paragraphs as if set forth herein.

412.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

413.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of UTSI publicly traded securities during the Class Period.

414.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UTSI publicly traded securities.  Plaintiffs and the Class would not have purchased UTSI publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

415.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of UTSI publicly traded securities during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violation of Section 14(a) of the 1934 Act and
Rule 14a-9 Against UTSI and the Individual Defendants**

416.    Plaintiffs incorporate all paragraphs as if set forth herein.

417. Rule 14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

418. UTSI's 4/2/03, 4/7/04, 4/18/05, 6/16/06 and 6/21/06 Proxy Statements were required to disclose the direct and indirect compensation of the Company's executive officers and directors, including a description of stock options granted to these individuals by the Company.

419. The Proxy Statements filed with the SEC during the Class Period falsely represented that the exercise prices of the stock options were the market price of UTSI's stock on the date of the option grant, when in fact the options were backdated to dates such that the exercise prices were less than the market price of the stock on the misrepresented date of the grant. The Proxy Statements also set forth the options granted each year to directors and executives, including the Individual Defendants, the purported option grant dates and the purported exercise prices of such options. The Company has admitted that those representations were false, and that the options were actually granted on different dates when the price of the Company's stock was less than the price of the Company's stock on the misrepresented grant date.

420. The Proxy Statements violated §14(a) of the 1934 Act and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing UTSI to engage in an option backdating scheme, a fact which defendants were aware of and participated in from even before the Class Period through 2Q06, resulting in the Company understating stock compensation expenses by $27.2 million.

421. In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading.

422. The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders'

1  endorsement of the directors' positions, the executive officers' compensation and the Company's

2  compensation policies.

3      423.   Plaintiffs were damaged as a result of the material misrepresentations and omissions

4  in the Proxy Statements because, among other things, the Company awarded millions of stock

5  options pursuant to plans that were invalidly approved by shareholders.

6                          **THIRD CLAIM FOR RELIEF**

7              **For Violation of Section 20(a) of the 1934 Act**
               **Against the Individual Defendants and SOFTBANK**

8      424.   Plaintiffs incorporate all paragraphs as if set forth herein.

9      425.   The Individual Defendants and SOFTBANK acted as controlling persons of UTSI

10  within the meaning of §20(a) of the 1934 Act.  They prepared, or were responsible for preparing, the

11  Company's press releases and SEC filings.  By reason of their positions as officers and/or directors

12  of UTSI, and their ownership of UTSI stock, the Individual Defendants and SOFTBANK had the

13  power and authority to cause UTSI to engage in the wrongful conduct complained of herein.  UTSI

14  controlled each of the Individual Defendants and all of its employees.  By reason of such conduct,

15  defendants are liable pursuant to §20(a) of the 1934 Act.

16                          **PRAYER FOR RELIEF**

17      WHEREFORE, plaintiffs pray for relief and judgment, including preliminary and permanent

18  injunctive relief, as follows:

19      A.   Determining that this action is a proper class action, and certifying plaintiffs as Class

20  representatives under Rule 23 of the Federal Rules of Civil Procedure;

21      B.   Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the

22  Class against defendants and their counsel, agents and all persons acting under, in concert with, or

23  for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze

24  on defendants' insider trading proceeds;

25      C.   Ordering an accounting of defendants' insider-trading proceeds;

26      D.   Disgorgement of defendants' insider-trading proceeds;

27      E.   Restitution of investors' monies of which they were defrauded;

28

1      F.      Awarding compensatory damages in favor of plaintiffs and the other Class members

2  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

3  wrongdoing, in an amount to be proven at trial, including interest thereon;

4      G.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

5  action, including counsel fees and expert fees; and

6      H.      Such other and further relief as the Court may deem just and proper.

7                                        **JURY DEMAND**

8      Plaintiffs demand a trial by jury.

9  DATED:  May 14, 2008                      COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
10                                          CHRISTOPHER P. SEEFER
                                            SHIRLEY H. HUANG
11                                          SYLVIA SUM

12

13                                              /s/ Christopher P. Seefer
                                            CHRISTOPHER P. SEEFER
14
                                            100 Pine Street, Suite 2600
15                                          San Francisco, CA  94111
                                            Telephone:  415/288-4545
16                                          415/288-4534 (fax)

17                                          Lead Counsel for Plaintiffs

18  T:\CasesSF\UTStarcom\CPT00050650_4th amend.doc

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - C-04-4908-JW(PVT)                              - 150 -

1  <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on May 14, 2008, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7      I further certify that I caused this document to be forwarded to the following designated

8  Internet site at:  http://securities.csgrr.com/.

9      I certify under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.  Executed on May 14, 2008.

11

12       /s/ Christopher P. Seefer
      CHRISTOPHER P. SEEFER

13      COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP
14      100 Pine Street, 26th Floor
      San Francisco, CA  94111
15      Telephone:  415/288-4545
      415/288-4534 (fax)
16      E-mail:Chriss@csgrr.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:04-cv-04908-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patricia I. Avery**
  pavery@wolfpopper.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Patrick J. Coughlin**
  PatC@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Stephanie L. Dieringer**
  sldieringer@hulettharper.com,office@hulettharper.com

- **Kimberly C. Epstein**
  kimcor@lerachlaw.com,mariam@lerachlaw.com,e_file_sf@lerachlaw.com

- **Boris Feldman**
  boris.feldman@wsgr.com,ncarvalho@wsgr.com

- **Vincent P. Finigan , Jr**
  vfinigan@morganlewis.com

- **Cheryl Weisbard Foung**
  cfoung@wsgr.com,bhickman@wsgr.com

- **Marvin L. Frank**
  mfrank@murrayfrank.com,info@murrayfrank.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Philip Howard Gordon**
  pgordon@gordonlawoffices.com,tmurphy@gordonlawoffices.com

- **Scott Christensen Hall**
  halls@sullcrom.com,herediak@sullcrom.com,singhl@sullcrom.com

- **Shirley H. Huang**
  shirleyh@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Terry T. Johnson**
  tjohnson@wsgr.com,calendar@wsgr.com,lkerska@wsgr.com,mevenson@wsgr.com

- **Christopher J. Keller**
  ckeller@labaton.com,cchan@labaton.com

- **Amanda Lenore Kosowsky**
  amanda.kosowsky@cwt.com

- **Michael John Lawson**
  michael.lawson@morganlewis.com,rluke@morganlewis.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **Elizabeth Pei Lin**
  elin@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Gregory A Markel**
  gregory.markel@cwt.com

- **Mark Punzalan**
  mpunzalan@finkelsteinthompson.com

- **Rachele R. Rickert**
  rickert@whafh.com

- **Amie Danielle Rooney**
  rooneya@sullcrom.com

- **Robert Andrew Sacks**
  sacksr@sullcrom.com

- **Christopher Paul Seefer**
  chriss@csgrr.com,jdecena@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.c

- **Ronit Setton**
  ronit.setton@cwt.com

- **Bahram Seyedin-Noor**
  bnoor@wsgr.com,rlustan@wsgr.com

- **Sylvia Sum**
  SSum@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Inna Zatulovsky**
  izatulovsky@morganlewis.com,dlang@morganlewis.com

- **Jason de Bretteville**
  debrettevillej@sullcrom.com,laytej@sullcrom.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into

your word processing program in order to create notices or labels for these recipients.

**Sam Brott**
550 West C Street
San Diego, CA 92101

**Paul T. Curley**
Murray Frank & Sailer LLP
275 Madison Avenue
Suite 801
New York, NY 10016

**Dale MacDiarmid**
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Ronit Sutton's**
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281